```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3                             - - -
    RESEARCH FOUNDATION OF STATE
 4  UNIVERSITY OF NEW YORK, et al.,  :   CIVIL ACTION
                                     :
 5                    Plaintiffs,    :
                                     :
 6  v.                               :
                                     :
 7  MYLAN PHARMACEUTICALS, INC.,     :
                                     :   NO. 09-184-LPS
 8                    Defendant.     :
    ---------------------------------
 9  MYLAN PHARMACEUTICALS, INC.,
                                     :   CIVIL ACTION
10            Plaintiff,             :
                                     :
11            v.                     :
                                     :
12  GALDERMA LABORATORIES,INC.,      :
    GALDERMA LABORATORIES, L.P., and :
13  SUPERNUS PHARMACEUTICALS, INC.,  :   NO. 10-892-LPS
                                     :
14            Defendants.
                              - - -
15
                         Wilmington, Delaware
16                       Thursday, July 7, 2011
                         BENCH TRIAL - VOLUME C
17

18                            - - -

19  BEFORE:      HONORABLE LEONARD P. STARK, U.S.D.C.J.

20  APPEARANCES:                     - - -

21          MORRIS NICHOLS ARSHT & TUNNELL, LLP
            BY:  JACK B. BLUMENFELD, ESQ.
22
                   and
23

24
                              Brian P. Gaffigan
25                            Valerie Gunning
                              Official Court Reporters
```

```
 1    APPEARANCES (Continued):

 2
                  PAUL HASTING JANOFSKY & WALKER, LLP
 3                BY:  GERALD J. FLATTMANN, ESQ.,
                       CHRISTINE WILLGOOS, ESQ.,
 4                     JOSEPH M. O'MALLEY, JR., ESQ., and
                       MELANIE R. RUPERT, ESQ.
 5                     (New York, New York)

 6                          Counsel for Research Foundation of
                            State University of New York, Galderma
 7                          Laboratories, Inc., New York University,
                            Galderma Laboratories, L.P., and
 8                          Supernus Pharmaceuticals, Inc.

 9
                  POTTER, ANDERSON & CORROON, LLP
10                BY:  RICHARD L. HORWITZ, ESQ.

11                     and

12                WILSON SONSINI GOODRICH & ROSATI, PC
                  BY:  DAVID S. STEUER, ESQ.,
13                     MATTHEW R. REED, ESQ., and
                       KIRIN K. GILL, ESQ.
14                     (Palo Alto, California)

15                     and

16                WILSON SONSINI GOODRICH & ROSATI, PC
                  BY:  TUNG-ON KONG, ESQ.
17                     (San Francisco, California)

18                     and

19                WILSON SONSINI GOODRICH & ROSATI, PC
                  BY:  LORI P. WESTIN, ESQ.,
20                     (San Diego, California)

21                          Counsel on behalf of
                            Mylan Pharmaceuticals, Inc.
22

23

24

25
```

```
1                         - oOo -

2                  P R O C E E D I N G S

3              (REPORTER'S NOTE:  The following trial

4   proceedings was held in open court, beginning at 9:05 a.m.)

5              THE COURT:  Good morning, everyone.

6              Any issues anybody wishes to raise before I

7   begin?

8              MS. WILLGOOS:  There are a few objections that

9   we'd like to take care of, your Honor.

10             THE COURT:  All right.  Your objections?

11             MS. WILLGOOS:  Yes.

12             THE COURT:  Go ahead.  Come to the podium,

13  please.

14             MS. WILLGOOS:  Thank you, your Honor.  There are

15  two documents that we're objecting to the admissibility of.

16  One is DTX-1014 that Mylan seeks to get in through the

17  testimony of Robert Ashley.  The document is an internal

18  Supernus e-mail.  Mr. Ashley was never a copy recipient or

19  an author of the e-mail and he was never an employee and

20  never -- was involved in any way with the e-mail chain, as

21  he testified at the depositions.  We object to that on lack

22  of foundation and hearsay.

23             The second document is a Supernus e-mail,

24  DTX-1085, and, again, they seek to get that through the

25  testimony of Dr. Chang, who was neither a copy recipient nor
```

1    an author of the e-mail, and so we will also object to that

2    on lack of foundation and hearsay, your Honor.

3                    THE COURT:  Excuse me.  Is it your understanding

4    that defendants intend to play more of the Ashley deposition

5    or is he appearing live?

6                    MS. WILLGOOS:  No.  They intend to play more of

7    his deposition testimony as do we as part of our affirmative

8    rebuttal case, your Honor.

9                    THE COURT:  All right.  Thank you.

10                   MS. WILLGOOS:  Okay.

11                   THE COURT:  Let me hear from Mylan, please.

12                   MR. KONG:  Good morning, your Honor.

13                   THE COURT:  Good morning.

14                   MR. KONG:  Just to answer one logistical

15   question, Mr. Ashley was deposed twice.  So the first

16   deposition was played.  I believe the second deposition is

17   intended to be played today.

18                   To respond to the issues raised by Ms. Willgoos,

19   would your Honor like to see the documents in question?

20                   THE COURT:  Sure.  Could you pass those up?

21                   MR. KONG:  Sure.

22                   (Mr. Kong handed documents to the Court.)

23                   MR. KONG:  So, your Honor, as to -- well, first

24   of all, generally, both documents are e-mails exchanged

25   between CollaGenex and Shire.

1              CollaGenex, if your Honor will recall, is the

2      predecessor entity to Galderma, who was a plaintiff in one

3      of the cases, a defendant in the other case.  Shire is the

4      predecessor to Supernus.  So these are e-mails exchanged

5      between two parties represented by counsel.

6              As to 1014, the document used with Mr. Ashley,

7      that document records statements made by Mr. Ashley.  As to

8      the other document, it actually contains reference to the

9      parameter they wanted to use, and both of these documents

10     are relevant to the issue of the Chang patent and the proper

11     inventorship of the Chang patent.

12             The other e-mail, 1085, I believe it is,

13     references specifications that were used by -- requested

14     by CollaGenex and used by Shire for purposes of

15     formulation.

16             THE COURT:  And what about the contention that

17     they're hearsay?

18             MR. KONG:  Well, it's our position that they're

19     party admissions, your Honor.

20             THE COURT:  All right.

21             MR. KONG:  Thank you.

22             THE COURT:  Thank you.

23             Ms. Willgoos, a response?

24             MS. WILLGOOS:  Just briefly, your Honor.  The

25     fact that the parties are, in the e-mail exchange, are both

1    represented by counsel is irrelevant to the issue of whether

2    there's proper foundation or whether the documents are

3    hearsay.

4              And simply particularly for the Ashley document,

5    DTX-1014, Mr. Ashley was not part of that e-mail chain, and

6    so for both of these documents, there's lack of foundation

7    and they are hearsay.

8              THE COURT:  Is Mr. or Dr. Chang testifying by

9    deposition?

10             MS. WILLGOOS:  By deposition, your Honor.

11             THE COURT:  Well, all right.  Thank you.

12             I'm going to reserve ruling on the

13   admissibility.  We're going to hear the deposition

14   testimony.  I'm not sure at what point in the day you'll get

15   to it.  I will get you a ruling today on the admissibility

16   of these two documents, but in the meantime, proceed in

17   whatever order you wish, and we'll hear the testimony later

18   if there's no objection to the testimony that's going to be

19   played.

20             Anything else the plaintiff wishes to raise?

21             MS. WILLGOOS:  Not at this time, your Honor.

22             THE COURT:  Anything from the defense?

23             MR. STEUER:  Your Honor, just quickly on a

24   scheduling issue, late night communications suggest that we

25   may close out the evidence today.  We might do it before

1    6:00 o'clock.  And if that's the case, I would propose that

2    the parties come back tomorrow morning, if they have time

3    left, to present closing arguments.

4              THE COURT:  Any objection to that?

5              MR. O'MALLEY:  No objection.

6              THE COURT:  All right.  That will be fine.  And

7    if you finish today, that's certainly fine as well.

8              I wanted to clarify, I don't think there's any

9    confusion on this, but in terms of the briefing schedule,

10   which I agreed to yesterday, I just want to make sure you

11   all understand, to the extent there are objections that we

12   are noting and not ruling on, which I think are only beyond

13   the scope of the expert report, if you are going to renew

14   those and brief those, that is to be done within those page

15   limits that I agreed to yesterday.  I don't want to see

16   extra motions or extra briefing beyond what you all have

17   proposed and I agreed to yesterday.

18             All right.  If that takes care of all the

19   issues, let's proceed with whoever the next witness

20   is.

21             MR. REED:  Thank you, your Honor.  Mylan calls

22   Dr. Werner Rubas.

23             THE COURT:  All right.

24             ... WERNER RUBAS, having been duly sworn

25             as a witness, was examined and testified as

Rubas - direct

1                follows ...

2                THE COURT:  Good morning, Dr. Rubas.

3                THE WITNESS:  Good morning.

4                THE COURT:  You may proceed.

5                MR. REED:  Thank you, your Honor.

6                     DIRECT EXAMINATION

7      BY MR. REED:

8      Q.    Dr. Rubas, would you please introduce yourself to the

9      Court.

10     A.    Good morning.  My name is Werner Rubas, and I'm from

11     Redwood City, California.

12     Q.    Are you here testifying as an expert witness on

13     before of Mylan?

14     A.    Yes, I am.

15     Q.    And can you briefly describe your educational

16     background?

17     A.    I'm a pharmacist by training.  I obtained my degree

18     in Zurich from the Swiss Federal Institute of Technology in

19     1982.  I also received a Ph.D. from the same institution in

20     1987.

21     Q.    Tell us about your current job.

22     A.    I'm the founder, president and CEO of a

23     pharmacokinetic consulting company.

24     Q.    Tell us just a little bit about that company.

25     A.    The company is providing pharmacokinetic services to

1    the pharmaceutical and biopharmaceutical industry.

2    Q.    And what positions did you hold prior to founding

3    this consulting company?

4    A.    After completion of my Ph.D., I had a teaching

5    position at the Swiss Federal Institute of Technology.   I

6    assumed a post-doctoral fellowship in 1989 in Syntex in Palo

7    Alto, California.

8              I progressed through my career from a

9    scientist at Genentech to become a senior scientist at Core

10   Therapeutics.  I was recruited by a startup company as an

11   associate director of pharmacokinetics at the end.  I was

12   working at Roche Palo Alto also as an associate director,

13   pharmacokinetics.

14   Q.    I appreciate you speaking close to the microphone,

15   but that might be just a little bit too close.

16             Can you please describe your current involvement

17   in academic organizations.

18   A.    Sure.  I'm on the advisory board of SPARK.  SPARK is

19   an organization at the medical institute of the Stanford

20   University.  The purpose of the SPARK program is to lead as

21   academic research in the pharmaceutics with the industry.

22   Q.    Can you tell us about your publications in

23   pharmacokinetics.

24   A.    Sure.  I published approximately 50 papers.  This

25   includes numerous abstracts, peer-reviewed articles, book

Rubas - direct

1   chapters and review papers.

2   Q.    Please describe your work as a peer reviewer of

3   scientific manuscripts for potential publication in the

4   pharmacokinetic field.

5   A.    During the years of 1990, I was peer reviewing for a

6   journal called Pharmaceutical Research.  During that time, I

7   reviewed numerous abstracts and articles that were submitted

8   for publication.

9   Q.    For about how long did you do that?

10  A.    For about eight to nine years.

11  Q.    Dr. Rubas, could you tell us about some

12  accomplishments of yours that stand out in the field of

13  pharmacokinetics.

14  A.    Sure.  When I was a post-doc at Syntex, we pioneered

15  an absorption model called Caco-2 monolayers.  This model

16  became the industry standard to examine the potential for

17  absorption for new drug entities.

18                  I also successfully predicted a

19  pharmacokinetic profiles of new drug ANDAs in animals and in

20  human beings.

21  Q.    Would you please look at Exhibit DTX-2194 in the

22  binder in front of you, please.

23  A.    Yes.

24  Q.    Do you see that?

25  A.    Yes, I do.

Rubas - direct

1    Q.      What is that document?

2    A.      This is my curriculum vitae.

3    Q.      Is this an accurate summary of your educational and

4    professional background?

5    A.      Yes, it is.

6              MR. REED:  I offered DTX-2194, your Honor.

7              THE COURT:  Is there any objection?

8              MR. O'MALLEY:  No objection, your Honor.

9              THE COURT:  It's admitted.

10             (DTX-2194 received into evidence.)

11             MR. REED:  Your Honor, we offer Dr. Rubas as an

12   expert in the area of pharmacokinetic and pharmacokinetic

13   modeling.

14             MR. O'MALLEY:  No objection.

15             THE COURT:  He is so recognized.

16   BY MR. REED:

17   Q.      Dr. Rubas, what were you asked to do in this case?

18   A.      I was given two questions regarding the

19   pharmacokinetic properties of doxycycline in the context of

20   the Chang patent.

21   Q.      Have you prepared a slide summarizing your opinions?

22   A.      Yes, I have.

23   Q.      Will you please describe your opinions for us?

24   A.      On this slide, I showed two opinions:

25             The first opinion is saying that prior to

Rubas - direct

1      April 2003, a person of ordinary skill in the art knew or

2      could have known that a 40 milligram daily dose of immediate

3      release doxycycline would provide steady state plasma

4      concentrations of between .1 and 1 microgram per mil.

5              The second opinion here on the slide speaks to

6      the fact that a person of ordinary skill in the art knew or

7      could have known the ratio of immediate release to delayed

8      release particles in a 40 milligram daily dose of

9      doxycycline that would also provide a steady state plasma

10     concentrations of between .1 and 1 microgram per mil.

11     Q.     What did you consider in forming your opinions?

12     A.     We summarized the resources that I considered.  I

13     understand the ordinary skill in the art.  I used my own

14     education and my professional experience.  I reviewed

15     numerous scientific papers.  I applied legal principles.

16             I also reviewed documents produced by the

17     parties, the expert opinions by the plaintiff as well as the

18     Chang patent.

19     Q.     Could you please briefly explain what the discipline

20     of pharmacokinetics is?

21     A.     Yes.  Pharmacokinetics is the science that describes

22     the time dependent change of the drug in an organism such as

23     human beings.

24     Q.     How is pharmacokinetics used?

25     A.     Pharmacokinetics is used in many ways.  In one way,

Rubas - direct

1    it's used to compare different compounds.  It's also used to

2    compare the same compound administered in different

3    formulations, and it can also be used to create models and

4    perform simulations.

5    Q.    Is the word pharmacokinetics sometimes abbreviated

6    PK?

7    A.    Yes, it is.

8    Q.    How do you measure or assess pharmacokinetic

9    parameters?

10   A.    You would have to administer a compound to a host

11   organism, that could be an animal, that could be a human

12   being.  Over the time course of your experiment, you take

13   multiple blood samples.  You would estimate or you would

14   determine the concentration of the drug in the blood samples

15   and from the time plasma concentration time curve, you can

16   extract pharmacokinetic parameters.

17   Q.    Would you please give us some examples of

18   pharmacokinetic parameters that can be measured?

19   A.    Yes.  This is a list that includes but is not limited

20   to, for example, the plasma concentration.  When the plasma

21   concentration reaches the highest point, we call it a

22   maximum concentration.

23          When we talk about a trough level or Cmin, that

24   is usually at the end of the collection period or determined

25   time period.

Rubas - direct

1          A drug exhibits a half-life which dictate how

2    quickly that is exiting the system.

3          We also can extract the area under the curve,

4    AUC.

5          Bioavailability can be estimated and several

6    other parameters.

7    Q.    What can a practitioner do with these pharmacokinetic

8    parameters?

9    A.    A practitioner will take these parameters and

10   compare between different compounds, able to use these

11   parameters as well as when the same compound is given a

12   different administration or in different formulations or, as

13   I mentioned earlier, I will use these parameters to perform

14   simulations.

15   Q.    Please tell us where a person of ordinary skill in

16   the art will find these kinds of PK parameters?

17   A.    This information is typically found in the scientific

18   literature.  If we are talking about commercialized

19   products, then you will find the information in the label.

20   You find it also in books such as the Physician's Desk

21   Reference book which will list a lot of these parameters.

22   Q.    In April 2003, what amount of information was known

23   about doxycycline?

24   A.    There was wealth of information regarding

25   pharmacokinetics known for doxycycline.  What I show on this

Rubas - direct

1    slide is there are five brand names on the market for

2    doxycyclines, and the very first one was introduced in 1967.

3              There are numerous original articles that

4    describe the pharmacokinetic properties of doxycycline.

5              There are at least a couple of review articles

6    that have summarized and reviewed the prior -- the

7    literature of the pharmacokinetics for doxycycline.

8              It was stated in these articles that doxycycline

9    behaves in a dose linear fashion, and a biopharmaceutic

10   classification system was also established before 2003 and

11   the compound was classified as a class 1 compound.

12   Q.    Would you please take a look in your binder at

13   Exhibit DTX-2205.

14   A.    I have in it front of me.

15   Q.    What is this document?

16   A.    This document is a review article written by Kenneth

17   Agwuh and also Alasdair MacGowan.

18   Q.    Is this an exhibit that you relied on in your

19   opinions?

20   A.    Yes.

21              MR. REED:  I offer DTX-2205.

22              MR. O'MALLEY:  No objection.

23              THE COURT:  It's admitted.

24              (DTX-2205 received into evidence.)

25   BY MR. REED:

Rubas - direct

1   Q.      And please turn to the next exhibit in your binder,

2   DTX-2206 and tell us what is this document.

3   A.      This document is another review article by Saivin and

4   Owen.

5   Q.      And did you rely on this document in forming your

6   opinions?

7   A.      Yes, I did.

8                   MR. REED:  I offer DTX-2206.

9                   MR. O'MALLEY:  No objection.

10                  THE COURT:  It's admitted.

11                  (DTX-2206 received into evidence.)

12  BY MR. REED:

13  Q.      Of the pharmacokinetic parameters of doxycycline

14  available prior to April 2003, which did you look at in

15  forming your opinions in this case?

16  A.      Yes.  So I go back to the slide that is available

17  here.  So I relied on the label for Periostat that was up

18  there in 1998.  And I also relied on the information in the

19  Physician's Desk Reference book with represent to Monodox.

20  Q.      What other public available information did you rely

21  upon?

22  A.      As we just discussed, there are numerous individual

23  articles and review articles, and I relied on those as well.

24  Q.      In addition to the pharmacokinetic properties that

25  were known, what was known about absorption of doxycycline

Rubas - direct

1    prior to April 2003?

2    A.    Here is a section of a paragraph from the review from

3    Saivin, and what the review states here is after review in

4    these original papers is the absorption primarily occurs in

5    the duodenum.

6    Q.    Now, have you heard the phrase "absorption window?"

7    A.    Yes, I have.

8    Q.    Is absorption window something a pharmacokineticist

9    would consider when forming a drug?

10   A.    Yes.

11   Q.    In this case, did you know the absorption window of

12   doxycycline?

13          MR. O'MALLEY:  Objection, your Honor.  Beyond

14   the scope of his expert opinion.

15          THE COURT:  The objection is noted.

16          You can answer.

17          THE WITNESS:  I applied the information stated

18   in this article.

19   BY MR. REED:

20   Q.    Now, can you remind us what opinion you formed

21   regarding immediate release doxycycline based on your work

22   in this case?

23   A.    My opinion is here on the slide, and it states that

24   prior to April 2003, a person of ordinary skill in the art

25   knew or could have known that a 40 milligram daily dose of

Rubas - direct

1    immediate release doxycycline would provide steady state

2    plasma concentrations of between .1 and 1 microgram per mil.

3    Q.     What methods did you use to come to the conclusion

4    that this was predictable?

5    A.     I used two methods.  One method was a dose

6    normalization method.  The second one was a compartment

7    modeling.

8    Q.     Tell us what information you needed to know to be

9    able to employ the first method, dose normalization?

10   A.     I had to first establish that the pharmacokinetics of

11   doxycycline was following a linear fashion.

12   Q.     And why was that important?

13   A.     That is important because if it would not follow a

14   linear fashion, then my approach will be invalid.

15   Q.     What does knowing that doxycycline specifically is

16   dose linear allow you to do?

17   A.     Once you have established the dose linear

18   pharmacokinetic is in existence, then you can basically take

19   the pharmacokinetic concentration at a particular dose, and

20   when you double the dose, for example, then the

21   concentration at that particular time point will also

22   double.

23   Q.     How did you use dose normalization in your

24   pharmacokinetic modeling?

25   A.     I applied this for my dose normalization, and I also

Rubas - direct

1    applied it for my compartment modeling.

2    Q.    With respect to dose normalization first, what

3    information did you use and how did you use it?

4    A.    I show here on this slide the information provided in

5    the label of Periostat.  What we're looking here is a single

6    20 milligram dose of tablets.  There is 20 individual, and I

7    want to point out the highlighted column which indicates the

8    maximum concentration which is here, 362 nanograms per mil

9    plus or minus 101 nanogram per mil.

10   Q.    And what did you do with that data?

11   A.    So when you double the dose to 40 milligrams as an

12   example, then you double the Cmax concentration, and we show

13   the outcome at the bottom here, so when you doubled it to

14   .362 microgram will basically become a .724 microgram per

15   mil.

16   Q.    How does that relate to your first opinion?

17   A.    That relates to my first opinion that it was

18   predictable to -- it was predictable that the 40 milligram

19   immediate release doxycycline will stay between .1 and

20   1 microgram per mil.

21   Q.    Did you perform a dose linear normalization with data

22   from any other source other than the Periostat label?

23   A.    Yes.  I examined the literature provided by Malmberg

24   and coworkers, and I did a dose normalization based on that

25   data and I came to the same conclusion.

762

Rubas - direct

1   Q.      Did you hear Dr. Rudnic's criticism of your use of

2   mean data for tablets --

3   A.      Yes.

4   Q.      -- instead of capsules?

5   A.      Yes.

6   Q.      What data was available to you when you performed

7   your work?

8   A.      Tablet data.

9   Q.      Did you use any capsule data in your work?

10  A.      Yes.  I used the capsule data from the Monodox.

11  Q.      How did you use this Monodox capsule data?

12  A.      The Monodox data in the Physician's Desk Reference

13  book provides a table that lists the concentration at

14  different time points and we showed this on the next slide.

15          The table here shows two rows.  The top row here

16  is the times.  So blood samples were taken from the first

17  one was .5 hours all the way out to 72 hours.

18          And on the bottom row, we see the concentration

19  at the respective time point in microgram per mil, also from

20  30 minutes out to 72 hours.

21  Q.      Can you describe the Physician's Desk Reference that

22  you used to obtain this data?

23  A.      This is a typical book that a physician in practice

24  would consult to inform him or her what the pharmacokinetic

25  properties of a particular drug would be.  It has sometimes

Rubas - direct

1    this information.  It has the Cmax in there.  It has Tmax

2    and whatever he needs to know to be sure that he provides

3    the correct dose.

4    Q.      And do you recall the year in which the particular

5    version of the Physician's Desk Reference for Monodox used

6    that you used?

7    A.      I believe it was 1986.

8    Q.      Would you turn to Exhibit DTX-2201, please.

9    A.      I have it.

10   Q.      Is this the Physician's Desk Reference that you

11   relied upon?

12   A.      Yes, it is.

13   Q.      And what year is this?

14   A.      1997.

15   Q.      So you remembered it wrong.

16   A.      Okay.

17   Q.      Is that right?

18   A.      Yes.

19              MR. REED:  Your Honor, I offer DTX-2201.

20              MR. O'MALLEY:  No objection.

21              THE COURT:  It's admitted.

22              (DTX-2201 received into evidence.)

23   BY MR. REED:

24   Q.      Why did you select this data as the basis for

25   building your pharmacokinetic model?

Rubas - direct

1    A.      There were two primary reasons.  Data provided here

2    is dense enough that I can do my modeling.

3           Secondly, in reviewing the documents that I

4    obtained from counsel from the plaintiffs, it became obvious

5    that they also used this data set for their own modeling and

6    simulation.

7    Q.      Now, you are not talking about plaintiffs' experts;

8    right?

9    A.      No.  I found this in the documents.

10   Q.      From plaintiffs themselves?

11   A.      Yes.

12   Q.      Did you hear Dr. Rudnic criticize your use of mean

13   data instead of individual data in your modeling?

14   A.      Yes, I did.

15   Q.      What data was available to a person of ordinary skill

16   in the art in April 2003?

17   A.      This is only the average data will be available to a

18   person of ordinary art -- ordinary skill in the art.

19   Q.      If individual data were available, how would you have

20   used it?

21   A.      If the individual data would have been available, I

22   would also have created the geometric mean and would have

23   done the same analysis.

24   Q.      Okay.  Referring now again to this Monodox data.  How

25   did you build your model?

Rubas - direct

1  A.     First, I had to establish what kind of a compartment

2  model Monodox is following.  The principles that you apply

3  is you plot the data that is listed in this table on a

4  semilog plot, which means the concentration on the Y axis is

5  in a logarithmic fashion whereas the time is in a linear,

6  and the circles present the data out of this table.

7          What you then do is you look at basically the

8  trend of line there the highest concentration to the lowest.

9  When this trend line has only one slope, you establish that

10 this is a one compartment model.  I did the regression

11 analysis, and you see there is a very high degree of

12 confidence that this is a linear relationship between a

13 coefficient, a variation coefficient of .989.

14 Q.     What did you do next?

15 A.     Once I know that this is a one compartment model and

16 this was also confirmed in documents, I reviewed from the

17 plaintiffs who concluded this is a one compartment model.

18         Then you apply a one compartment model and you fit

19 the actual clinical data down here with a one compartment

20 model and on this axis again, it's a semi-logarithmic plot.

21 This is the concentration and this is the time.  The red

22 circles represent the actual data and the green line is the

23 simulated plasma concentration.

24         And what it shows is that a one compartment

25 model does well describe the pharmacokinetic or the plasma

Rubas - direct

1    concentration profile of Monodox.

2    Q.    Now, how did you apply this model?

3    A.    First, as I said, I had to establish that the

4    pharmacokinetic follows a linear fashion.  Then what you do

5    is you take the information from this fitting and you apply

6    a different dose.  Then you simulate the pharmacokinetic,

7    the plasma concentration profile as a different dose.

8    Q.    What did you extract from this -- from the curved

9    fit?

10   A.    So important for a one compartment model is, for

11   example, the volume of distribution, the elimination

12   constant, linear absorption constant.

13   Q.    Is the half-life another one of the parameters that

14   you extracted?

15   A.    Yes, the half-life is estimated from the down slope

16   here, and the fitting program I used normally which is the

17   standard, software package used in the industry gave me a.

18   Half-life of 17 and-a-half hours.

19   Q.    Did you hear Dr. Rudnic criticize your half-life of

20   17.5 hours?

21   A.    Yes.

22   Q.    How does this half-life that you calculated of

23   17.5 hours compare to the reported half-life of Monodox?

24   A.    As a matter of fact, in the Physician's Desk

25   Reference, which was just admitted, you can see in the table

1    that the reference listed a half-life of 16.33 hours.  So I

2    was actually having my fitting actually gives me a slightly

3    longer half-life.

4    Q.     Now, with respect to this model, you said that you

5    used it to then simulate steady state; is that right?

6    A.     That is correct.

7    Q.     And is this depiction of the results of your

8    simulation?

9    A.     Absolutely.  So this is the plasma concentration

10   profile that I simulate for 40 milligram instant release

11   dose of Monodox or doxycycline.

12               On the Y axis again is the concentration in

13   microgram and on the X axis is the time.

14               I assumed five doses of 24 hours apart to

15   reach steady state.  And what you can appreciate from the

16   simulated plasma concentration time profile is that at

17   steady state, we are clearly below 1 microgram per mil and

18   also at this minimum concentration, we are clearly above .1

19   microgram per mil.

20               MR. REED:  Your Honor, I believe I omitted or I

21   forgot to move for the admission of Exhibit DTX-2199, which

22   is the Periostat labeled in which Dr. Rubas relied.  And I

23   offer that.

24               MR. O'MALLEY:  No objection.

25               THE COURT:  It is admitted.

Rubas - direct

1                 (DTX-2199 received into evidence.)

2     BY MR. REED:

3     Q.     Now, was all the information that you used in

4     modeling and simulation available prior to April 2003?

5     A.     Yes.  I stated previously all the information was

6     available information to generate the PK constants for the

7     simulation came directly from the Monodox data.  Other

8     pharmacokinetic information was already cited in other

9     different papers, including review articles.

10    Q.     And based on the two different methods that you used,

11    what opinion did you form regarding the steady state plasma

12    concentrations of a 40 milligram daily dose of immediate

13    release doxycycline?

14    A.     My opinion is that prior to April 2003, a person of

15    ordinary skill in the art knew or could have known that a 40

16    milligram daily dose of immediate release doxycycline will

17    provide steady state plasma concentrations of between .1 and

18    1 microgram per mil.

19    Q.     I would like now to switch to the second question

20    that you were asked to form an opinion on.  What opinion did

21    you form regarding a 40 milligram dose of doxycycline that

22    contains a combination of immediate release and delayed

23    release portions?

24    A.     My opinion is that prior to April 2003, a person of

25    ordinary skill in the art knew or could have known the ratio

1    of immediate release to delayed release particles in a 40

2    milligram daily dose doxycycline that will provide steady

3    state plasma concentrations of between .1 and 1 microgram

4    per mil.

5    Q.    How did you reach this conclusion?

6    A.    I came to this conclusion again by examination of

7    the available literature, and from the information provided

8    in the various documents.

9    Q.    How does the knowledge of absorption of doxycycline

10   relate to your opinion?

11   A.    The information in the literature was stating that

12   the absorption occurs in the duodenum and that teaches me

13   that a large portion of the compound has to be given in a

14   manner that it is released and available for absorption by

15   the duodenum.

16   Q.    If a significant portion of doxycycline is not

17   released immediately, what would you expect?

18   A.    I will be -- I will expect that it would not be

19   absorbed.

20   Q.    What support did you find for your conclusion?

21   A.    By reviewing the patent application filed by Robert

22   Ashley.  I took out this paragraph, and I highlighted the

23   conclusion that supports or corroborates what I thought is

24   that it is preferred that at least 50 percent, more

25   preferably greater than 80 percent of the tetracycline in

Rubas - direct

1    the composition be released in the upper GI tract.

2              MR. O'MALLEY:  We'll just object beyond the

3    scope of the expert opinion.

4              THE COURT:  It is noted.

5    BY MR. REED:

6    Q.    How is this information relevant to your opinion?

7    A.    Again, as I mentioned early, it teaches me that a

8    combination formulation of instant release and not instant

9    release has to be fabricated in a manner that a significant

10   portion of the drug is in the instant release portion.

11   Q.    Did you create a pharmacokinetic model to reach your

12   conclusion about the immediate release portion?

13   A.    Yes, I did.

14   Q.    Can you please describe what we see here?

15   A.    This slide shows a modeling simulation which is based

16   on the pharmacokinetic model that I prepared earlier for the

17   instant release.  This graph shows, again, on the Y axis the

18   concentration and in micrograms per mil, and on the time

19   axis, X axis, I have the time, and again I simulate out to

20   five individual doses given of 24 hours apart.

21              Each dose level is depicted in a different

22   color.  I have 20 milligram instant release as green, the 25

23   is blue, 30 milligram is red, and the 40 milligram is in

24   black.

25              Well, you can appreciate from this graph is that

Rubas - direct

1    when you need a minimum of 25 milligram provided as an

2    instant release to be certain that your minimum

3    concentration stays above the .1 microgram per mil.

4    Q.    In terms of meeting the plasma concentration goal or

5    target of between about.1 microgram per mil to 1.0 microgram

6    per mil, can you get better results from your simulation

7    with a dose higher than --

8    A.    Absolutely.

9    Q.    Dr. Rubas, let me finish that question, please.

10        (Continuing):   -- better results from your

11   simulation with a dose higher than 25 milligrams of

12   doxycycline in an immediate release form?

13   A.    Absolutely.  As you can appreciate from this figure

14   here, the red line, which is the 30 milligram, gives you a

15   better certainty that you stay above the .1 microgram per

16   mil and while not exceeding the 1.0 microgram per mil level.

17        MR. REED:  Thank you, Dr. Rubas.

18        No further questions at the time.

19        THE COURT:  Cross-examination.

20        MR. O'MALLEY:  Your Honor, Joe O'Malley for

21   Galderma.

22        If I may proceed.

23        THE COURT:  You may.

24        MR. O'MALLEY:  I'd like to hand out some books.

25   If I may approach?

772

Rubas - cross

1           THE COURT:  You may.

2           (Binders passed forward.)

3                   CROSS-EXAMINATION

4    BY MR. O'MALLEY:

5    Q.     Good morning, Dr. Rubas.

6    A.     Good morning.

7    Q.     Did I pronounce that correctly, by the way?

8    A.     Yes, you did.

9    Q.     Dr. Rubas, your basic opinion is that Dr. Chang's

10   solution to the formulation problem he was presented with

11   was not surprising in 2003; correct?

12   A.     My opinion is that the concentration was predictable.

13   Q.     So your opinion is that the use of an IR/DR

14   combination formulation to achieve the blood plasma levels

15   of his claims was not surprising in 2003; is that fair?

16   A.     As I said, all the information is available in the

17   literature.

18   Q.     So you agree with me, that is basically a summary of

19   your opinion?

20   A.     No.

21   Q.     You disagree?  It was not surprising?

22   A.     It was not -- as I said, it was predictable based on

23   the pharmacokinetic information that a person of ordinary

24   skill in the art could find in the public domain.

25   Q.     And I'm just trying to determine what it is that was

Rubas - cross

1    not predictable, see if we can agree on that as a premise.

2    What you are basically saying is that the use of IR and DR

3    in combination, as in Dr. Chang's claims, was not surprising

4    in 2003 to achieve the blood levels that are claimed in his

5    patent.  Is that fair as a starting point?

6    A.    Yes.

7    Q.    Now, Dr. Rubas, are you aware that Galderma's Oracea

8    product employed Dr. Chang's patented invention?

9    A.    No.

10   Q.    You are not aware of that.  And were you aware

11   Galderma's Oracea product has garnered hundreds of millions

12   of dollars of sales since its launch?

13   A.    No.

14   Q.    Now, by contrast, Dr. Rubas, if you totalled sales of

15   all the controlled release formulations that you developed

16   that made it to the market in the United States, what would

17   that total be?

18   A.    I have not developed any modified release

19   formulations.

20   Q.    You have not developed any modified release

21   formulations that have made it to the market in the U.S.?

22   A.    Worldwide.

23   Q.    Worldwide.  And just for the court reporter, it will

24   be better if we don't speak over one another.

25              And you have been in this field for over

Rubas - cross

1    25 years; is that correct?

2    A.    Yes.

3    Q.    Now, in forming your opinions that it would not have

4    been surprising at the IR and DR combination that Dr. Chang

5    employed would meet his claimed plasma concentration ranges,

6    you employed a hindsight analysis; correct?

7    A.    I disagree.

8    Q.    Well.  For example, you weren't asked, when presented

9    with the formulation problem that Dr. Chang was presented

10   with and had nothing but your own knowledge in the prior art

11   to put towards that problem, how would you solve it.  Mylan

12   didn't ask you that question; correct?

13   A.    Counsel gave me all the parameters that I used to

14   form my opinion.

15   Q.    But they didn't ask you the question I just posed to

16   you; correct?

17   A.    Counsel asked me to provide pharmacokinetic

18   predictions of a 40 milligram immediate release and a

19   combination of immediate release and delayed release

20   formulation and to predict whether or not such a formulation

21   would stay between .1 and 1 microgram per mil at steady

22   state.

23   Q.    So they didn't, in other words, say if you were going

24   to formulate a controlled release formulation of doxycycline

25   as a method of treating rosacea in 2003, with just the prior

775

Rubas - cross

1   art and your own knowledge, how would you go about it?  I'm

2   just trying to determine is it correct Mylan never asked you

3   that question?

4   A.    As I just stated, I got that question from counsel

5   with all the parameters.

6   Q.    And the question you received from counsel was not

7   the question I just posed to you; fair enough?

8   A.    Yes.

9   Q.    Instead, as you put it, you were given some of the

10  basic parameters of Dr. Chang's claims and you were asked,

11  looking backwards to 2003, was Dr. Chang's solution

12  surprising; correct?

13  A.    No.

14  Q.    No.  Well, let's take a look at the question that you

15  were asked.  And let's pull up Dr. Rubas's report, paragraph

16  1.  It should be in that notebook I just handed to you.

17        Do you see a copy of your expert report in

18  there, sir?

19  A.    Yes.

20        MR. O'MALLEY:  Now let's pull up the latter half

21  of paragraph 1.

22  BY MR. O'MALLEY:

23  Q.    Let's start with the latter sentence there.  You were

24  asked basically two questions as you put it; right?

25  A.    Yes.

Rubas - cross

1    Q.     And the second question you were asked was, for your

2    opinion as to whether a person of ordinary skill in the art

3    in 2003 could have predicted a ratio of instant release

4    versus delay release multi-particulates that would also have

5    provided steady state plasma concentrations of doxycycline

6    that stay between about .1 and 1.0 micrograms per

7    milliliter.

8              Correct?

9    A.     Yes.

10   Q.     And you understand, you had read, as you testified,

11   Dr. Chang's patent prior to presenting your opinions; is

12   that correct?

13   A.     Yes, I read it.

14   Q.     And you understand that Dr. Chang's claims include,

15   among other things, a ratio of instant release versus

16   delayed release multi-particulates; is that correct?

17   A.     Yes.

18   Q.     And you know from reading Dr. Chang's patents that

19   that combination is claimed to provide a steady state plasma

20   concentration of doxycycline that stays between about

21   .1 micrograms per milliliter and about 1.0 micrograms per

22   milliliter; is that correct?

23   A.     Yes.

24   Q.     So you recognize those are parameters of Dr. Chang's

25   claims that were provided to you as the starting point for

1   your analysis; is that correct?

2   A.    I'm not exactly sure where counsel got the parameters

3   from.

4   Q.    Didn't you just tell me you recognized those to be

5   parameters of Dr. Chang's claims?

6   A.    I do, but counsel might have gotten these parameters

7   from somewhere else.

8   Q.    That, coincidentally, might have been also parameters

9   of Dr. Chang's claims?

10  A.    I cannot speculate.  I don't want to speculate.

11  Q.    But, in any event, these parameters, whether they

12  came from another source in addition to Dr. Chang's claims

13  were the starting point for your analysis; is that correct?

14  A.    Yes.

15  Q.    And you worked from there?

16  A.    Yes.

17  Q.    Okay.  Now, you did not conduct any independent

18  evaluation yourself of what a person of ordinary skill in

19  the art would have done in 2003 absent those parameters we

20  just looked at that were provided to you by counsel; is that

21  correct?

22  A.    Correct.

23  Q.    And you did not consider whether a person of ordinary

24  skill in the art in 2003 would have even been motivated to

25  design a combination of the immediate release and delayed

778

Rubas - redirect

1    release formulation to begin with to accomplish the claim

2    plasma concentration parameters; correct?

3    A.    I don't understand why this is relevant.

4    Q.    But you didn't consider it; correct?

5    A.    Correct.

6          MR. O'MALLEY:  No further questions, your Honor.

7          THE COURT:  All right.  Any redirect?

8          MR. REED:  Yes.  Maybe just a couple of

9    questions, your Honor.

10                   REDIRECT EXAMINATION

11   BY MR. REED:

12   Q.    Dr. Rubas, I believe you said that you did not

13   confirm where the many parameters came from, that you were

14   supplied by counsel; is that right?

15   A.    Yes.  I did not follow up where they exactly were

16   coming from.

17   Q.    Do you have an understanding of where counsel got

18   those when they gave them to you?

19   A.    I understand they come from the Ashley patent.

20         MR. REED:  No further questions, your Honor.

21         THE COURT:  All right.  Thank you.  You may step

22   down, Doctor.

23              (Witness excused.)

24         THE COURT:  Mylan may call its next witness.

25         MR. REED:  Mylan calls Dr. David Friend, your

Friend - direct

1   Honor.

2                  THE COURT:  All right.

3                      ... DAVID R. FRIEND, having been duly

4                  sworn as a witness, was examined and testified

5                  as follows ...

6                  THE COURT:  Good morning, Doctor.

7                  THE WITNESS:  Good morning.

8                  (Mr. Reed handed a notebook to the witness.)

9                          DIRECT EXAMINATION

10  BY MR. REED:

11  Q.     Good morning, Dr. Friend.  Would you please introduce

12  yourself to the Court.

13  A.     Yes.  My name is David Friend.  I am originally from

14  California, but over the past few years I've been taking the

15  sojourn on the East Coast.

16  Q.     Are you here testifying as an expert on behalf of

17  Mylan?

18  A.     Yes, I am.

19  Q.     Could you please summarize your education for the

20  Court.

21  A.     Yes.  I have a biochemistry degree from the

22  University of California at Davis in 1979.  Did a Ph.D.

23  degree from University of California, California at

24  Berkeley, in chemistry.

25  Q.     What did you do after you received your doctoral

Friend - direct

1   degree?

2   A.      I took a position at the Stanford Research Institute,

3   also known as SRI International, in Menlo Park, California,

4   where I worked for ten years on a range of drug delivery

5   systems, including oral controlled release dosage forms.

6   Q.      What did you do after your ten years at SRI?

7   A.      I joined a company called Cibus Pharmaceutical, where

8   I eventually became the chief scientific officer and was in

9   charge of developing a wide range of oral dosage forms for

10  controlled release into the gastrointestinal tract.

11  Q.      Can you briefly describe the other positions that you

12  have held through the course of your career?

13  A.      Yes.  I've had several other positions, including

14  drug device combination work.  I have a position with Elan

15  as a senior formulation director, where I developed some pH

16  independent post-release dosage forms for use in the

17  gastrointestinal tract, and most recently I've been employed

18  at Conrad.

19  Q.      Can you tell us a little bit about your current

20  position at Conrad?

21  A.      Yes.  Conrad is a division of the OB/GYN department

22  at Eastern Virginia Medical School, and we are funded to

23  develop new ways to prevent the transmission of HIV to women

24  who live in the developing world.

25              My job is to be head of product

Friend - direct

1    development, where I'm involved with all aspects of taking

2    the drug substance through reformulation, formulation,

3    scaleup, manufacturing, including up to Phase III clinical

4    trials.

5    Q.     What laboratory research have you conducted during

6    your career?

7    A.     Very wide range of laboratory research in the area of

8    drug delivery.  It encompasses almost all sorts of dosage

9    forms.  Oral controlled release, delayed release, targeting

10   of drugs to the lower G.I. tract, to treat inflammatory

11   bowel disease, transdermal systems, including gels and

12   patches, electronic systems, thin films for oral dosage

13   forms, dry powder inhalers and most recently intravaginal

14   rings for sustained release of microbicides.

15   Q.     Can you please describe your publications?

16   A.     Yes.  I have about 170 publications split roughly

17   evenly between peer-reviewed research articles and abstracts

18   and including several book chapters.

19   Q.     Please describe your role as an editor and as a peer

20   reviewer for scientific journals.

21   A.     Yes.  I was for about five years editor of the

22   Journal of Controlled Release, the U.S. editor.  I've also

23   sat on a number of editorial boards for medical and

24   pharmaceutical journals.  And most recently, I'm a member of

25   the editorial board of Drug Delivery and Translational

Friend - direct

1    Research.

2    Q.    Please describe your activities as a member of

3    professional organizations.

4    A.    Yes.  I'm a member of the Controlled Release Society,

5    AAPS, American Association of Pharmaceutical Scientists.

6    I've also been involved in organizing symposia, mini

7    symposia, workshops on a variety of topics over the years,

8    both nationally and internationally.

9    Q.    Would you please look in your witness binder at

10   Exhibit DTX-2128.

11   A.    Yes.

12   Q.    Can you tell us what that document is?

13   A.    It's my curriculum vitae.

14   Q.    Does it accurately summarize your educational and

15   professional experience?

16   A.    Yes, it does.

17              MR. REED:  Your Honor, I offer DTX-2128.

18              MR. O'MALLEY:  No objection.

19              THE COURT:  It's admitted.

20              (DTX-2128 was admitted into evidence.)

21              MR. REED:  Your Honor, also at this time we

22   offer Dr. Friend as an expert in the field of designing and

23   developing controlled release drug delivery systems.

24              MR. O'MALLEY:  No objection.

25              THE COURT:  He's so recognized.

Friend - direct

1   BY MR. REED:

2   Q.      Dr. Friend, what were you asked to do in this case?

3   A.      I was asked to form an opinion concerning the Chang

4   patent.

5   Q.      Can you please summarize the opinion you formed in

6   the case?

7   A.      Yes.  I formed four opinions.  The first is that the

8   Ashley '932 application, which was available prior to

9   April 2003, anticipates the asserted claims of the Chang

10  patent.

11          Secondly, that the claims of the Chang

12  patent are obvious in view of prior art available prior

13  to 2003.

14          And, thirdly, the Chang patent specification

15  lacks written description to support the narrow range of

16  plasma concentrations that are required by claims 4 and

17  18.

18          And then, fourthly, there is a lack of evidence

19  that Mylan's proposed generic formulation will infringe

20  claims 4 and 18 of the Chang patent.

21  Q.      In addition to the Chang patent, what else did you

22  consider in forming your opinions?

23  A.      In addition, I reviewed the Chang patent file history

24  and other documents that were produced for me.  I applied

25  the understanding of one of ordinary skill in the art, the

Friend - direct

1   Court's claim construction, applicable legal principles,

2   prior art references, plaintiff's experts' opinions, my own

3   education, experience and knowledge.

4   Q.     And can you please describe the asserted claims of

5   the Chang patent.

6   A.     Yes.  There are asserted claims 1 through 5, 7

7   through 9, 13 through 21.  The overall structure of the

8   asserted claims are based on claim 1, 15 and 20.  These are

9   independent claims.  And each have associated dependent

10  claims.  For example, claim 13 is dependent on claim 2,

11  which is dependent on claim 1.  And I will go through this

12  in some more detail in a moment.

13  Q.     What do the three independent claims have in common?

14  A.     They have in common, with the exception of a short

15  preamble, which in the case of claim 1 is composition 15, a

16  method of treatment, and 20, a process for preparing, they

17  are virtually identical in that they claim an oral once

18  daily dosage of doxycycline, steady state plasma

19  concentrations of between 0.1 and 1.0 micrograms per ml,

20  immediate release portion of about 30 milligrams

21  doxycycline, delayed release pellets of about ten milligrams

22  doxycycline, coated with an enteric polymer, and one or more

23  pharmaceutical excipients.

24  Q.     What are the additional elements of the dependent

25  claims?

Friend - direct

1    A.      Those can be summarized here.  The immediate release

2    portion is actually in the form of a pellet.  These pellets

3    are found in a capsule.  There is a narrower steady state

4    plasma concentration claimed of 0.3 to 0.8 micrograms per

5    ml.  The excipients are further broken down into classes,

6    and then, finally, the proportion of IR and DR pellets is

7    claimed.

8    Q.    Backing up half a step to talk a little more

9    generally, can you tell us, what is a controlled release

10   dosage form?

11   A.    A controlled release dosage form is a dosage form

12   that can accomplish a number of functions targeting, and I

13   will just restrict this to oral delivery, where typically it

14   encompasses sustained or prolonged release, delayed release,

15   and those are the two primary forms of controlled release

16   for oral delivery.

17   Q.    Why would someone of ordinary skill in the art

18   incorporate a drug into a controlled release dosage

19   form?

20   A.    Well, I think we've heard already that with the

21   sustained release system, it reduces the number of doses

22   required over a given period of time.  This improves patient

23   compliance and should improve therapeutic outcome.

24        Secondly, there's a scientific rationale often

25   used, and that's that the plasma concentration ranges can be

Friend - direct

1    better controlled, such that the plasma concentrations don't

2    rise above a certain point, perhaps leading to toxicity or

3    fall below a certain level where efficacy would be lost.

4    Q.    How would a pharmaceutical formulator have made a

5    controlled release dosage form in April 2003?

6    A.    Well, a formulator would have, at his or her

7    disposal, a range of technologies available through a number

8    of what we call drug delivery companies.

9    Q.    What are some of those technologies that were

10   available?

11   A.    Well, those technologies were associated with certain

12   companies.  Elan, where I was employed for awhile, has a

13   technology called SODAS and IPDAS.  Eurand has Diffucaps,

14   and Ethypharm has a similar multi-particulates with dosage

15   form, as well as other organizations.

16   Q.    What is multi-particulate controlled release

17   technology?

18   A.    That's a technology quite common now these days where

19   multiple beads or pellets are used wherein the drug can be

20   located in the core or sprayed onto or applied to the

21   external portions of a sugar bead, and then additional

22   multiple layers can be added to provide more functionality

23   to those units.

24   Q.    Was multi-particulate controlled release technology

25   available in April 2003?

Friend - direct

1    A.      Yes, it was widely available.

2    Q.      Did you create a slide showing different drug release

3    profiles?

4    A.      Yes, I did.

5    Q.      Now, this isn't your handwriting, is it?

6    A.      No.  No.  I did not draw this.  This is taken,

7    reproduced from the Ashley '854 application, and it's

8    similar to the slide shown by Dr. Rudnic earlier.  This just

9    happens to be I think the first version, a hand-drawn

10   version.  And it does demonstrate, interesting enough,

11   several drug release profiles.

12            The difficulty with this figure is that it shows

13   those profiles indirectly.  What it shows is the resulting

14   plasma concentrations that may be obtained from instant

15   release dosage form or a sustained release or a delayed

16   release preparation.

17            The difficulty with this is that in between

18   the time the drug is released in the gastrointestinal tract

19   and the time course for its appearance in plasma can vary

20   tremendously from drug to drug.

21            MR. REED:  Now, your Honor, I offer DTX-1008.

22            THE COURT:  Is there any objection to DTX-1008?

23            MR. O'MALLEY:  No objection, your Honor.

24            THE COURT:  It's admitted.

25            MR. REED:  Thank you.

Friend - direct

1              (DTX-1008 was admitted into evidence.)

2    BY MR. REED:

3    Q.     You mentioned available technologies for

4    multi-particulate controlled release formulations.  What are

5    some examples of commercial formulations that were available

6    prior to April 2003 and that used multi-particulate

7    technology?

8    A.     Actually, a fairly wide range of drugs were available

9    in multi-particulate controlled release technologies.

10   Ritalin is one from Eurand.  Cardizem CP for controlled

11   hypertension.  Over-the-counter products, such as Vitamin C

12   is available.  Narcotic analgesics, non-steroidal

13   anti-inflammatory drugs.  Essentially a wide range of drugs

14   with various physical and chemical properties.

15   Q.     And those were all available prior to April 2003?

16   A.     Yes, those were all available.

17   Q.     You understand that Shire Pharmaceuticals, which

18   later was named Supernus, was hired by CollaGenex, which

19   later became Galderma, to help develop Oracea; is that

20   right?

21   A.     Yes.

22   Q.     Did Shire in April 2003 already have any commercially

23   available products using a multi-particulate based

24   technology?

25   A.     Yes.  It's my understanding that two products were

Friend - direct

1   available prior to that time.  One, Carbatrol, and the

2   other, Adderall XR.

3   Q.     What was the name of Shire's multi-particulate

4   technology?

5   A.     Microtrol.

6   Q.     Okay.  Now let's go over your first opinion.

7          What is the first opinion you formed about the

8   validity of the Chang patent in view of the available prior

9   art?

10  A.     That it was anticipated by the Ashley '932

11  application.

12  Q.     Can you tell us what you did to form your opinion?

13  A.     Yes.  I applied the information that was -- that I

14  believe was available to one in the field and the reading in

15  detail of the '932 application.

16  Q.     Did you consider the Court's claim construction?

17  A.     I certainly did, yes.

18  Q.     Did you follow this same general procedure for each

19  of your opinions that you offered today?

20  A.     Yes, I did.

21  Q.     Now, the prior art reference that you concluded

22  anticipates the Chang patent was what?

23  A.     Ashley '932.  It was published in October of 2002,

24  filed originally internationally on the 5th of April 2002,

25  and it claims a priority date back to the fifth of April of

1    2001.  The inventor is Robert Ashley, and it generally

2    addresses methods of treating acne.

3                 MR. REED:  Your Honor, I offer Exhibit DTX-2111.

4                 MR. O'MALLEY:  No objection.

5                 THE COURT:  It's admitted.

6                 (DTX-2111 was admitted into evidence.)

7    BY MR. REED:

8    Q.    Please describe the teachings of the '932 application

9    in general terms.

10   A.    In general terms, it's an application that outlines

11   the use of tetracycline compounds to treat acne rosacea

12   specifically, and it describes various oral dosage forms, as

13   shown in the second box below.

14   Q.    What does the Ashley '932 application say about

15   controlled release technology?

16   A.    Well, in addition to the information disclosed in

17   that application, it has further reference to a patent

18   application called -- entitled Controlled Delivery of

19   Tetracycline and Tetracycline Derivatives.  This was filed

20   on April 5th, 2001 by CollaGenex, and the application, the

21   aforementioned application is incorporated herein by

22   reference.

23   Q.    Have you reviewed the patent application filed on

24   April 5th, 2001, that is referenced in this paragraph?

25   A.    Yes, I have.

Friend - direct

1   Q.    What relationship exists between the Ashley '932

2   application and the application that is incorporated by

3   reference?

4   A.    It includes the fact, has the same assignee,

5   CollaGenex, the same inventor, and most tellingly, it was

6   filed on the same day as the '932 application.

7   Q.    Okay.  Let's take a look at this other application.

8         Is this the other application that was

9   incorporated by reference?

10  A.    Yes, it is.

11              MR. REED:  Your Honor, I offer DTX-1008.

12              MR. O'MALLEY:  No objection, your Honor.

13              THE COURT:  It's admitted.

14          (DTX-1008 was admitted into evidence.)

15  BY MR. REED:

16  Q.    Can you describe the '854 patent in general terms?

17  A.    Certainly.  In general terms, it focuses on delivery

18  methods of tetracycline to a host, and it describes various

19  controlled release formulations and approaches that would

20  lead to plasma concentrations that would be absent of any

21  anti-microbial activity.

22  Q.    Given the incorporation by reference in the '932

23  application of the '854 application, do you consider

24  the teachings of the '854 application related to the

25  controlled release of tetracyclines to be part of the '932

Friend - direct

1    application?

2    A.    Yes, I do.

3    Q.    Now, did you compare the Ashley '932 application to

4    claim 1 of the Chang patent?

5    A.    Yes, I did.

6    Q.    Did you prepare a table to help describe the

7    comparison you made?

8    A.    Yes.

9    Q.    Can you describe the table for the Court and

10    generally what it contains?

11    A.    Certainly.  Very briefly, on the left, in this case,

12    this example, we're examining claim 1 of the Chang patent,

13    and I've broken down that claim into various elements to

14    better compare with the '932 application.

15    On the right, we have the citation of, the

16    disclosure of that element of the claim, Chang patent.

17    Q.    Can you describe, please, what we learned from the

18    '932 application regarding oral administration.

19    A.    Certainly.  The first element of the Chang, claim 1,

20    is that the oral pharmaceutical composition, that would be

21    an oral form, and we find that in Ashley '932, page 14, that

22    the application discloses that the tetracycline compound is

23    administered orally.

24    Q.    What do we learn regarding doxycycline?

25    A.    We learn that, again, in the '932 application of

Friend - direct

1    Ashley, on Page 16, that the tetracycline is specifically

2    doxycycline.

3    Q.    What do we learn regarding once daily?

4    A.    It's found also in the '932 application, where, on

5    page 15, it's stated that the tetracycline compound may be

6    administered one to six times a day, and more preferably one

7    to four times a day.  Hence, the once-a-day disclosure.

8    Q.    What do we learn regarding the steady state blood

9    levels of claim 1?

10   A.    Well, there are actually two locations.  The '932

11   application, first on page 10, it states that the

12   doxycycline is administered in an amount which results in a

13   serum concentration of about 0.1 and 0.8 micrograms per ml.

14            And in the '854 application on Page 5, the range

15   is stated to be 0.1 and 1.0 micrograms per ml, the same as

16   in the Chang patent.

17   Q.    What do we learn regarding the immediate release and

18   delayed release portions of doxycycline?

19   A.    Well, we learn, first of all, that the total dose of

20   doxycycline is 40 milligrams, and that's found on the Ashley

21   application, '932, page 15, second-to-the-last line there.

22            And then it refers to further information on

23   ways to deliver the tetracycline in the '854 application.

24   Q.    And what do we learn about the combination of instant

25   release and delayed release?

Friend - direct

1    A.      Well, in the case here, '854 states that the

2    composition can include from a group consisting of

3    instantaneous release and delayed release agent and

4    combinations thereof.

5    Q.      What do we learn about pellets?

6    A.      Pellets are found in the '854 application when the

7    dosage forms are described as alternatively being a solid

8    form, such as, among other things, a pellet.

9    Q.      What do we learn about the ratio of the immediate

10   release and delayed release portions of doxycycline?

11   A.      Okay.  In the '854 Ashley application, on page 16, it

12   states that the preferred amount of drug release be at least

13   50 percent and more preferably greater than 80 percent that

14   should be released in the upper gastrointestinal tract.  And

15   this range includes in percent terms the about 75 percent to

16   25 percent of immediate release.

17   Q.      What do we know about formulating a 40 milligram

18   total dose with about 30 milligrams of immediate release and

19   about 10 milligrams of delayed release doxycycline?

20   A.      We know that the amounts of immediate release,

21   according to Dr. Rubas's report, that that amount of

22   immediate release to delayed release can be no less than

23   25 milligrams.  And as he also pointed out, and I agree with

24   his opinion, that that would be unacceptably too close to be

25   practical and that the ratio would be more preferably

Friend - direct

1   75 percent or 30 milligrams in about 25 percent or about

2   10 milligrams.

3   Q.     What do we learn from the '932 application regarding

4   the enteric coating on the delayed release pellets?

5   A.     The use of enteric coatings is commonly known and

6   also disclosed in the Ashley application where examples of

7   delayed release agents are provided, and these include

8   polymer or biodegradeable coatings, and this would include

9   enteric coatings.

10  Q.     What do we learn about excipients?

11  A.     Excipients are found -- examples of excipients are

12  found throughout the '932 and '854 application, but I just

13  listed one example here where, pharmaceutically acceptable

14  additional ingredients.  In other words, excipients are

15  provided for.

16  Q.     In sum, what is your opinion regarding claim 1 of the

17  Chang patent in light of the '932 application?

18  A.     It is my opinion that the '932 application

19  anticipates claim 1 of the Chang patent.

20  Q.     Is that your opinion even though the '932 application

21  does not recite the numbers 30 milligrams and 10 milligrams

22  for the immediate release and delayed release portions

23  doxycycline?

24  A.     Yes.

25  Q.     Why?

Friend - direct

1    A.     Well, because the required target range of 0.1 to

2    1.0 micrograms per mil as stated in the '932 application

3    requires a very narrow range of ratios that can accomplish

4    and reach that target goal.  This narrow range of ratios

5    necessarily encompasses the amount of about 75 percent

6    immediate release and about 25 percent delayed release.  And

7    in terms of milligrams, that would be about 30 milligrams IR

8    and about 10 milligrams DR.

9              THE COURT:  Dr. Friend, I would ask you to push

10   the microphone away just a little bit.

11             Thank you.

12   BY MR. REED:

13   Q.     Does the Ashley '932 application anticipate any other

14   asserted claims of the Chang patent?

15   A.     Yes.

16   Q.     Which ones?

17   A.     The remaining asserted claims.

18   Q.     All of them?

19   A.     All of them.

20   Q.     Did you prepare a table to help explain your opinions

21   regarding the rest of the asserted claims?

22   A.     Yes.

23   Q.     Let's take a look first at claim 2.

24             Please describe your anticipation opinion

25   regarding claim 2.

797

Friend - direct

1    A.     Yes.  Claim 2 is dependent on claim 1 with the

2    restriction that the immediate release portion is in the

3    form of pellets.  And in the '854 application, pellets are

4    described on page 12.  So for this reason, it is my opinion

5    that claim 2, also with respect to what I already provided

6    an opinion on claim 1, is anticipated.

7    Q.     Let's turn to claim 3.

8    A.     Okay.

9    Q.     What is your anticipation opinion regarding claim 3?

10   A.     Here we have the pellets are contained in a capsule.

11   And in '854, this is stated quite clearly, polymeric

12   capsules filled with solid particles.  And so based on this

13   clear statement, it is my opinion, as well as the reasons I

14   provided for anticipation of claims 2 and 1, I believe claim

15   3 is anticipated by '932.

16   Q.     Please describe your anticipation opinion regarding

17   claim 4.

18   A.     Claim 4 is directed towards the narrower steady state

19   plasma concentrations and disclosures of these ranges are

20   found in both '932 and '854.  And this includes the range

21   more preferably 0.4 and 0.7 micrograms per mil and, '854,

22   0.3 and 0.8 micrograms per mil.

23          Therefore, my opinion is that claim 4 is

24   anticipated by '932 and, for the reasons I have already

25   provided for my opinion regarding claim 1, I believe claim 4

Friend - direct

1    is anticipated by the '932 application.

2    Q.     Please describe your anticipation opinion regarding

3    claim 5.

4    A.     Yes.  Claim 5 is directed now more at a narrower

5    range of excipients as defined by function; that would be a

6    binder, a disintegration agent, filling agent, so on and so

7    forth.  Excipients defined as such in the '932 application

8    can be found as shown in the box below.  Pharmaceutically

9    acceptable additional excipients such as stabilizers are

10   included.

11          It is for this reason, the statement that I

12   believe claim 5, and for the reasons I already stated about

13   claim 1, that claim 5 is anticipated by the Ashley '932

14   application.

15   Q.     Please describe your anticipation opinion regarding

16   claim 7.

17   A.     Yes.  Claim 7 now gets further down into different

18   types of excipients specifically naming various agents, in

19   this case, disintegrating agents consisting of a group of

20   corn starch and others; and in the '932 application, we find

21   corn starch mentioned.  Therefore, it's my opinion that the

22   '932 application anticipates this claim and in light of also

23   the fact that the reasons I have given above for claim 1

24   that it's anticipated.

25   Q.     Please describe your anticipation opinion regarding

Friend - direct

1    claim 8.

2    A.      Eight regards now or focuses on filling agents

3    consisting of the group among others lactose.  Lactose is

4    found in the '932 application on page 15.  And for this

5    reason, I believe, in addition to the reasons I gave for

6    claim 1 being anticipated, I believe claim 8 is anticipated

7    by the '932 application.

8    Q.      Please describe your anticipation opinion regarding

9    claim 9.

10   A.      Claim 9 refers to surfactants consisting from a group

11   including sodium laurel sulfate, and sodium laurel sulfate

12   is identified in the '854 application highlighted here in

13   yellow on page 14.  For this reason, I believe the '932

14   application anticipates claim 9 and for the reasons claim 5

15   I gave above earlier for claim 5.  So this is the basis for

16   my opinion concerning anticipation of this claim.

17   Q.      Please describe your anticipation opinion regarding

18   claim 13.

19   A.      Okay.  Claim 13 is dependent on claim 2.  Here, we

20   have a change in the ratio expressed as percent as opposed

21   to previously milligrams where the immediate release portion

22   constitutes about 80 percent to about 70 percent total

23   pellets in a composition.  And for the reasons that I

24   provided concerning the ratios of immediate release to

25   delayed release for claim 1, it follows then that claim 13

800

Friend - direct

1    as well as claim 2 are anticipated by the '932 application.

2    Q.    Please describe your anticipation opinion regarding

3    claim 14.

4    A.    Okay.  Claim 14 is dependent on 13.  Here, we have a

5    statement of the immediate release portion expressed as a

6    percent rather than a milligram, so about 75 percent of the

7    total pellets in the composition, and the arguments I

8    provided for the basis of my opinions for reasons I gave for

9    claim 1 apply directly here.  So I believe that the '932

10   Ashley application anticipates this claim as well.

11   Q.    Now, this slide, DDX-635, deals with all the asserted

12   claims that depend from claim 1; is that right?

13   A.    Yes.

14   Q.    There, the next asserted claim is claim 15.  An

15   independent claim.  Would you please describe your

16   anticipation opinion regarding claim 15?

17   A.    Yes.  Claim 15, an independent claim, is focused or

18   directed towards a method of treating rosacea.  And '932

19   application provides the following information I highlighted

20   in yellow just to save time and not read it.  But the

21   invention provide a method of treating acne in a human, and

22   various forms of acne.  Ultimately acne, rosacea being

23   identified towards the bottom of that paragraph.

24   Q.    And based on that, what is your opinion with respect

25   to claim 15?

Friend - direct

1    A.      My opinion is that claim 15 is anticipated by the

2    Ashley '932 application.

3    Q.      And is that for all the same reasons as you described

4    with respect to claim 1?

5    A.      Yes.

6    Q.      Please describe your anticipation opinion regarding

7    claim 16.

8    A.      Claim 16 is dependent on 15, and here it states that

9    the mammal is specifically a human.  And in '932, on page 5,

10   it states that the method of treating acne is in deed

11   directed towards a human and for this reason I believe that

12   claim 16 as well as for the reasons I stated for claim 15,

13   that this claim is anticipated by the '932 application.

14   Q.      Please describe your anticipation opinion regarding

15   claim 17.

16   A.      17 is similar to claim 3 above where the pellets and

17   the composition are contained in a capsule, and I applied

18   the same reasoning that I did for claim 3, that this was

19   disclosed in the '932 application, and also for the reasons

20   I provided above for claim 15, therefore, claim 17 is

21   anticipated by the '932 application.

22   Q.      Please describe your anticipation opinion regarding

23   claim 18.

24   A.      Claim 18 is parallel to claim 14 in that the steady

25   state blood levels are defined as being between 0.3 and

Friend - direct

1    0.8 micrograms per mil.  For the reasons I gave for the

2    anticipation of claim 4 above, as well as 1, there, I

3    conclude it's my opinion that claim 18 is anticipated by the

4    '932 application.

5    Q.     In your answer I think at one point I think you

6    referred to claim 14.  Did you mean to refer to claim 4?

7    A.     15.  15.  Excuse me.

8    Q.     We were talking about claim 18, and I think you said

9    it's parallel to claim 14.

10   A.     Claim 4.  Claim 4.

11   Q.     Thank you.  Can you please describe your anticipation

12   opinion with respect to claim 19?

13   A.     Yes.  Here we're back to excipients again, a similar

14   list as we found in claim 5 above.  And for the reasons I

15   provided that claim 5 was anticipated by '932, the same

16   reasoning, it forms my opinion that it is anticipated by the

17   '932 application.

18   Q.     Please describe your anticipation opinion regarding

19   the next independent claim, claim 20.

20   A.     Okay.  This claim is again very similar to 1 and 15

21   with the exception of the preamble.  And here, the claim is

22   a process for preparing an oral pharmaceutical composition.

23           And the preparation of pharmaceutical products

24   of this type is found in '932, on page 14, where it

25   indicates that tetracycline compounds can be formulated as

803

Friend - direct

1    understood by practitioners in the art of the and these

2    preparations can be made according to conventional methods.

3    For this reason, I believe or it's my opinion that claim 20

4    is anticipated by the '932 Ashley application.

5    Q.    And for all the same reasons you offered with regard

6    to claim 1 as well?

7    A.    Yes.

8    Q.    Please describe your anticipation opinion regarding

9    claim 21.

10   A.    Claim 21 is dependent on claim 20.  And it states

11   more this range of types of excipients binders,

12   disintegrating agents and so on.  And for the reasons I

13   provided in claims 5 and 19, the same reasons apply, it's my

14   opinion that this claim as well as the reasons that I

15   provided for claim 20, this claim is anticipated by the '932

16   application.

17   Q.    In sum, is it your opinion that all of the asserted

18   claims of the Chang patent are invalid as anticipated by the

19   '932 application?

20   A.    Yes, that's my opinion.

21   Q.    Let's move to the second of your opinions.  What is

22   the second opinion you formed?

23   A.    The second opinion is that the claims of the Chang

24   patent are obvious in view of the prior art available in the

25   year 2003.

804

Friend - direct

1    Q.      Does this apply to all the asserted claims of the

2    Chang patent?

3    A.      Yes, it does.

4    Q.      On which prior art do you base your obviousness

5    opinion?

6    A.      I rely on three obviousness references.  One, Ashley

7    '932 application, standing alone; and then Ashley '932

8    combined with U.S. patent '304; and, thirdly, the '932

9    Ashley application combined with U.S. patent ending '819.

10   Q.      So each of these are three different obviousness

11   opinions; is that right?

12   A.      That's correct.

13   Q.      Let's take your first obviousness opinion.  Does this

14   opinion reflect a combination of references?

15   A.      No, it does not.

16   Q.      What is the basis of your opinion that the '932

17   application renders obvious all asserted claims of the Chang

18   patent?

19   A.      Well, firstly, for all the reasons that I provided

20   under anticipation, and as applied to those reasons, applied

21   as an obviousness, it's for the same reason Ashley '932

22   makes all the asserted claims of the Chang patent obvious.

23   Q.      Did you combine your understanding of the background,

24   knowledge available to a person of ordinary skill in the art

25   in April 2003 together with the '932 application?

Friend - direct

1    A.      Yes, I did.

2    Q.      Can you describe the knowledge that was in possession

3    of a person of ordinary skill in the art in April of 2003?

4    A.      Yes.  I did.  And with transport to that knowledge in

5    the area of pharmacokinetics that that person would have

6    general pharmacokinetic method and principles understood,

7    that they would know the specific pharmacokinetic parameters

8    of doxycycline, they would know the absorption

9    characteristics of doxycycline, and the resulting blood

10   plasma concentration profiles as well as relied on extensive

11   clinical database that was available on this drug.

12   Q.      Now, we heard from Dr. Rubas regarding many of the

13   specific pharmacokinetic parameters and absorption and so

14   on.  Did you rely on the same materials that he relied upon?

15   A.      Yes, I did.

16   Q.      Did you also consider the opinions of Dr. Rubas?

17   A.      I did.

18   Q.      How did the opinions of Dr. Rubas relate to your own

19   opinions?

20   A.      They reinforced my opinions in understanding of the

21   general knowledge required.

22   Q.      With the combination of this background information

23   and the information in the '932 application, what did you

24   conclude?

25   A.      That all of the asserted claims of the Chang patent

Friend - direct

1    are obvious.

2    Q.     Let's talk now about your second obviousness opinion.

3    Does this opinion reflect a combination of references?

4    A.     It does, yes.

5    Q.     And what is that combination?

6    A.     The Ashley '932 application combined with the patent

7    '304.

8    Q.     Please describe the '304 patent generally.

9    A.     Yes.  It is a patent issued in April of 1994 and

10   focused on systems and formulations providing a minimum

11   therapeutic blood level of minocycline for at least 24 hours

12   for once daily dose administration.

13              MR. REED:  Your Honor, I offer DTX-2119.

14              MR. O'MALLEY:  No objection.

15              THE COURT:  It is admitted.

16              (DTX-2119 received into evidence.)

17   BY MR. REED:

18   Q.     What does the '304 patent teach about how often the

19   minocycline is administered?

20   A.     It teaches that it should be administered once daily.

21   Q.     And what does it teach about the range of blood

22   plasma concentrations achieved?

23   A.     Among other ranges, it talks about a minimum target

24   range of about 0.1 to 1.0 micrograms per mil.  And this is

25   found in the '304 application on page 1.

Friend - direct

1    Q.      What does the '304 patent say about how to achieve

2    the blood plasma concentrations?

3    A.      I won't go through the actual statement here pulled

4    from the '304 application, but basically it teaches a

5    mixture of IR and DR pellets, where the DR pellets are

6    coated with enteric polymers.

7    Q.      And what does the '304 patent say about a mixture of

8    pellets?  What mixture does it teach?

9    A.      Well, it teaches a range of mixtures of IR to DR

10   pellets.  That range goes from about 20 to 80.  That would

11   be 20 IR, 80 DR to about 80 IR to 20 delayed release.

12   Q.      How is that relevant to the Chang patent?

13   A.      It's quite relevant since it discloses, and for this

14   range, encompasses the range that is expressed more or less

15   as percent of 75 to 25 IR to DR.  It also states that this

16   ratio of IR to DR was already generally contemplated and

17   obvious.

18   Q.      What does the '304 patent teach about excipients?

19   A.      It teaches the use of standard pharmaceutical

20   excipients, including those that would permit release in the

21   upper small intestine, particularly the duodenum, and that

22   is shown here spelled out specifically in the '304

23   application on page 11.

24   Q.      Now the '304 patent is about minocycline; right?

25   A.      Yes.

Friend - direct

1    Q.      Why do you feel it was appropriate to combine the

2    '932 application with the '304 patent?

3    A.      Well, first, the Ashley application, '932, discloses

4    minocycline along with doxycycline as a compound that can be

5    used to treat rosacea.  And that is found in the '932

6    application on page 7 as I have shown here.

7           Minocycline and doxycycline are both very well

8    known second generation tetracycline compounds.  They are

9    similar chemically and physically and demonstrates

10   pharmacokinetics that are similar.

11          And based on all of this, my conclusion and

12   opinion is that substitution of minocycline with doxycycline

13   would be reasonably expected to be successful.

14   Q.      Now, when you do combine these two references, the

15   '932 application and the '304 patent, what do you get?

16   A.      I get, again, reinforcement of the information alone

17   from '932 that one of ordinary skill in the art prior to

18   2003 would be motivated to combine these two references and

19   that the combination leads to an obviousness of the Chang

20   asserted claims.

21   Q.      And it's your opinion that the '304 patent combined

22   with the '932 application renders all asserted claims of the

23   Chang patent obvious; is that right?

24   A.      Yes.

25   Q.      Let's turn to --

Friend - direct

1                    MR. REED:  I can't remember if I offered

2      DTX-2119, the '304 patent.

3                         MR. O'MALLEY:  I can't either but don't object.

4                         THE COURT:  It's admitted, or admitted again.

5                         MR. REED:  Thank you.

6                         (DTX-2119 was admitted into evidence.)

7      BY MR. REED:

8      Q.      Can you please tell us about your third obviousness

9      opinion?  Does this reflect a combination of references?

10     A.      Yes.

11     Q.      What combination?

12     A.      Again, the Ashley '932 application and the patent

13     '819 issued in the U.S.

14                    MR. REED:  Your Honor, I offer DTX-2116, the

15     '819 patent.

16                    MR. O'MALLEY:  No objection.

17                    THE COURT:  It's admitted.

18                    (DTX-2116 was admitted into evidence.)

19     BY MR. REED:

20     Q.      Can you please describe the '819 patent?

21     A.      Yes.  It's directed towards oral pulsed dose drug

22     delivery technology.  It's assigned to Shire Laboratories

23     and it was licensed actually to Galderma.  The inventors

24     include Dr. Chang, the inventor of the Chang patent we have

25     been discussing, as well as Dr. Rudnic.

Friend - direct

1                        It describes a beadlet technology.  These

2       beadlets are in the form of capsules, and essentially it

3       describes the Microtrol technology.

4                        The ratio of immediate release to delayed

5       release can be determined by other means.  There's no -- no

6       restriction on that ratio.

7                        More specifically, as we heard from Dr. Rudnic,

8       it does eventually get directed towards controlled release

9       of amphetamines, that these amphetamines are comprised into

10      immediate release and enteric or delayed release components

11      in a capsule.

12      Q.     And I can't recall.  What did you say about the date

13      of the '819 patent?

14      A.     It was issued in the year 2001.

15      Q.     Okay.  What did you notice about the language in

16      the '819 patent regarding incipient -- excuse me --

17      excipients?

18      A.     Quite interestingly enough, when you looked at --

19      when I looked at these two patents and focused on a couple

20      of areas, disintegrants and filling agents, I found

21      remarkable parallelism between these two.  In fact, word for

22      word identical phrases and disclosure of specific excipients

23      and their preferred amounts.  Likewise, the same thing for

24      filling agents.  It's typically as you see in patents like

25      this, a laundry list of various materials, but in this case,

Friend - direct

1    it's identical in both applications, both patents.

2    Q.     To be clear, the two patents that we're talking about

3    here are not your obviousness combination; is that right?

4    A.     No.

5    Q.     This is the '819 patent, which is part of your third

6    obviousness combination, plus the asserted Chang patent?

7    A.     Yes.

8    Q.     And Dr. Chang was one of the inventors on both of

9    these two patents; is that right?

10   A.     Yes.

11   Q.     Why is the language so similar?

12   A.     I would say that it was -- it reenforces the

13   obviousness of certainly this element of the use of

14   excipients and the generation of multi-particulate drug

15   release formulations.

16   Q.     And what does the '819 patent teach about controlled

17   release, generally speaking?

18   A.     It teaches that one can combine immediate release and

19   delayed release components to provide a desired delivery

20   profile.

21   Q.     The Microtrol technology described in the '819

22   patent, that was one of the off-the-shelf technologies you

23   referred to earlier in your testimony?

24   A.     Yes, it is.

25   Q.     What do you get when you combine the '932 application

812

Friend - direct

1   with the '819 patent?

2   A.     It reinforces the opinion that Ashley is, when

3   combined with this application, that all of the asserted

4   Chang claims are -- excuse me -- rendered obvious.

5   Q.     Okay.  What opinion have you formed about written

6   description?

7   A.     In terms of written description in the Chang patents,

8   it's my opinion that it lacks written support and

9   description for the narrow range of plasma concentrations

10  required by claims 4 and 18.

11  Q.     Now, what do these two claims have in common?

12  A.     They, in the first case, claim 4 is dependent on one

13  and provides for this narrower steady state blood level

14  between 0.3 and 0.8.  And then claim 18 is dependent on 15.

15  And, again, recites the same desired steady state --

16  required steady state plasma levels, between 0.3 and

17  0.8 micrograms per ml.

18  Q.     And what is the basis of your opinion that the Chang

19  patent lacks written description of claims 4 and 18?

20  A.     Well, I have reviewed the Chang patent in great

21  detail and in no place could I find any description written

22  or otherwise of the fact that the claimed composition

23  actually can lead to the desired or stated plasma ranges of

24  0.3 to 0.8 micrograms per ml.

25  Q.     Well, what did you find in the Chang patent?

Friend - direct

1    A.      Well, I found figure 5, which shows the, among other

2    thing m the steady state plasma concentrations obtained from

3    the 75/25 IR/DR preparation.  In other words, the Oracea

4    product.  And that while the plasma levels do rise above 0.3

5    early on following the dose, that in this group of subjects,

6    the 14 different subjects in this case, that all of the

7    plasma concentrations as just expressed by the means fall

8    below 0.3 micrograms per ml, even before 12 hours had

9    elapsed.  This would be less than half the required dosing

10   interval.

11   Q.      How low do these levels go in figure 5?

12   A.      They go below 0.2 micrograms per ml.

13   Q.      Let's move now to the last of your opinions.  What is

14   the last opinion you formed?

15   A.      This opinion is that there is no evidence that

16   Mylan's proposed generic formulation will infringe on claims

17   4 and 18 of the Chang patent.

18   Q.      What studies were conducted using Mylan's product to

19   determine the steady state Cmax achieved with Mylan's

20   product?

21   A.      To my knowledge, no such studies have been performed.

22   Q.      So there's simply no data that demonstrates that

23   Mylan's product results in a steady state Cmax of between .3

24   to .8 micrograms per milliliter; is that right?

25   A.      Yes.

Friend - direct

1    Q.      You heard Dr. Rudnic talk about bioequivalency

2    between Mylan's product and Galderma's product and used that

3    to link Mylan's product to the pivotal PK study conducted

4    with Galderma's product; is that right?

5    A.      Yes.  Yes.

6    Q.      You understand that Mylan's label refers to that

7    pivotal PK study?

8    A.      I do.

9    Q.      And you understand that Mylan's product refers to

10   that pivotal PK study because the FDA requires it to do so?

11   A.      Yes.

12   Q.      Do you recall how many subjects that study involved?

13   A.      That subject -- excuse me.  That study involved 31

14   subjects.

15   Q.      In that study of 31 subjects, how many of them showed

16   steady state plasma concentrations that stayed between .3

17   and .8 micrograms per milliliter throughout the 24-hour

18   testing period?

19   A.      Of the 31 subjects, only one.

20   Q.      Do you recall how much higher than .3 that one

21   subject's steady state plasma concentration was at 24

22   hours?

23   A.      It was what could be described as barely above.  It

24   was 0.001 nanograms per milliliter.

25   Q.      Okay.  Now, Dr. Rudnic included others by rounding

Friend - direct

1   the values.  Do you agree that rounding the values of the

2   other subjects reported in the pivotal PK study is

3   appropriate?

4   A.     In some instances, rounding is appropriate.  However,

5   rounding is dependent upon the units employed.  In this

6   case, to choose micrograms per ml when all of the values

7   reported from the biostudies are reported in nanograms per

8   ml to more significant digits.

9                Applying rounding rules in those cases

10  would reflect at best only very small changes and would not

11  allow one to say that someone with a concentration of 0.251

12  is equivalent to the same as 0.3.

13  Q.     Now, in your experience, would it be appropriate to

14  look at individual data from a study like this pivotal PK

15  study?

16  A.     Typically, one would look at average data and the

17  error associated with whatever PK parameter you are

18  interested in.

19  Q.     Why would it be more appropriate to review average

20  data?

21  A.     One, it's typically scientific standard practice.

22  When you look at most research reports, and if you even look

23  at the Chang patent, all the figures presented are means.

24  There are no individual data there.  And, in addition, as,

25  from a regulatory point of view, the FDA requests that they

Friend - direct

1    see the pharmacokinetic data expressed as means and plus the

2    percent coefficient of variation.

3    Q.      If you were to look at the mean data from the pivotal

4    PK study, would it fall within .3 and .8 at all times during

5    the 24-hour period?

6    A.      No.

7    Q.      From your perspective, then, what evidence does

8    Mylan's label, which references this pivotal PK study,

9    provide in terms of evidence regarding infringement of

10   claims 4 and 18 of the Chang patent?

11   A.      I found no evidence that the label provides

12   information that the product will lead to steady state

13   plasma levels of between 0.3 and 0.8 micrograms per ml.

14   Q.      Turning next to Mylan's formulation, can you tell us

15   a little about Mylan's proposed formulation compared to

16   Galderma's formulation and what that means about the Cmax

17   and Cmin?

18   A.      Okay.  Mylan's formulation is -- is a capsule based,

19   as is the Oracea product.  However, the pellet portion, if

20   you will, differs.  Mylan uses a mini tablet formulation

21   wherein the drug is dispersed throughout the powder and then

22   compressed, and then if delayed release is required, as it

23   is, that's coated with an enteric polymer.

24          The technology of -- used by Shire is based on a

25   sugar with various layers of coating of drug, binders and

Friend - direct

1    other polymeric materials to get the desired dissolution

2    profiles.

3                    THE COURT:  Is there an objection?

4                    MR. O'MALLEY:  Beyond the scope of expert

5    opinion, your Honor.

6                    THE COURT:  It's noted.

7    BY MR. REED:

8    Q.    I think you said this a few minutes ago.  Well, what

9    effect would that have on the Cmax and Cmin?

10   A.    Well, it means that you're not automatically going to

11   get the exact same pharmacokinetic parameters as the Oracea

12   formulation.

13   Q.    I think you said this a few minutes ago, but would

14   you tell us again, how much higher than .3 micrograms per ml

15   the one subject in the pivotal PK study that Dr. Rudnic

16   testified about, how much higher it was at the 24-hour time

17   period?

18   A.    At the 24-hour time period, that one subject of 31,

19   it was one one billionth of a gram.

20   Q.    Would the formulation differences between the Mylan

21   product and Galderma's Oracea product be sufficient to

22   change a patient's Cmin or, excuse me, Cmax by one one

23   billionth of a gram per ml?

24                   MR. O'MALLEY:  Same objection, your Honor.

25                   THE COURT:  It's noted.

Friend - cross

1                THE WITNESS:  Yes.

2                MR. REED:  No further questions.

3                THE COURT:  All right.  We will take our morning

4    recess and then we'll have cross-examination.

5                (Brief recess taken.)

6                THE COURT:  You may proceed.

7                MR. O'MALLEY:  Thank you, your Honor.

8                May I approach?

9                THE COURT:  You may.

10               (Binders passed forward.)

11                       CROSS-EXAMINATION

12   BY MR. O'MALLEY:

13   Q.    Good morning, Dr. Friend.

14   A.    Good morning.

15               THE WITNESS:  Is this a good volume here.

16               THE COURT:  So far so good.  Try not to get too

17   close.

18               THE WITNESS:  Okay.

19   BY MR. O'MALLEY:

20   Q.    Dr. Friend, over the course of your career, you

21   developed new drug formulations; correct?

22   A.    Yes.

23   Q.    You have never had any professional experience with

24   respect to doxycycline; correct?

25   A.    That's true.

Friend - cross

1    Q.      And you have never formulated a tetracycline class

2    compound; correct?

3    A.      Correct.

4    Q.      And you had no experience of formulating a drug that

5    is an antibiotic compound formulated at sub-antimicrobial

6    doses; correct?

7    A.      Correct.

8    Q.      Now, you understand that the Chang patent claims

9    controlled release formulations for a once daily doxycycline

10   treatment; correct?

11   A.      Yes.

12   Q.      It's difficult to develop a controlled release drug

13   product that makes it all the way to the market, wouldn't

14   you agree?

15   A.      It can be challenging.

16   Q.      In fact, over the course of your 25 year career, you

17   have never been involved in the formulation of any drug

18   product that is, or has been, marketed; correct?

19   A.      Not directly.  Indirectly, some technology of mine

20   has been used in commercial products.

21   Q.      But not directly?

22   A.      Not directly.

23   Q.      In fact, you have been involved in approximately 30

24   to 40 drug formulations that never made it as far as

25   clinical trials; correct?

Friend - cross

1    A.      Yes.

2    Q.      And most of those, in fact, around 95 percent of

3    those, as you estimated them, were controlled release

4    formulations; correct?

5    A.      Correct.

6    Q.      Now, based on your own experience, even when a

7    skilled formulator makes a reasonable prediction that a

8    particular formulation will work, that formulation is

9    unsuccessful about 50 percent of the time when tested in

10   humans; correct?

11   A.      It could be.  I'm not sure if it's 50, 60, or

12   40 percent.

13   Q.      But that is a reasonable ballpark; correct?

14   A.      Reasonable, yes.

15   Q.      Now, let's talk about your infringement opinions

16   first, if we may.

17           Specifically, you offered infringement opinions

18   as to claims 4 and 18; is that correct?

19   A.      Yes.

20   Q.      I prepared a demonstrative for our help which

21   includes claims 4 and 18 along with their independent claims

22   as PDX-600.  If we can put it up there.

23           And if it's easier for you at any point,

24   Dr. Friend, the Chang patents at PTX-5 in the larger of the

25   two notebooks.

Friend - cross

1              Let me know when you are with me, sir.

2    A.      Yes.

3    Q.      Okay.  Now, you understand that claims 4 and 18 only

4    differ from their respective independent claims in that the

5    patient taking the dosage must also have the blood levels in

6    the narrower concentration range of between .3 microgram per

7    milliliter to .8 microgram per milliliter; correct?

8    A.      Yes.

9    Q.      You may need to speak up just a hair.

10   A.      Okay.

11   Q.      And it's your expert opinion that Mylan's generic

12   product would not infringe those narrower concentration

13   ranges; correct?

14   A.      Yes.

15   Q.      Now, in formulating your expert opinion, did you take

16   into account Mylan's assertion to this Court in this case

17   that it's mean trough or Cmin doxycycline serum

18   concentration of its proposed ANDA product is .3 microgram

19   per milliliter?

20   A.      I don't recall such an assertion.

21   Q.      Okay.

22   A.      Statement.

23   Q.      The first tab in your larger of the two notebooks is

24   PTO-Exhibit 3.  Do you see that?

25   A.      Yes.

822

Friend - cross

1   Q.      Would you turn to paragraph 39 of PTO-Exhibit 3, page

2   11.

3   A.      Oh, I'm sorry.

4   Q.      Let me know when you have that, sir.  It's also on

5   your screen if at any time any of these references become

6   easier --

7   A.      Okay.

8   Q.      -- to fiddle around with rather than a notebook.

9   A.      Yes, I see that.

10  Q.      Are you with me?

11  A.      Yes.

12  Q.      You probably are not familiar with this document, I

13  take it?

14  A.      It doesn't appear to be one I have seen before.  No.

15  Q.      So, naturally, you didn't employ this document in

16  your opinions of noninfringement?

17  A.      No, I did not.

18  Q.      Well, I will represent to you this is the so-called

19  Mylan's statement of contested facts, a portion thereof that

20  was submitted to the Court prior to the trial in this case.

21          Turning to paragraph 39, do you see where it

22  says that the mean trough doxycycline serum concentration

23  of Mylan's proposed ANDA product is .3 micrograms per

24  milliliter?

25  A.      Yes, I see that.

Friend - cross

1    Q.      And mean trough is another way of saying mean Cmax;

2    correct?

3    A.      Mean Cmin.

4    Q.      Oh, I'm sorry.  It's another way of saying mean Cmin;

5    correct?

6    A.      Yes.

7    Q.      And a mean Cmin of .3 would be within the ranges of

8    claims 8 and 14; correct?

9    A.      It would be.

10   Q.      Now, if we take paragraph 38 of Mylan's statement of

11   contested facts, naturally, you didn't take this paragraph

12   into account in your opinions; is that correct?

13   A.      That's correct.

14   Q.      And you see where they report a mean Cmax for the

15   single dose 40 milligram capsule -- Mylan capsule at steady

16   state?

17   A.      Yes.

18   Q.      And you see they report a figure of .6 for that?

19   A.      Yes.

20   Q.      And that, again, would be within the concentration

21   ranges of claims 8 and 14; is that correct?

22   A.      Yes.  At the time of Cmax, yes.

23   Q.      Now, I'd like to turn now to your invalidity

24   opinions, if we may.  Now, today you testified as to

25   invalidity of the Chang claims based on several prior art

1   references; correct?

2   A.      Yes.

3   Q.      Now, most or all of those references were provided

4   to you in the first instance by Mylan's counsel; is that

5   correct?

6   A.      That's true, yes.

7   Q.      Now, were you in the courtroom earlier when Dr. Rubas

8   began to talk about something called an absorption window?

9   A.      I was.

10  Q.      And you are familiar with the term "absorption

11  window;" correct?

12  A.      I am.

13  Q.      An absorption window is an area in the

14  gastrointestinal tract in which a drug is well absorbed

15  or absorbed at a sufficient rate as compared to other

16  regions where the drug is absorbed more slowly or not at

17  all; correct?

18  A.      Yes.

19  Q.      Now, the establishment or prediction of an absorption

20  window for a particular drug needs to be confirmed by

21  clinical testing; correct?

22  A.      Proof of an absorption window, yes.

23  Q.      An absorption window is something that a person of

24  ordinary skill in the art should consider when designing or

25  formulating a drug; correct?

Friend - cross

1    A.      Correct.

2    Q.      Indeed, under certain circumstances, the existence of

3    an absorption window makes developing a controlled release

4    formulation more challenging relative to a drug without

5    absorption window; isn't that true?

6    A.      Yes, if challenging means you would need to perform

7    more experiments and spend more time in the development

8    process.

9    Q.      Now, today it's known that doxycycline has an

10   absorption window; correct?

11   A.      The data support that conclusion, yes.

12   Q.      Now, in your direct testimony, I did not hear you

13   present opinion that it was known prior to 2002 that

14   doxycycline has an absorption window.  Did I miss that or am

15   I correct?

16   A.      No, I did not express an opinion.

17   Q.      Now, in forming your opinions in this case, you did

18   not even consider what a person of ordinary skill in the art

19   would have thought had the doxycycline absorption window not

20   been known in 2002; correct?

21   A.      Correct.  Excuse me.

22   Q.      In your own experience, you have worked with drugs

23   that have an absorption window; correct?

24   A.      Correct.

25   Q.      In fact, you worked on an attempted formulation of

Friend - cross

1    the drug rantinidine (phonetic) and I might have

2    mispronounced that.

3    A.      Close.   Ranitidine.

4    Q.      Ranitidine.   That has an absorption window; correct?

5    A.      Correct.

6    Q.      And you were unable to develop a successful

7    controlled release formulation of that particular drug;

8    correct?

9    A.      Correct.

10   Q.      And am I also correct that that is the only drug that

11   you attempted to develop a controlled release formulation

12   that had this absorption window?

13   A.      Correct.

14   Q.      Now, in your opening or direct testimony, rather,

15   today, you relied on the Ashley references, the '304 patent

16   and the '819 patent; correct?

17   A.      Correct.

18   Q.      Now, in your expert report, however, you previously

19   relied on a number of -- I count seven other references to

20   support your opinions of invalidity; correct?

21   A.      That is correct.

22           MR. O'MALLEY:  And if we could just put up on

23   the screen -- we're just going to ask a quick question so

24   the screen may be sufficient.  Would you put up DTX-2117,

25   please.

Friend - cross

1              This is one of the references that you relied on

2    in your expert report to support your opinions of invalidity

3    of the Chang patents; correct?

4    A.      Correct.

5    Q.      And today you provided no testimony with respect to

6    that reference; is that correct?

7    A.      Yes.

8              MR. O'MALLEY:  Would you put up, please,

9    DTX-2120.

10   BY MR. O'MALLEY:

11   Q.      And this reference, which I will call the Walker

12   reference, is a reference that you relied on in your expert

13   report to support your invalidity opinion; correct?

14   A.      Correct.

15   Q.      And today you provided no testimony as to that

16   reference; is that correct?

17   A.      That's correct.

18   Q.      And with respect to Thomas 2000, DTX-2121, same

19   question, you relied on in your expert report; correct?

20   A.      Correct.

21   Q.      No testimony today?

22   A.      No testimony, no.

23             MR. O'MALLEY:  Okay.  PTX-206, please.

24   BY MR. O'MALLEY:

25   Q.      It is a little hard to read, but do you recognize

Friend - cross

1    this to be the Periostat tablet label?

2    A.    I do, yes.

3    Q.    And you relied on this to support your invalidity

4    opinions in your expert report; correct?

5    A.    Correct.

6    Q.    And no testimony today; correct?

7    A.    Correct.

8              MR. O'MALLEY:  And DTX-2118, please.

9    BY MR. O'MALLEY:

10   Q.    Similarly, you relied on this in your expert report

11   to support your invalidity; correct?

12   A.    Correct.

13   Q.    And no testimony today?

14   A.    That's correct.

15             MR. O'MALLEY:  I think are almost at the end.

16   DTX-2123, please, which I will call the Ashley presentation.

17   BY MR. O'MALLEY:

18   Q.    You relied on it in your expert report to support

19   your invalidity opinions; correct?

20   A.    Yes.

21   Q.    And no testimony today?

22   A.    No, no testimony.

23   Q.    Now, let's talk about your testimony with respect to

24   the Ashley rosacea references; okay?

25   A.    Okay.

Friend - cross

1    Q.      And you know what I'm referring to by the Ashley

2    rosacea references?

3    A.      You are referring to '932 and the related

4    applications?

5    Q.      That's correct.

6    A.      Not the '854.

7    Q.      No, the '854 we can call the Ashley controlled

8    release references.  Is that fair for our communication?

9    A.      Okay.

10   Q.      So if I refer to either the '932 or the Ashley

11   rosacea references, you will understand I'm referring to the

12   same thing?

13   A.      Yes.

14   Q.      Okay.  Now, it's at DTX-2111 in your notebook if you

15   need it.  I'll wait until you have it in front of you.

16   A.      Okay.

17   Q.      Now, the '932 patent application does not explicitly

18   disclose the use of a 30 milligram IR component; correct?

19   A.      Correct.

20   Q.      And the '932 patent application does not explicitly

21   disclose the use of a 10 milligram DR component; correct?

22   A.      Correct.

23   Q.      And the '932 application does not explicitly disclose

24   the ratio of 30 milligrams to 10 milligrams IR to DR; isn't

25   that correct?

Friend - cross

1   A.      Yes, not explicitly.  It does not.

2   Q.      And do you recall -- well, let me ask you this.  Were

3   you in the courtroom, I guess it was Tuesday, Dr. Friend,

4   when the opening statements were made?

5   A.      Yes, I was here.

6   Q.      And do you recall that in the opening statement of

7   Mylan's counsel, he referred to this 30 to 10 IR/DR ratio as

8   the so-called secret sauce of the Chang invention?

9   A.      Something along those lines, yes.

10  Q.      And do you recall that Mylan's counsel conceded in

11  his opening statement that the Ashley patents do not

12  disclose this 3 to 1 ratio, the so-called secret sauce?

13  A.      Yes.

14  Q.      And you don't dispute that?

15  A.      I do not.

16  Q.      Do you understand that for anticipation, each and

17  every limitation of the patent claims must be found in a

18  single reference?

19  A.      I do.

20  Q.      But, again, the 30 to 10 ratio is not disclosed in

21  the Ashley patents; correct?

22  A.      Not explicitly.

23  Q.      Okay.  Now, you also testified as to some disclosures

24  from the Ashley rosacea references; correct?

25  A.      Yes.

Friend - cross

1    Q.      And for your slides, you used the '854 but for

2    purposes of your opinions, you have testified previously

3    there is no distinction between that reference and another

4    reference in the same family such as the '106 application;

5    is that fair?

6    A.      That is what I said at deposition, yes.

7    Q.      Do you agree with that?

8    A.      Yes.

9    Q.      Okay.  Now, before I move to the rosacea references,

10   returning back briefly to the -- well, no.  Let me stay with

11   the Ashley rosacea references.  None of those slides that

12   you discussed the rosacea references talked about a single

13   complete embodiment of a controlled release formulation from

14   those references; correct?

15   A.      For the '932?  Yes.  There was no complete

16   formulation, if you will.  I understand you correctly.

17   Q.      There is no embodiment or example of a complete

18   formulation anywhere in the '932; correct?

19   A.      Correct.

20   Q.      So, naturally, there is no disclosure of a complete

21   formulation that will give steady state blood levels of

22   doxycycline of a minimum of .1 micrograms per milliliter and

23   a maximum of 1.0 microgram per milliliter?

24   A.      If you take the '932 in isolation, yes, that's

25   correct.

Friend - cross

1  Q.      And there is no expressed disclosure of any single

2  complete formulation that included both an IR and a DR

3  portion in the '932; correct?

4  A.      Correct.

5  Q.      And there is no expressed disclosure of any specific

6  embodiment or example of a formulation that had an IR

7  portion with a 30 milligram doxycycline; correct?

8  A.      Correct.

9  Q.      Or a DR portion with a 10 milligram doxycycline;

10  correct?

11  A.      That's correct.

12  Q.      And there is no specific complete example or

13  embodiment of any formulation in the '932 with a DR portion

14  in the form of pellets coated with at least one enteric

15  polymer; correct?

16  A.      Correct.

17  Q.      And it's your opinion that the Ashley references are

18  the closest prior art; is that correct?

19  A.      Yes.  As I said earlier, though, the combination of

20  those two references, '854 and '932.

21  Q.      All right.  But let's talk about then the Ashley CR

22  references.  And I got a little bit ahead of myself before,

23  but, again, there's no difference between the '854 you

24  discussed versus the one of the other in that family.  For

25  example, the 106; correct?

Friend - cross

1    A.      Correct.

2    Q.      Now, you presented some slides today on the Ashley

3    controlled release references; correct?

4    A.      Correct.

5    Q.      And you testified as to the portions of the

6    disclosure from the Ashley CR references that you rely on

7    for your invalidity opinion; is that correct?

8    A.      Correct.

9    Q.      And none of those slides that you presented to the

10   Court today with respect to the Ashley CR patents, again,

11   disclose the single complete example or embodiment of CR

12   formulation; correct?

13   A.      Correct.

14   Q.      Because in the Ashley CR references, just like the

15   Ashley rosacea references, there is no disclosure of a

16   single, complete example or embodiment of a controlled

17   release formulation; correct?

18   A.      Correct.

19   Q.      And there's no explicit disclosure, I think you've

20   answered this already with respect to the secret sauce, of

21   any particular ratio of IR to DR, doxycycline, in the Ashley

22   CR references; correct?

23   A.      No, no specific ratio is presented.

24   Q.      Now, given the fact that there's no example or

25   embodiment of a single complete formulation in the Ashley CR

Friend - cross

1    references, and naturally there's no disclosure of such a

2    formulation that will give steady state blood levels of a

3    minimum of between .1 microgram per milliliter and a maximum

4    of 1.0 microgram per milliliter; is that correct?

5    A.    Correct.

6    Q.    And there's no express disclosure of an example or

7    embodiment of a complete formulation that includes both an

8    IR portion and a DR portion; is that correct?

9    A.    No explicit statement, no.

10   Q.    And there's no express disclosure of a complete

11   example or embodiment of a particular formulation with an

12   IR portion of about 30 milligrams doxycycline; is that

13   correct?

14   A.    Correct.

15   Q.    And there's no express disclosure of such a

16   formulation with a DR portion of ten milligrams; correct?

17   A.    Correct.

18   Q.    And no express disclosure much such a formulation

19   with the ratio of 30 to 10 IR to DR; is that correct?

20   A.    That's true, yes.

21   Q.    And no express disclosure of any such specific

22   formulation with a DR portion in the form of pellets coated

23   with at least one enteric polymer; correct?

24   A.    Not explicitly, no.

25   Q.    Okay.  Now, let's look at your slide, if we may,

Friend - cross

1    DDX-623.

2              Now, if I recall correctly from your testimony,

3    you rely on this disclosure from the Ashley CR references to

4    support your opinion that the ratio of IR to DR in the Chang

5    claims is anticipated; is that correct?

6    A.    Yes.  In part.

7    Q.    In part.  And further in part by relying on Rubas'

8    testimony; is that correct?

9    A.    Correct.

10   Q.    And naturally Rubas' testimony is not incorporated

11   explicitly in the Ashley disclosure; is that correct?

12   A.    Correct.

13   Q.    Now, the Ashley CR references can disclose many

14   combinations of immediate and sustained and delayed release

15   phases; correct?

16   A.    Correct.

17   Q.    In fact, let's take a look at your DDX-621.  And as

18   you pointed out, the composition also can include a

19   controlled release agent selected from the group consisting

20   of an instantaneous release agent, and you pointed out

21   delayed release agent and combinations thereof.

22              It can also include the portion you didn't

23   highlight of sustained release agent; is that correct?

24   A.    It could.

25   Q.    Okay.  And if we can turn to DTX-1067, page 10.  And

Friend - cross

1    let's focus on the bottom paragraph, please.

2              And this is from the 106 application.  And it

3    states, "In a preferred embodiment, the composition of the

4    invention comprises more than one controlled release agent,

5    and can include all three types of controlled release

6    agents, i.e., an instantaneous release agent, a sustained

7    release agent, and a delayed release agent."

8              Do you see that?

9    A.     I do.

10   Q.     And so according to the disclosure of the Ashley CR

11   references, the Ashley patent teaches that you can have for

12   its controlled release composition a combination of instant

13   release and sustained release; is that correct?

14   A.     Yes.

15   Q.     You can have a combination of instant release and

16   delayed release; correct?

17   A.     Correct.

18   Q.     You could have sustained release by itself; is that

19   correct?

20   A.     Yes.

21   Q.     You could have delayed release by itself; is that

22   correct?

23   A.     Correct.

24   Q.     Or you could have all three:  Immediate release,

25   delayed release, and sustained release; correct?

837

Friend - cross

1    A.      Correct.

2    Q.      Now, going back to your slide 623, DDX-623.  Now, you

3    focused on the highlighted language, and I will read it

4    again into the record.  "It is preferred that at least

5    50 percent, more preferably greater than 80 percent of the

6    tetracycline in the composition be released in the upper

7    G.I. tract."

8            Correct?  You've focused on that?

9    A.      Yes.

10   Q.      And you testified that that is a relatively narrow

11   range of ratios.  Did I hear you correctly?

12   A.      It suggests a narrow range of ratios, yes.

13   Q.      Now, for the purposes of trying to pick out a piece

14   of disclosure that would anticipate the Chang claim, you

15   have to get rid of that disclosure of greater than

16   80 percent being immediately released; is that correct?

17   A.      Well, I interpreted the claim of -- in one of about

18   30 and about ten to mean ranges possibly -- not specifically

19   those numbers, but ranging outside because of the about

20   language.

21   Q.      Now, it states that more preferably greater than

22   80 percent will be released in the upper G.I. tract; is that

23   correct?

24   A.      Correct.

25   Q.      Now, if you just take the preferred language of at

Friend - cross

1    least 80 percent, and given the combinations that we already

2    said are within the disclosure of the Ashley CR, namely,

3    IR/SR, IR/DR, SR by itself, IR/DR/SR, in those teachings, it

4    would suggest a myriad of compositions, wouldn't it?

5    A.    It could, yes.

6    Q.    In fact, the disclosure of the Ashley CR reference

7    could be met by a single phase SR gastro-retentive form;

8    correct?

9    A.    Potentially.

10   Q.    In fact, the reference in the portion of the

11   disclosure you cite to refers to the fact that the

12   formulation is entrapped in the upper portion of the

13   gastrointestinal tract.

14         Do you see that?

15   A.    I see that, yes.

16   Q.    And that means a dosage form that's retained in the

17   stomach due to its size; correct?

18   A.    That's my interpretation, yes.

19   Q.    So that could be, for example, a gastro, so-called

20   gastro-retentive formulation that released 80 percent over a

21   longer period of time; is that correct?

22   A.    Longer period of time than what?

23   Q.    Over a longer period of time relative to immediate

24   release.

25   A.    Yes.

Friend - cross

1    Q.      Okay.  And a gastro-retentive formulation is

2    different from an immediate release formulation; is that

3    correct?

4    A.      It depends.

5    Q.      Well, for example, an immediate release dosage form

6    is not generally retained in the stomach due to its size;

7    correct?

8    A.      That's true, yes.

9    Q.      And that is by contrast a characteristic of a

10   gastro-retentive formulation; correct?

11   A.      Correct.

12   Q.      Now, there's nothing in the portion of the disclosure

13   you rely on that states that there should be a delayed

14   release component; correct?

15   A.      Just kind of repeat that question.

16   Q.      Yes.  There's nothing in the paragraph you rely on

17   for the anticipation of the IR/DR ratio that states that

18   there should be a delayed release component at all; is that

19   correct?

20   A.      It doesn't explicitly state the need for a DR

21   portion, correct.

22   Q.      Okay.  Now, let's return to the portion that we

23   looked at DTX-1067 at the bottom of page 10.  And, again,

24   there's discussion of an embodiment of the Ashley CR

25   reference that includes all three types of the controlled

Friend - cross

1    release agents; correct?  IR, SR and DR; is that correct?

2    A.     That's correct.

3    Q.     And they state that using all three types of those

4    controlled release agents can produce a profile that

5    administers the tetracycline compound in a specific dose

6    over an extended period of time, for example, 12 to

7    24 hours.  And then they refer to figure 1 that depicts that

8    release profile.

9           Do you see that?

10   A.     Yes.

11   Q.     Now, figure 1 was also part of your slides; correct?

12   DDX-607, if I'm not mistaken?

13   A.     That's correct.

14   Q.     Now, again, no specific example of a complete

15   formulation is provided in the Ashley CR references that

16   would create the release profile of figure 1; is that

17   correct?

18   A.     Yes, correct.

19   Q.     And you see, according to the disclosure, that

20   reference figure 1, it has incorporated three different

21   release phases, an instantaneous release, a sustained

22   release, and a delayed release.

23          Do you see that?

24   A.     Yes, I do.

25   Q.     And apparently, according to the disclosure, that's

Friend - cross

1  to give continuous release over a period of 12 to 24 hours;

2  is that correct?

3  A.     Yes.

4  Q.     Now, the 30-milligram IR to ten-milligram DR

5  formulation that Chang claims would create a very different

6  release profile than shown in figure 1; correct?

7  A.     Well, like I said earlier in my testimony, these --

8  this figure presents blood plasma levels which aren't

9  necessarily reflective of release profiles.

10 Q.     Well, I believe you also showed us a release profile

11 for the Ashley 30 IR 10 DR milligram formulation, as I

12 recall, DDX-602, perhaps.

13 A.     Yes, I did.

14 Q.     Okay.  Let's -- I have the wrong number.  Let me pull

15 up PDX-602, which is a demonstrative we created.

16        Do you recognize on the left is another form of

17 figure 1 from one of the other Ashley CR patents?

18 A.     Yes.

19 Q.     And that one is from the 106.  And then on the right,

20 is another representation of the figure that you testified

21 about in your written description portion of your testimony;

22 is that correct?

23 A.     Yes.

24 Q.     And that is a plasma concentration graph for the

25 claims of the Chang patent, 30 IR, 10 DR; is that correct?

Friend - cross

1    A.      Correct.

2    Q.      And you can see that it provides for a very different

3    plasma concentration profile relative to the only plasma

4    concentration profile provided by the Ashley CR references;

5    is that correct?

6    A.      They're not identical, no.

7    Q.      They're different.  They're rather different,

8    wouldn't you agree, Dr. Friend?

9    A.      They're different, yes.

10   Q.      Okay.  So if you were trying to follow the disclosure

11   of Ashley with respect to the only release profile it

12   disclosed, you would not be successful if you tried a

13   30-milligram IR to 10-milligram DR combination; is that

14   correct?

15   A.      Yes.  Yes.

16   Q.      Now, I would like to move on, Dr. Friend, to talk

17   about the '304 reference that you testified about.

18   A.      Okay.

19   Q.      And if you need to refer to it, circumstances it's at

20   DTX-2019.

21   A.      Okay.

22   Q.      And as I believe you testified, the '304 patent

23   discloses a controlled release formulation of minocycline;

24   is that correct?

25   A.      Correct.

Friend - cross

1    Q.      And minocycline and doxycycline have different

2    physical and chemical properties; correct?

3    A.      "Different" needs to be defined within a range of

4    possible differences.

5    Q.      Well, did you testify in your deposition that the two

6    drugs have different chemical and physical properties?

7    A.      They're -- they're different, but similar.

8            MR. O'MALLEY:  Would you give me transcript page

9    143, 9 to 17.

10           And the transcript, Dr. Friend and your Honor,

11   is provided in the thinner of the two notebooks I've handed

12   up.  I think it's the first tab.

13           MR. REED:  What page?

14           MR. O'MALLEY:  Page 143, Line 9 to 17.  It's on

15   the screen.

16           "Question:  And minocycline and doxycycline have

17   different physical and chemical properties; correct?

18           "Answer:  That's a relative term.  They are

19   relatively similar in the big scheme of pharmaceutical

20   products.

21           "Question:  Okay.  But do they have different

22   physical and chemical properties; correct?

23           "Answer:  Yes."

24           MR. REED:  Your Honor, this is not impeaching.

25           THE COURT:  That's an objection.  It's

Friend - cross

1      overruled.

2              Go ahead.

3      BY MR. O'MALLEY:

4      Q.      We asked you those questions and you provided those

5      answers; correct?

6      A.      I did.

7      Q.      All right.  Now, turning to the '304 patent, you

8      don't consider the '304 patents to be as close to the Chang

9      patent claims as the Ashley references; correct?

10     A.      Correct.

11     Q.      And the '304 patent, again, was brought to your

12     attention by Mylan's counsel; is that correct?

13     A.      Correct.

14     Q.      And the '304 patent does not disclose a once-daily

15     formulation of doxycycline; is that correct?

16     A.      Correct.

17     Q.      And the '304 patent does not disclose the 75 to 25

18     IR/DR ratio of doxycycline of the Chang claim; is that

19     correct?

20     A.      Not of doxycycline, no.

21     Q.      It does not disclose the so-called secret sauce;

22     correct?

23     A.      Not for doxycycline.

24     Q.      Well, you said not of doxycycline.  For the

25     disclosure you rely on for the concentration I believe that

845

Friend - cross

1    is on DDX-652.

2              MR. O'MALLEY:  Can we pull that up?

3    BY MR. O'MALLEY:

4    Q.    Am I correct that's the disclosure?

5    A.    Yes.

6    Q.    All right.  So the IR portion can be anywhere from 20

7    to 80 percent; correct?

8    A.    Correct.

9    Q.    And the DR portion could be conversely anywhere from

10   80 to 20 percent; correct?

11   A.    Correct.

12   Q.    That's a huge range of possible combinations of IR

13   and DR; correct?

14   A.    Correct.

15   Q.    The '304 patent does not disclose methods of treating

16   rosacea; correct?

17   A.    Correct.

18   Q.    Now, you discussed some of the blood plasma

19   concentrations levels that were disclosed by the '304

20   patent.  Do you remember that?

21   A.    In the '304 patent?  Can you refresh my memory.

22   Q.    Well, let me just ask the question differently so I

23   don't have to find you a slide.

24              The Cmax of the formulations described in the

25   examples of the '304 patent are much higher than the 1.0

Friend - cross

1    microgram milliliter limit of the Chang claims; correct?

2    A.     Yes, there is a range of potential concentration

3    ranges that are disclosed in the '304 application.

4    Q.     They're much higher than the Chang upper limit;

5    correct?

6    A.     Most of these examples are, yes.

7    Q.     In fact, all of them are; correct?

8    A.     The lower range disclosed a 0.1 to 1.0 micrograms per

9    mil minocycline.

10   Q.     Micrograms per mil or a different MCG per mil?

11   A.     Micrograms.

12   Q.     Now, do you recall, when you were asked in your

13   deposition, "do you understand that the Cmax of the

14   formulations described in the examples of the '304 patent

15   have Cmax that are much higher than 1.0 micrograms per

16   milliliter?"  Do you recall?

17   A.     Yes.

18   Q.     And do you recall answering "I do?"

19   A.     I do recall answering "I do."

20   Q.     And as you testified today, the point of the '304

21   patent is to keep blood plasma levels of minocycline above

22   the therapeutic minimum; correct?

23   A.     Yes.

24   Q.     And the point of it is to keep the blood plasma

25   levels in the concentration range where they would act as an

Friend - cross

1    antibiotic; correct?

2    A.     Yes.  From that range, high range to a minimum.

3    Right.

4    Q.     And you understand that by contrast, the point of the

5    Chang blood plasma concentration upper range limitation is

6    to keep blood plasma concentration below that which would

7    allow the doxy to act as an antibiotic; correct?

8    A.     Correct.

9    Q.     Now, if we go back to DDX-3650.

10              And if you look at the bottom box, does that

11   refresh your recollection that the units are not micrograms

12   per milliliter in the '304 patent?

13   A.     MC I think is an abbreviation for micro.

14   Q.     Okay.  You believe that is the same?

15   A.     Yes.

16   Q.     Now, you are not aware of any disclosure in the

17   '304 patent of anything other than an antibiotic dose of

18   minocycline?

19   A.     That's correct.

20   Q.     And you are not aware of any once daily minocycline

21   product that is formulated according to this patent or

22   disclosed in this patent using IR and DR multiparticulate

23   pellets; correct?

24   A.     Correct.

25   Q.     Now, you also relied on the '819 patent for your

Friend - cross

 1   invalidity opinions; correct?

 2   A.      Correct.

 3   Q.      And if you need it, that's at DTX-2116 in your book,

 4   sir.

 5   A.      Okay.

 6   Q.      All right?

 7   A.      Thank you.

 8   Q.      Now, you were in the courtroom Tuesday when

 9   Dr. Rudnic testified as to his personal involvement with the

10   development of the inventions claimed in the '819 and other

11   related patents; correct?

12   A.      Correct.

13   Q.      And you heard that the products covered by the '819

14   patent are among the 80 products that reached the market for

15   which Dr. Rudnic was involved in the formulation; correct?

16   A.      Yes.

17   Q.      And again, by contrast, you were not personally

18   involved in the development of the formulations covered by

19   the '819 patent; correct?

20   A.      Correct.

21   Q.      And you were not personally involved in fact in the

22   formulation of any drug that has been marketed; correct?

23   A.      Correct.

24   Q.      But you disagree with Dr. Rudnic's opinion that this

25   amphetamine patent is very distant from the Chang patent;

Friend - cross

1   right?

2   A.    The use of amphetamines is, yes.

3   Q.    I'm sorry?

4   A.    The use of amphetamines is very far from the Chang

5   patent.

6   Q.    Right.  In fact, there is no particular reason why a

7   person of ordinary skill in the art would look to

8   formulations of amphetamines, per se, when trying to

9   formulate a once daily doxycycline formulation; correct?

10  A.    Correct.  I could have chosen dozens of other

11  examples.  I just choose this one.

12  Q.    The amphetamine example?

13  A.    Yes.

14  Q.    And doxycycline and amphetamines naturally have very

15  different physical and chemical properties; correct?

16  A.    They can, yes.

17  Q.    Now, again, if you can turn to DTX-2117, please.  I'm

18  sorry.  Let's set that aside for the moment.

19          Returning to the '819 patent.  One of the

20  purposes of the invention of the '819 patent was to provide

21  continuing increasing blood levels of amphetamines over an

22  extended period of time as compared to an immediate release

23  formulation; correct?

24  A.    Correct.

25  Q.    And, again, by contrast, the formulation claimed in

Friend - cross

1    the Chang patent is intended to keep blood plasma levels

2    below a certain ceiling; correct?

3    A.      Correct.

4    Q.      And a formulation such as that disclosed in the '819

5    patent that provides for continuing increasing blood plasma

6    concentrations could, if employed with doxycycline, exceed

7    the upper concentration limit required by Chang; correct?

8    A.      If one directly applied what is disclosed, yes.

9    Q.      Now, the '819 patent does not disclose 75 to 25 IR/DR

10   ratio of doxycycline; correct?

11   A.      Correct.

12   Q.      It doesn't disclose the so-called secret sauce;

13   right?

14   A.      Yes.

15   Q.      And the '819 patent does not disclose a once daily

16   formulation of any drug that gives a steady state blood

17   level of a minimum of .1 and a maximum of 1.0 micrograms per

18   milliliter; correct?

19   A.      Correct.

20   Q.      And the '819 patent does not disclose the once daily

21   formulation of any drug that gives steady state blood levels

22   of between .3 to .8 micrograms per milliliter; correct?

23   A.      Correct.

24   Q.      And the '819 patent does not disclose any methods of

25   treating rosacea; correct?

Friend - cross

1    A.      That's true.

2    Q.      Now, I'll ask you if you would to turn to DTX-2117,

3    please.

4            Now, again, you are familiar with this

5    reference.  As you testified earlier, this is one of the

6    references that you relied on in your expert report but not

7    in your testimony today; correct?

8    A.      Correct.

9    Q.      Now, in your expert report, you took the position

10   that you believe the Chang formulation was virtually

11   identical to the Shire technology disclosed not only in the

12   '819 patent that we just discussed but also the '768 patent;

13   correct?

14   A.      I don't recall exactly.

15   Q.      Okay.  You have your expert report in the thinner of

16   your two references.  And if we could pull up Friend Opening

17   Report, paragraph 62.

18           Sir, this is the paragraph where you take the

19   position that Shire's prior controlled release references

20   similarly disclose the use of virtually the identical

21   technology employed by the Chang patent, and you reference,

22   by example, the '819 patent; correct?

23   A.      Yes.

24   Q.      And then in the following paragraph, you say,

25   similarly, you cite the '768 patent for the same purpose;

Friend - cross

1   correct?

2   A.      Correct.

3   Q.      So -- and you understand that both the '819 and the

4   '768 patent relate to what you testified as the Adderall

5   technology or formulation?

6   A.      Yes.

7   Q.      And I believe you said they both employ the so-called

8   Microtol technology.  Did I get that correct?

9   A.      Microtrol.

10  Q.      Microtrol?

11  A.      I think that is correct.

12  Q.      And I think you referred to this Microtrol technology

13  as an example of so-called off-the-shelf technologies; is

14  that correct?

15  A.      I did, yes.

16  Q.      Now, just because a technology is so-called

17  off-the-shelf technology, that doesn't mean it's appropriate

18  for formulating all drugs; correct?

19  A.      That's correct.

20  Q.      And just because a person uses a certain so-called

21  off-the-shelf technology for one formulation, that doesn't

22  mean they can't get a valid patent using that same

23  off-the-shelf technology on a later formulation; isn't that

24  true?

25  A.      That's -- I can't answer that.  It's too broad a

Friend - cross

1    question.

2    Q.      You can't answer that.

3            Now, the disclosure of the '768 and the '819

4    patents are certainly closer to one another than they are to

5    the Chang patent; correct?

6    A.      Yes.

7    Q.      Both the '819 and the '768 patents disclose

8    controlled release formulations of amphetamines; correct?

9    A.      Yes.

10   Q.      Both relate to Shire's technology as applied to the

11   Adderall drug franchise; correct?

12   A.      Correct.

13   Q.      And both patents disclose that the formulations can

14   be combinations of IR and DR multiparticulate drug

15   components; correct?

16   A.      Correct.

17   Q.      And both are intended to deliver in a once daily

18   dosage a therapeutically effective amount of amphetamines to

19   treat attention deficit hyperactivity disorder; correct?

20   A.      Correct.

21   Q.      Now, you testified the '819 and the '768 patent

22   disclosures are closer to one another than they are to the

23   Chang patent; correct?

24   A.      Correct.

25   Q.      And are you aware that the PTO decided that the '768

Friend - cross

1    invention was patentably distinct from this '819 invention

2    that is, by your own testimony, closer than Chang?

3    A.    I'm not aware of that, no.

4          MR. O'MALLEY:  Could we pull up the '768 patent

5    and notice of references?  I believe we have a snapshot,

6    gentlemen.

7    BY MR. O'MALLEY:

8    Q.    Again, you can refer to the portion of the '768,

9    DTX-2117, that is in your notebook.  But do you see on the

10   second page of cited references that the '819 patent is

11   disclosed as having been a cited reference in the '768?

12   A.    Yes, I see that.

13   Q.    Do you understand that that indicates that the Patent

14   Office considered the disclosure of the '819 and decided

15   that the '768 was nevertheless patentable?

16   A.    Yes, I understand that.

17   Q.    And, again, they're closer to one another than either

18   are to Chang; correct?

19   A.    Yes.

20   Q.    Now, let's return to your claim chart, which is I

21   think DDX-615.

22         Now, again, since neither Ashley references you

23   testified discloses any single complete formulation, as you

24   pull citations, you can't pull from a single formulation,

25   naturally, in this chart; correct?

Friend - cross

1    A.      No, there is not a specific formulation mentioned in

2    this chart.  Correct.

3    Q.      So to meet the various anticipatory opinions with

4    respect to each and every limitation of Chang claim 1, you

5    have to piece together disclosures from various portions of

6    the two references; correct?

7    A.      Correct.

8    Q.      And, again, even if you were to piece together these

9    various separate disclosures from the two references, never

10   will you find an expressed disclosure between the two of

11   them of the 75 and 25 ratio, the so-called secret sauce;

12   correct?

13   A.      No, it's not explicitly stated as such were found.

14   Q.      Now, during your direct testimony, you didn't provide

15   any testimony as to the Faulding company's attempt to

16   formulate doxycycline; correct?

17   A.      Correct.

18   Q.      And you heard Dr. Rudnic talk about the Faulding's

19   company's failure?

20   A.      Yes, I did.

21   Q.      But today you provided no testimony in rebuttal to

22   that; fair enough?

23   A.      Fair.

24            MR. O'MALLEY:  I have no further questions.

25            THE COURT:  Any redirect?

Friend - redirect

1              MR. REED:  Yes.  Thank you, your Honor.

2                        REDIRECT EXAMINATION

3       BY MR. REED:

4       Q.     Dr. Friend, Mr. O'Malley asked you to look at

5       Exhibit 3 of the pretrial order, the first document in the

6       big binder.

7       A.     Yes.

8       Q.     I'm going to ask you to look back at that as well,

9       please.

10      A.     Okay.

11      Q.     He took us to a paragraph near the beginning of the

12      document.  I'd like to take you to a paragraph that appears

13      later in the same document that appears at page 30.

14      A.     Okay.

15      Q.     At the bottom of page 30, there is a numbered

16      paragraph 138.  Do you see that paragraph?

17      A.     I do.

18      Q.     Could you read that paragraph, please?

19      A.     It says the mean Cmin of the CR 101 PK study relied

20      on by DJ defendants is 164 nanograms per milliliter plus or

21      minus 70.7 nanograms per milliliter.

22      Q.     Is that consistent with your understanding of the

23      Cmin for the pivotal PK study discussed by Dr.  Rudnic?

24      A.     Yes.

25      Q.     Is that also consistent with your opinion that the

Friend - redirect

1    Mylan product Cmin will not stay between .3 and

2    .8 micrograms per milliliter?

3    A.      Yes, it is consistent.

4    Q.      Looking at the next page, paragraph number 139, could

5    you read that as well, please?

6    A.      Taking the Cmin standard deviation a range of

7    variability calculated from the population into account, for

8    instance, an upper value of 234.7 nanograms per milliliter

9    or 23 micrograms per milliliter, the upper range of the

10   expected Cmin value is still much less than the

11   0.3 micrograms per mil plasma concentration required by the

12   claim.

13   Q.      Again, is that consistent with your opinions?

14   A.      Yes, it is.

15   Q.      Do you understand that be to the Cmin that was

16   referred to in the previous paragraph determined by the

17   pivotal PK study that Dr. Rudnic identified?

18   A.      Yes.  That's what I understand.

19   Q.      Let's go back to the page that you were asked to look

20   at by Mr. O'Malley.  That was page 11 of the document.

21   A.      Okay.

22   Q.      At the end of that paragraph, you see two exhibit

23   numbers referenced.

24   A.      I do.

25                   MR. REED:  Your Honor, I would like to

858

Friend - redirect

1    provide copies of that.  I have only three, so with the

2    Court's permission, I suggest I give one to the witness, one

3    to opposing counsel and one to yourself.

4                   THE COURT:  And these are the two DTX's

5    referenced in paragraph 3?

6                   MR. REED:  Yes.

7                   THE COURT:  That's fine.

8                   (Mr. Reed handed exhibits to the witness, the

9    Court and opposing counsel.)

10   BY MR. REED:

11   Q.    Let's take them one at a time.  DTX-2274 first.

12         Do you recognize that document?

13   A.    It's the one I have in my hand, yes.

14   Q.    Do you recognize it?

15   A.    Yes.  It's the proposed labeling for Mylan generic

16   equivalent.

17   Q.    And is this the label that you were discussing in

18   your testimony earlier when you said that there's no

19   evidence on Mylan's label of infringement of claims 4 and 18

20   of the Chang patent?

21   A.    Yes.  And I did that by reading a version with larger

22   print than this.

23   Q.    Anywhere on DTX-2274 does it say that the mean trough

24   doxycycline serum concentration of Mylan's proposed ANDA

25   product is .3 micrograms per milliliter?

Friend - redirect

1          MR. O'MALLEY:  Objection, your Honor.  I don't

2   know how he's supposed to answer this.  You can't read this

3   exhibit.

4          THE COURT:  We'll see if he can answer it.

5          THE WITNESS:  Yes.  In reading this previously,

6   and if I put on my reading glasses, I would be able to find

7   that it's not disclosed anywhere.

8          MR. REED:  Your Honor, I offer DTX-2274.

9          MR. O'MALLEY:  No objection.

10          THE COURT:  It's admitted.

11          (DTX-2274 was admitted into evidence.)

12          MR. REED:  Let's turn now to DTX-2275, please.

13   BY MR. REED:

14   Q.     Do you recognize this document?

15   A.     Yes, I do.

16   Q.     And is it a different version of Mylan's label?

17   A.     Yes, it is.

18   Q.     Does it provide a comparison between Mylan's proposed

19   label and the Oracea label?

20   A.     Yes, it does.

21   Q.     Is that what the various columns indicate?

22   A.     Yes.  Oracea on the left, Mylan's proposed label in

23   the middle, with some proposed changes on the right.

24   Q.     And does this document anywhere indicate that the

25   mean trough doxycycline serum concentration of Mylan's

860

Friend - redirect

1  proposed ANDA product is .3 micrograms per milliliter?

2  A.     No, it's not disclosed.

3              MR. REED:  I offer DTX-2275, your Honor.

4              MR. O'MALLEY:  No objection.

5              THE COURT:  All right.

6              (DTX-2275 was admitted into evidence.)

7  BY MR. REED:

8  Q.     Let's talk for just a minute now about the absorption

9  of doxycycline.

10             MR. REED:  And can we please put up on the

11 screen DDX-506.

12 BY MR. REED:

13 Q.     What do you know about the absorption of doxycycline

14 prior to April 2003?

15             MR. O'MALLEY:  Objection.  Beyond the scope of

16 the direct.  His direct or my cross.

17             THE COURT:  I'm sorry.  Where is this slide

18 from, Mr. Reed?

19             MR. REED:  This was a slide that Dr. Rubas

20 testified about, and Dr. Friend on his direct testified

21 knowing about the absorption, and then Mr. O'Malley

22 questioned him for several minutes on the absorption window

23 of doxycycline.

24             MR. O'MALLEY:  Not with respect to this exhibit

25 that he did not testify about, your Honor.

Friend - redirect

1                  THE COURT:  Well understood.  Dr. Friend will

2       incorporate Dr. Rubas opinion into his, so I'm going to

3       overrule the objection to that question.

4       BY MR. REED:

5       Q.      Is the Exhibit DTX-2206, which is an article by

6       Saivin, a document you considered in forming your opinions?

7       A.      Yes, it is.

8       Q.      Is it, in fact, a document that you were examined on

9       at your deposition extensively?

10      A.      Yes, I was.

11      Q.      Can you tell us what you know about doxycycline

12      absorption from this reference?

13      A.      From this reference, it states that the absorption

14      primarily occurs in the duodenum.  And this also discloses

15      the reason as to why that occurs and that the drug has the

16      greatest liposolubility.  Doxycycline is not particularly

17      lipophilic, but it is most lipophilic at pH 5.5 and

18      maximally absorbed at that pH.

19      Q.      Is that consistent with the disclosure in the '932

20      application about release of a large portion of doxycycline

21      in the upper G.I. tract?

22                  MR. O'MALLEY:  'Objection, your Honor.  I hate

23      to launch the first leading objection, but feel compelled

24      to.

25                  THE COURT:  Okay.  Overruled.

Friend - redirect

1           You may answer.

2           THE WITNESS:  Sorry.

3   BY MR. REED:

4   Q.      Is the information here in DTX-2206 consistent?

5   A.      Yes, it is.  Yes, it's very consistent.

6   Q.      Mr. O'Malley asked you a question about a drug that

7   I'm not sure I can pronounce either.  Ranitidine?

8   A.      Yes.

9   Q.      What can you tell us about the half life of

10  Ranitidine?

11  A.      Ranitidine has a relatively short half life of

12  between two and three hours.

13  Q.      How is that different from doxycycline?

14  A.      Well, as we heard, the half life is substantially

15  longer.  Depending on which reference you look at and so on,

16  it's 17, 18, 19, 20 hours.

17  Q.      For doxycycline?

18  A.      Doxycycline, yes.

19  Q.      How does the difference in half lives matter for

20  purposes of formulating a drug?

21  A.      Well, in the case of doxycycline, it means that there

22  is some latitude in terms of interval of dosings.  It's

23  natural that the drug is going to be present in the plasma

24  for very long periods of time following a single dose.  In

25  the case of Ranitidine, it's cleared very quickly.  And so

Friend - redirect

1     the requirements to create a once-daily version of

2     Ranitidine and doxycycline are very much different.

3     Q.     Mr. O'Malley also asked you several questions about

4     prior art references that you had included in your expert

5     report and that you discussed at your deposition, but that

6     you did not present here today.

7              Do you recall that?

8     A.     Yes.

9     Q.     Do you still believe that those prior art references

10    all anticipate and/or render obvious each of the asserted

11    claims of the Chang patent?

12    A.     I do.

13    Q.     And is there a reason why you did not discuss each

14    and every one of them in light of today?

15    A.     Well, after reviewing the documents as a whole, my

16    opinions were supported by the narrower number, the more

17    limited number of references that were really required to

18    form my opinion.  They bolster my opinion, but not required

19    to do what I testified to today.

20    Q.     Is it your understanding we're on a clock for this

21    trial?

22    A.     Yes.  Yes.  And that was also another reason there

23    really wasn't a practical -- it wasn't a practical

24    consideration of the ability of time to run through all

25    those references.

864

Friend - redirect

1            MR. REED:  Your Honor, Mr. O'Malley discussed

2      with Dr. Friend exhibits DTX-1067, also 2117, also 2118,

3      also 2120, also 2123, and 2124, and I offer all of those

4      exhibits.

5            MR. O'MALLEY:  Your Honor, I used those only for

6      impeachment, so not for any evidentiary purpose.  So I will

7      object.

8            THE COURT:  The objection is overruled.  They're

9      admitted.

10            (DTX-1067, 2117, 2118, 2120, 2123 and 2124 were

11      admitted into evidence.)

12            MR. REED:  No further questions.

13            THE COURT:  Thank you, Doctor.  You may step

14      down.

15            THE WITNESS:  Thank you.

16            (Witness excused.)

17            MS. GILL:  Your Honor, Kirin Gill for Mylan.

18            THE COURT:  All right.

19            MS. GILL:  Mylan would like to call Robert

20      Ashley by deposition.  Mr. Ashley was a named inventor of

21      the '932 and the '854 applications that Dr. Friend testified

22      about this morning.

23            And before we get to that, we'd also like to

24      move for the admission of a couple of exhibits, which we

25      understand Galderma does not object to.  DTX-1008, DTX-1009

1    and DTX-1283.

2               THE COURT:  Correct.  If there's no objection to

3    those?

4               MS. WILLGOOS:  No objection.

5               THE COURT:  All right.  Those are admitted.

6               (DTX-1008, 1009 and 1283 were admitted into

7    evidence.)

8               MS. GILL:  We'd also like to move for the

9    admission of 1014, which we understand Galderma has raised

10   an objection to.

11              THE COURT:  I'm still reserving a ruling on that

12   objection.

13              MS. WILLGOOS:  Thank you, your Honor.

14              MS. GILL:  We'll go ahead and play the clip.

15              (Videotaped deposition of Robert Ashley played

16   as follows.)

17              "Question:  How long were you employed by

18   CollaGenex?

19              "Answer:  Ten years.

20              "Question:  So from '93?

21              "Answer:  End of -- yeah.  '94, yeah.

22              "MR. SHULMAN:  Could you please mark for

23   identification this Ashley Exhibit 1, a copy of U.S. Patent

24   7,211,267?

25              "Question:  You're the Robert Ashley on this

866

Ashley - designations

1   patent?

2           "Answer:  Yeah.

3           "Question:  Would you turn, please, to column 9.

4   And if you would read to yourself the paragraph that begins

5   at line 9 of column 9.

6           "Answer:  Mm-hmm.

7           "Question:  And in that paragraph, beginning at

8   about line 9, you stated that the tetracycline compound of

9   your invention may be administered by sustained release.  Do

10  you see that?

11          "Answer:  I do.

12          "Question:  And in the same paragraph, at around

13  line 14, you stated that further descriptions of methods of

14  delivering tetracycline compounds via sustained release can

15  be found in a patent application entitled Controlled

16  Delivery of Tetracycline and Tetracycline Derivatives filed

17  on April 5th, 2001, and assigned to CollaGenex.  Do you see

18  that?

19          "Answer:  I do.

20          "Question:  In the sentence beginning at line 19

21  of column 9, you incorporated by reference the entirety of

22  the identified controlled delivery application into this

23  specification of the '267 patent; correct?  Is that

24  correct?

25          "Answer:  It says, 'The aforementioned

1    application is incorporated herein by reference in its

2    entirety' --

3            "Question:  Okay.

4            "Answer:  -- which presumably means what you

5    said, yes.

6            "Question:  All right.  And in the sentence

7    beginning at line 21 of column 9, you stated that

8    40 milligrams of doxycycline could be administered in the

9    controlled delivery formulation over a 24-hour period of

10   time; correct?

11           "Answer:  Yeah, what it says here is, for

12   example, 40 milligrams of doxycycline may be administered by

13   sustained release over a 24-hour period.

14           "Question:  Okay.  Now, let's mark for

15   identification as Exhibit No. 2, Ashley Exhibit 2, a

16   provisional patent application bearing production numbers

17   MYLDJ2223 through 46.

18           Let me start over again.  Is Exhibit 2 the

19   controlled delivery application that you incorporated by

20   reference into the '267 patent?

21           "Answer:  I just wanted to make sure that this

22   is an accurate reference here.

23           "What column are we in?

24           "Question:  Column 9, sir.

25           "Answer:  Column 9.  I'm sorry.

868

Ashley - designations

1              "Yes.  The document says that this patent

2        application was incorporated here in by reference in its

3        entirety, whatever that exactly means.

4              "Question:  Okay.  So Exhibit 2 is the

5        referenced document in Exhibit 1; correct?

6              "Answer:  That's what it says, yes.

7              "Question:  And in this paragraph that begins at

8        line 15 on page 2 of Exhibit 2, you state that these

9        conventional tetracycline compositions were required to be

10       taken or administered every three to six hours; is that

11       correct?

12             "Answer:  For those tetracyclines with a short

13       serum half life, that sentence is accurate.  This short

14       serum half life requires or required the conventional

15       compositions to be administered often, for example, every

16       three to six hours.  It wasn't always true, but...

17             "Question:  Okay.  But the conventional

18       tetracycline compositions that you are speaking of here in

19       the paragraph that begins at line 15 are those which have a

20       short serum concentration half life; correct?

21             "Answer:  No, not necessarily.  It wasn't true

22       of all of them.  I don't know, I'm not a pharmaco

23       kineticist.  So there was a range of -- or there is a range

24       of administered times and doses depending on what one's

25       objective is for administering the drug.  One example would

869

Ashley - designations

1    be that, for those tetracyclines with a short serum half

2    life, they would have to be administered often if they were

3    cleared quickly.  For example, every three to six hours.

4              "Question:  Okay.  And that's the direct

5    opposite of the release profile that you wanted to achieve

6    with your invention of Exhibit 2; correct?

7              "Answer:  Well, the objective of the invention

8    was to define a pharmacokinetic profile which avoided spikes

9    of concentration and diminutions of concentration.  So in my

10   view, the invention was the notion of a flat or relatively

11   flat release profile or relatively flat pharmaco serum

12   profile -- pharmacokinetic profile -- I didn't know how we

13   were going to get there, but a relatively flat

14   pharmacokinetic profile of serum concentration.  But the

15   direct opposite is probably a little aggressive as a

16   statement.  But the objective was to avoid those spikes.

17             "Question:  And to flatten out the curve?

18             "Answer:  And to flatten out the curve, yeah.

19             "Question:  Okay.  Now, you mentioned just a

20   moment ago in your answer that you didn't know how you were

21   going to get there.  What did you mean by that?

22             "Answer:  I had no idea what -- or no meaningful

23   idea what composition might achieve that objective.  Nobody

24   had ever tried it before, as far as I knew.

25             "Question:  Okay.  Do you describe in this

Ashley - designations

1    application formulations that will achieve that objective?

2              "Answer:  No.

3              "Question:  Is there enough information in

4    this application to allow a formulator to achieve that

5    objective?

6              "Answer:  No.

7              "Question:  Okay.  Would you turn to page 11,

8    please, and read the first full paragraph of that page to

9    yourself.

10             "Answer:  Okay.

11             "Question:  And there you stated that a delayed

12   release agent is an ingredient that prevents the

13   tetracycline compound from being made available to the host

14   until some time after initial administration of the

15   tetracycline composition.

16             "Do you see that?

17             "Answer:  No.  What I see is, a delayed release

18   agent is an ingredient which prevents the active ingredient,

19   for example -- or that is tetracycline in this case -- from

20   being made available to the host until some time after

21   initial administration.  I guess that's the definition of

22   delayed.

23             "Question:  Okay.  And that was your

24   understanding at the time that you filed your declaration in

25   connection with this application?

871

Ashley - designations

1              "Answer:  I don't recall specifically what my

2       understanding was at that time.

3              "Question:  Well --

4              "Answer:  I don't know what the phrase -- I

5       don't know specifically what defines a delayed release

6       agent.

7              "Question:  Okay.  Did you take issue with the

8       statements in this paragraph on page 11 beginning at line 4

9       at the time that you filed your application?

10             "Answer:  I don't recall objecting to the

11      statement.

12             "Question:  Okay.  And, in fact, you signed a

13      declaration which said that you read and understood the

14      statement; correct?

15             "Answer:  I -- as I said before, I don't recall

16      having signed that, but I presumably did.

17             "Question:  Okay.  Would you turn to page 7 of

18      your application, please.  Would you read the first

19      paragraph on the page to yourself.

20             "Answer:  Okay.

21             "Question:  Are we on the same -- you're on page

22      7; right?

23             "Answer:  This says page 7.

24             "Question.  Okay.  Great.  You refer in that

25      first paragraph to the G.I. tract and, in particular, to the

Ashley - designations

1    upper portion of the G.I. tract as opposed to the small

2    intestine.  Do you see that?

3              "Answer:  That's the last part of that last

4    sentence, yes.

5              "Question:  According to your understanding,

6    what is the upper portion of the G.I. tract?  What does it

7    include?

8              "Answer:  Oh, I'm not a -- I'm not a medical

9    doctor.  I don't know what the definition specifically of

10   the upper portion of the G.I. tract would be.

11             "Question:  Well, I'm not asking you for

12   a medical definition.  I'm just asking for your

13   understanding.

14             "Answer:  Those portions of the G.I. tract

15   opposed to the small intestine.

16             "Question:  So does it mean everything, so to

17   speak, north of the small intestine?

18             "Answer:  Distal.

19             "Question:  I'm sorry?

20             "Answer:  Yes, before the small intestine.

21             "Question:  So do you understand what figure 1

22   depicts?

23             "Answer:  Figure 1, I -- I understand what it's

24   trying to depict, yes.

25             "Question:  Okay.  And what is the spiked curve

Ashley - designations

1    that's entitled "instantaneous release?"

2              "Answer:  Well, my understanding of this would

3    be that these are just hypothetical, wholly hypothetical,

4    profiles of release of hypothetical -- it's not even that.

5    I mean, they're just curves which show serum concentrations

6    over time.

7              "Question:  For three different components of a

8    composition?

9              "Answer:  That being completely hypothetical

10   curves.

11             "Question:  For three different components of a

12   composition, sir?

13             "Answer:  Yeah, I think they're just three

14   curves of different serum concentrations over time which are

15   named in this way here.

16             "Question:  Does figure 1 depict a tetracycline

17   release profile that utilizes a combination of three

18   different controlled release agents that are associated with

19   a tetracycline compound in a composition according to your

20   invention?

21             "Answer:  Not really.  It shows three different

22   hypothetical curves of serum concentration over time for

23   three things which are just called different things.

24             "Question:  Would you turn to page 7.

25             "Was the following statement true when you

1    signed your declaration:  Quote, 'figure 1 depicts a

2    tetracycline release profile utilizing a combination of

3    three different controlled release agents which are

4    associated with a tetracycline compound in a composition

5    according to the present invention?'

6            "Answer:  I think that it depicts three

7    different potential tetracycline release profiles.  I agree.

8    And one could interpolate a flat profile, which was what

9    this composition -- or what this patent was describing was

10   the notion of a flat pharmacokinetic profile.  It is an

11   entirely hypothetical description of how one would get

12   there.

13           "Question:  Would you turn to page 16, please?

14           "Answer:  Maybe I said that in here somewhere.

15   I don't know.

16           "Okay.

17           "Question:  And if you would read to yourself

18   the paragraph that begins at line 9.

19           "Answer:  I read it.

20           "Question:  Is it correct that at the time

21   you filed this application you preferred that at least

22   50 percent and more preferably at least 80 percent of the

23   tetracycline in the composition be release in the upper GI

24   tract?

25           "Answer:  Clearly at the time this was written,

Ashley - designations

1    that was the -- that was a suggestion for -- well, not a

2    suggestion.  Maybe a preferred outcome.  However, I didn't

3    know whether that was a necessary outcome.

4                "Question:  Okay.  But it was a preferred

5    outcome, as stated here?

6                "Answer:  It states what it states.

7                "Question:  Is that correct?

8                "Answer:  It's correct it states what it states.

9    It states that it's preferred that at least 50 percent and

10   more preferably, greater than 80 percent of the tetracycline

11   in the composition be released in the upper GI tract.

12               "Question:  And if I have done my math

13   correctly, this means that the remainder of the tetracycline

14   in the composition would be release in the lower GI tract;

15   correct?

16               "Answer:  How are we defining upper GI tract and

17   lower GI tract?

18               "Question:  Well, you defined it for me earlier,

19   I believe.  You said the upper GI tract is above the small

20   intestine.  Do you recall that?

21               "Answer:  I recall that, yes.

22               "Question:  So if I've done my math --

23               "Answer:  That would be -- that would be a

24   reasonable conclusion to draw from this statement that the

25   reciprocal is true.  I agree.

876

Ashley - designations

1          "Question:  What information did you have that

2      led you to put the lower limit at about .1?

3              "Answer:  Well, preferably put, about .3.

4              "Question:  Well, I want to speak about the .1

5      first.  We'll get to the .3, I promise you.

6              "Answer:  Good.

7              "The objective was to deliver a sufficient dose

8      to be effective in a cumulative sense.

9              "Question:  What do you mean by a cumulative

10     sense?

11             "Answer:  Over a period of 24 hours.  That's

12     defined typically by the area under the curve, in my

13     understanding.  So our objective was to deliver a dose which

14     was sufficient to be effective over the period of 24 hours

15     or whatever and yet did not exceed the antimicrobial

16     threshold.  And so that was where this definition of the

17     range of dose and the preferable range of doses came from.

18             "Question:  Okay.  And what work or research or

19     information did you have available to you that allowed you

20     to state that .1 was the -- or about .1 was the lower limit

21     for the effective amount of the drug?

22             "Answer:  Well, the data that existed were

23     those data with Periostat.  And the data from the clinical

24     development of Periostat suggested, for example, that a 20

25     milligram once-a-day dose was insufficient for affecting

Ashley - designations

1    periodontitis.

2              "Question:  So did there come a point in time

3    when CollaGenex decided that it did want a once daily 40

4    milligram dosage form of doxycycline?

5              "Answer:  My recollection is yes.

6              "Question:  Okay.  And at what point in time did

7    CollaGenex decide that, hey, this is something we'd like to

8    develop?

9              "Answer:  I really don't recall.

10             "Question:  Was it before or after you filed

11   this application in April of 2001?

12             "Answer:  Oh, before, I would --

13             "Question:  How long before?

14             "Answer:  I don't recall.

15             "Question:  Was it before CollaGenex ever

16   contacted Shire for assistance in connection with

17   formulating a once daily 40 milligram dosage form?

18             "Answer:  I don't recall, but almost certainly,

19   yes.

20             "Question:  Were you the person who came up with

21   the idea that it would be useful to have a once daily

22   formulation of doxy?

23             "Answer:  I believe so.  However, that step, for

24   want of a better word, is not particularly interesting.

25   It's obvious in and of itself.

Ashley - designations

1         "Question:  Well, was Faulding trying to develop

2    a once daily formulation or a different twice daily

3    formulation or what?

4         "Answer:  Just different.  We would experiment

5    or they were experimenting as to whether it was possible to

6    alter the really -- alter the pharmacokinetic profile of

7    doxycycline, as I described, without altering its

8    efficiency, that could have released could have resulted in

9    a once-a-day formulation.  I suppose, that might have been

10   one of the objectives.

11        "Question:  Okay.  Now, the -- if you'd pull out

12   Exhibit 1, please, which is your '267 patent.  Column 9, in

13   the paragraph that begins at line 9, discusses the sustained

14   release or controlled delivery of tetracycline.

15        "Do you see that?

16        "Answer:  Um-hmm.

17        "Question:  And in the last sentence of that

18   paragraph, you give an example of the amount that may be

19   administered by the sustained release over 24 hours, namely,

20   40 milligrams.  Do you see that?

21        "Answer:  Um-hmm.

22        "Question:  How did you come up with that

23   40 milligrams amount?

24        "Answer:  Because that was the total

25   administered dose for Periostat, for example.  I didn't

1    know whether that was going to work in a sustained release

2    formulation or whatever, in a -- I don't know whether that

3    was going to work in order to achieve the objectives of the

4    invention, but obviously that's one --

5                    "Question:  Okay.

6                    "Answer:  -- example of a dose which one could

7    administer.

8                    "Question:  And --

9                    "Answer:  It was a dose we knew already was

10   safe, and that was really important.

11                   "Question:  And that you learned from the

12   Periostat data, so to speak?

13                   "Answer:  Correct.

14                   "Question:  And, similarly, these blood serum

15   concentration levels that we looked at earlier on whatever

16   page it was, page 5 of Exhibit 2, also were based on your

17   experience with Periostat; correct?

18                   "Answer:  As I recall those, yes.  Certainly,

19   the top level.

20                   "Question:  Let's mark as Exhibit 3 a document

21   bearing production numbers SUP 15508 through 509.

22                   "I understand.  But the December 18th e-mail --

23                   "Answer:  Right.  The December 18th e-mail.

24                   "Question:  -- is from Woody Bryan to you,

25   correct?

Ashley - designations

1        "Answer:  It certainly appears to be, yes.

2        "Question:  And he states in the e-mail, 'thanks

3    again for the opportunity to discuss CollaGenex's interest

4    in once-per-day dosage form for doxycycline hyclate.'

5        "Does that refresh your recollection that, as of

6    December 2000, CollaGenex was interested in a once daily

7    formulation of doxy?

8        "Answer:  Certainly what it says.

9        "Question:  Okay.  But do you recall -- even

10   though you don't recall the call, do you recall that the

11   objective of the program early on with Shire was to develop

12   a once-per-day dosage form that can meet the bioequivalence

13   criteria in comparison to the 20 milligrams twice-a-day

14   dosage form?

15       "Answer:  That certainly looks how Woody

16   interpreted our objectives.  I must admit, I don't recall

17   having said that, but that's how Woody interpreted it.

18       "Question:  And he also said that one of the

19   objectives was, given that the half-life of doxycycline is

20   inherently 18 hours, the release profile would potentially

21   only need to be four to eight hours.  Do you see that?

22       "Answer:  That, again, is what Woody has said in

23   this document, yes.

24       "Question:  Okay.  And point number 4 here is,

25   'it is believed that doxy is only absorbed in the upper GI

 1   tract and released lower in the colonic region is not

 2   desired.'

 3           "And that's consistent with what you told me

 4   earlier; correct?

 5           "Answer:  Right.

 6           "Question:  Is that correct?

 7           "Answer:  The literature suggested that at the

 8   time, yes.

 9           "Question:  Okay.

10           "Answer:  And as I mentioned earlier, release in

11   the colon was not a good idea.

12           "Question:  Let's mark as Exhibit No. 4 a

13   document bearing production numbers SUP 36372 through 83.

14           "According to the first paragraph of this

15   agreement, CollaGenex asked Shire Laboratories to conduct a

16   feasibility study to evaluate the application of Shire's

17   Microtrol technology with doxycycline as a line extension of

18   CollaGenex's Periostat for the indication of periodontitis.

19   Do you see that?

20           "Answer:  I do.

21           "Question:  Okay.  And is it correct that,

22   according to this agreement that you signed on behalf of

23   CollaGenex, what CollaGenex desired was a controlled release

24   oral solid dosage form that can deliver up to 40 milligrams

25   of doxycycline over a six to eight hour period of time?

Ashley - designations

1          "Answer:  In a dosage unit of reasonable size

2      and appearance.

3          "Question:  Yes.

4          "Answer:  That was clearly one of the objectives

5      of this development agreement, yes.

6          "Question:  Okay.  And the first sentence refers

7      to Shire's Microtrol technology; do you see that?

8          "Answer:  Um-hmm.

9          "Question:  What was that, according to your

10     understanding?

11         "Answer:  I don't recall the details of Shire's

12     Microtrol technology.  Shire had a numerous technologies

13     and, most importantly to us, a bunch of expertise in

14     formulation development.  And so Microtrol was, as I recall,

15     one of -- they had a product called Carbatrol, I think, so

16     that was one of the technologies which they had.

17         "Question:  Okay.  Now, under the heading stage

18     1 on page 1, it says that the primary objective in stage 1

19     will be to formulate and test IR and DR beads for use in a

20     capsule dosage form utilizing Shire's Microtrol technology.

21     Do you see that?

22         "Answer:  Yeah.  It says the primary objective

23     of stage 1 will be the development and testing of immediate

24     release and delayed release beadlets for utilization in a

25     composite capsule dosage form, using Shire's Microtrol

883

Ashley - designations

1    technology.

2           "Question:  Did Shire contribute in any way to

3    do the information that you set forth in your provisional

4    patent application, Exhibit 2?

5           "Answer:  Not that I recall, no.

6           "Question:  Okay.  So everything in here was

7    your ideas?

8           "Answer:  Ever in that pre -- well, as I recall,

9    yes.

10          "Question:  Okay.  And looking at Exhibit No. 1,

11   column 9 --

12          "Answer:  One was the '267 patent?

13          "Question:  Yes, sir.  Looking at column 9, the

14   paragraph that begins at line 9.  Was it your idea, as

15   opposed to someone at Shire's, to include in this paragraph

16   the exemplary sustained release formulation that contains

17   40 milligrams of doxycycline?

18          "Answer:  Do you mean the line, for example,

19   40 milligrams of doxycycline may be administered by

20   sustained over a 24-hour period?

21          "Question:  Yes, sir.

22          "Answer:  That was one example of how one would

23   achieve the objectives of this patent, yes.  And I have no

24   reason -- it's -- in and of itself, 40 milligrams would be

25   certainly the dose which one would try first.

Ashley - designations

1          "Question:  Okay.  So that was your idea?

2          "Answer:  The idea was to achieve -- I believe

3     that you needed to administer 40 milligrams of doxycycline

4     or something around that dose in order to be -- over a

5     24-hour period in order to be effective.

6          "Question:  Okay.  And that was an idea that you

7     came up with as opposed to having been told that by someone

8     at Shire?

9          "Answer:  I don't recall Shire -- a discussion

10    with Shire.  I recall Shire suggesting that we may need --

11    if we wanted to achieve the objectives which were laid out,

12    laying within those boundaries over a sustained period, that

13    we may need to deliver more than that.

14         "Question:  Okay.

15         "Answer:  But my objectives in the patent at

16    least was to find a way of delivering 40 milligrams, or

17    somewhere around a dose of 40 milligrams of doxycycline, to

18    get that area under the curve without the spikes and troughs

19    so we'll have a flatter PK profile.

20         "Question:  Okay.  Now, earlier today you

21    mentioned that, according to Shire, they thought that to

22    achieve the desired PK profile, they may have to use more

23    than 40 milligrams of doxy in the formulation.  Do you

24    recall that?

25         "Answer:  I recall there being discussions about

885

Ashley - designations

1    that.

2         "Question:  And can you tell me what your

3    understanding is of why Shire believed that perhaps more

4    than 40 milligrams would be necessary?

5         "Answer:  I don't recall specifically, but I do

6    recall a discussion about that.

7         "Question:  And what about that discussion do

8    you recall?

9         "Answer:  Just the discussion of the need

10   potentially to have a larger dose to achieve the serum

11   concentration parameters which we were preferring.

12        "Question:  Did anyone explain why there might

13   be a need for a higher dosage to achieve those serum

14   concentrations that you desired?

15        "Answer:  I don't recall.  I don't recall the

16   discussion.  But I do recall a discussion on that topic.

17        "Question:  Okay.  And what was CollaGenex's

18   reaction to this suggestion that you might have to go above

19   40?

20        "Answer:  Well, if that was the case, that would

21   complicate our clinical development programs then.

22        "Question:  Why would that be the case?

23        "Answer:  Because we wouldn't have been able to

24   rely so much on the fact that we'd already demonstrated that

25   40 milligrams every 24 hours with Periostat was safe.  So we

Ashley - designations

1    would certainly prefer that not to have been the case, but

2    if -- as I say, we weren't formulation people, so maybe that

3    was the only conclusion.  I don't know.

4            "Question:  Let me back up.  Look at Exhibit 11,

5    the second e-mail on the first page, the third paragraph.

6    Second sentence.  It states that, 'this is not necessarily

7    accurate as we were aware that region specific absorption

8    may very well be an issue based on comments from CollaGenex,

9    voiced by Rob Ashley during kickoff meeting and during

10   face-to-face meeting with Shire team at the time of

11   prototype -- prototype selection, and the Faulding report,

12   albeit late in the process.'

13           Do you have any reason to doubt the truth of

14   what Mr. Bryan said here, namely, that he had been aware

15   that region specific absorption may very well be an issue

16   based on comments from you and during the face-to-face

17   meeting with the Shire team at the time of the prototype

18   selection as well as the Faulding report?

19           "Answer:  Yeah, I don't know what Woody was

20   thinking.

21           "Question:  That wasn't my question.  The

22   question is do you have any reason to doubt that Mr. Bryan

23   believed what he stated here in the second sentence of the

24   third paragraph of the second e-mail on page 1 of

25   Exhibit 11.

Ashley - designations

1              "If you have a reason, tell me about it.  If you

2     don't, you can say no.

3              "Answer:  No, I have no -- I -- I have no reason

4     to think that this isn't what Woody thought.

5              "Question:  Was Faulding's approach very

6     different, in your view, than the approach that Shire took?

7              "Answer:  Yes.  I think that their -- yes.

8     Faulding's approach was very different.

9              THE COURT:  What's going to be next?

10             MS. GILL:  Your Honor, Richard Chang.  This clip

11    is about 50 minutes, so it might be appropriate to break for

12    lunch.

13             THE COURT:  50?  50?

14             MS. GILL:  Yes.

15             THE COURT:  We'll take our lunch break and we'll

16    begin with that.  When we get back, we'll see you about 1:35

17    or thereabouts.

18             (Luncheon recess taken.)

19             AFTERNOON SESSION, 1:45 P.M.

20             THE COURT:  Good afternoon.  Before we move on

21    with the testimony, let me give you my rulings on the

22    objections from the plaintiff to the two exhibits that we

23    discussed this morning, DTX-1014 and DTX-1085.  I'm going to

24    overrule the objections and allow the documents to be

25    admitted.

888

Ashley - designations

 1          DTX-1014 appears to be an e-mail chain amongst

 2   Supernus representatives.  Supernus is a party here.

 3   Therefore, in this case, it looks as if these are

 4   non-hearsay and therefore admissible as party admissions.

 5   The foundation appears to be established in that the

 6   document appears to be produced by Supernus, and there's

 7   certainly no basis in the record to conclude otherwise.  The

 8   Court, of course, will give it the weight it deserves along

 9   with everything else, including the Ashley deposition

10   excerpts.

11          And with respect to DTX-1085, it appears to be

12   an e-mail chain among CollaGenex and Shire, the predecessor

13   in interest to the parties in this case, Galderma, some of

14   the parties in the case, Galderma and Supernus,

15   respectively.  It appears again to have been produced by

16   Supernus in this case.  Therefore, it appears the foundation

17   was adequate and, again, the Court will admit it, give it

18   the weight it deserves in connection with all the other

19   evidence.

20          With that, we'll hear I believe next from Dr.

21   Chang; correct?  All right.  You may proceed.

22          MS. WILLGOOS:  Your Honor, we have one

23   additional exhibit that was part of our counterdesignations

24   for Chang that's not in the defendants' exhibit binder.

25          THE COURT:  If you want to pass that up, that's

889

Chang - designations

1    fine.

2                    (Ms. Willgoos handed an exhibit to the Court.)

3                    MS. GILL:  Your Honor, Mr. Chang is the first

4    named inventor of the Chang patent, and also at this time

5    we'd like to move into admission DTX-1071, DTX-1079,

6    DTX-1081, DTX-1086, DTX-787, DTX-1088, DTX-1090, DTX-1094,

7    DTX-1095, DTX-1283, DTX-1285, DTX-1294, and DTX-1298.

8                    MS. WILLGOOS:  No objections, your Honor.

9                    THE COURT:  Those are all admitted.

10                   (The above-referenced exhibits were admitted

11   into evidence.)

12                   MS. GILL:  We're going to start playing the

13   clip.

14                   THE COURT:  All right.  Mr. Golden, if you want

15   to down some of the lights, please.

16                   (Videotaped deposition of Richard Chang played

17   as follows.)

18                   "Question:  Would you state your full name,

19   please.

20                   "Answer:  My full name is Richard Rongkun Chang.

21                   "Question:  So you were with Shire/Supernus from

22   approximately 1997 until 2009?

23                   "Answer:  That's right.

24                   "Question.  Okay.  And at Shire, you did do work

25   with capsules containing beads for extended release

1    products; correct?

2              "Answer:  That's correct.

3              "Question:  Okay.  And did the Adderall product

4    that you worked on contain immediate release beads?

5              "Answer:  Yes.

6              "Question:  Did it contain delayed release

7    beads?

8              "Answer:  Yes.

9              "Question:  Did it contain any other types of

10   beads?

11             "Answer:  No.

12             "Question:  Apart from the Adderall XR, what

13   other bead containing capsule formulations did you work on

14   at Shire?

15             "Answer:  Bead containing -- doxycycline.

16             "Question:  Okay.  Any others?

17             "Answer:  That -- that's about it.

18             "Question:  Okay.  And was the Carbatrol

19   product, did it have a commercial name or was it called

20   Carbatrol?

21             "Answer:  Carbatrol.

22             "Question:  And was the Carbatrol product a

23   capsule with beads in it?

24             "Answer:  Yes.

25             "Question:  And were the beads in the Carbatrol

1    product, did they include immediate release beads?

2                 "Answer:  Yes.

3                 "Question:  Did they also include delayed

4    release beads?

5                 "Answer:  There are three types of beads in the

6    capsule.

7                 "Question.  Okay.  Was -- well, one of the types

8    was immediate release; correct?

9                 "Answer:  Mm-hmm.

10                "Question:  Was a second type delayed release?

11                "Answer:  Yes.

12                "Question:  And what was the third type?

13                "Answer:  Sustained release, with delay.

14                "Question:  Okay.  Now, you have heard of the

15   term Microtrol technology?

16                "Answer:  Yes.

17                "Question:  What does that mean?

18                "Answer:  It's a general term to -- to describe

19   the dosage form, the dosage form that Shire has.  It is

20   beads in the capsule, we call Microtrol.

21                "Question:  Okay.  And when you use the

22   Microtrol technology, can you have all of the same type of

23   beads in a capsule, like IR beads?

24                "Answer:  Yes.  It's possible.

25                "Question:  Okay.  Or you can have combinations

Chang - designations

1    of IR and DR as well as perhaps others?

2              "Answer:  That's right.

3              "Question:  Okay.  Did the Adderall XR product

4    use the Microtrol technology?

5              "Answer:  That Microtrol is just for -- for --

6    for business development purpose, just to try to educate the

7    client what kind of dosage form we can develop.  Not

8    actually is a fixed technology.

9              "Question:  Okay.  But to the extent -- you

10   described, if I understood you correctly, Microtrol

11   technology as beads in a capsule?

12             "Answer:  That is -- that's right, just -- just

13   to give a name to it -- to it.  It is beads in capsule.

14             "Question:  Okay.  So with that understanding,

15   Adderall did use beads in a capsule, which is the generic

16   description of Microtrol?

17             "Answer:  That's correct.

18             "Question:  And so did the doxy project?

19             "Answer:  That's correct.

20             "Question:  And so did the Carbatrol project?

21             "Answer:  That's correct.

22             "Question:  Was Carbatrol develop at Shire?

23             "Answer:  Yes.

24             "Question:  Now, did there come a point in time

25   when you learned that Shire and CollaGenex had entered into

1    an agreement concerning the development of a once-a-day

2    40-milligram dosage form of doxycycline?

3                    "Answer:  2001.  2002, I don't --

4                    "Question:  But you learned that they entered

5    into an agreement?

6                    "Answer:  That's right.

7                    "Question:  Let me hand you what was marked as

8    Raoufinia Exhibit number 1.

9                    "Answer:  Okay.

10                   "Question:  It has the AR numbers on it, his

11   initials.

12                   "Have you ever seen this development agreement

13   before?

14                   "Answer:  I sure have.

15                   "Question:  Okay.  If you look at the first

16   paragraph on the first page, and you can just read it to

17   yourself, it says there that:  CollaGenex asked Shire Labs

18   to conduct a feasibility study to evaluate the application

19   of Shire's Microtrol technology with doxycycline as a line

20   extension of CollaGenex's Periostat for the indication of

21   periodontitis.

22                   "Do you see that?

23                   "Answer:  Yes.

24                   "Question:  And it goes on to say in that same

25   paragraph that:  What CollaGenex desired was the development

1    of a controlled release oral solid dosage form that can

2    deliver up to 40 milligrams of doxycycline over a six to

3    eight-hour period of time.

4              "Do you see that?  Do you see that?

5              "Answer:  Yes.

6              "Question:  To your knowledge, was any work done

7    at Shire on formulating doxycycline before the agreement,

8    Raoufinia Exhibit 1, was signed?

9              "Answer:  No.

10             "Question:  No work was done?

11             "Answer:  No work was done.

12             "Question:  Okay.  Did you participate in the

13   drafting of this agreement?

14             "Answer:  Definitely, yes.

15             "Question:  Okay.  Now if you could go back to

16   the agreement.

17             "Answer:  Mm-hmm.

18             "Question:  Raoufinia Exhibit 1.  I am going to

19   refer to the Raoufinia exhibits as AR because Raoufinia is a

20   mouthful.

21             "If you turn to page one of AR, in Section A

22   entitled, Stage 1, the agreement states that:  The primary

23   objective of Stage 1 of the feasibility study was to develop

24   IR and DR beadlet formulations for inclusion in a combined

25   capsule dosage form using the Microtrol technology.

Chang - designations

1           "Do you see that?

2           "Answer:  Yes.

3           "Question:  And is that what CollaGenex wanted

4    from Shire, to your understanding?

5           "Answer:  That's correct.

6           "Question:  Okay.  If you turn to the top of

7    page 2 of this agreement, and just read that paragraph to

8    yourself, the very first paragraph.

9           "You can -- you are always free to read whatever

10   you want.  Is that okay?

11          "In the first paragraph, it states that:  During

12   Stage 1, CollaGenex and Shire contemplated that formulations

13   of these IR and DR beadlets would be selected for a pilot PK

14   study to be performed in humans.

15          "Do you see that?

16          "Answer:  Yes.

17          "Question:  And was that study referred to

18   internally at Shire as the pilot PK study?

19          "Answer:  That's correct.

20          "Question:  If you look at the fourth bullet

21   point under heading 5 on page 2 of this exhibit, No. 6, it

22   states that:  In silico modeling will also take place after

23   the receipt of the first PK study results prior to the start

24   of the second PK study.

25          "Do you see that?

Chang - designations

1                    "Answer:  Yes.

2                    "Question:  So is it correct that as of

3      March 6th, 2002, CollaGenex and Shire had agreed that in

4      silico modeling of various ratios of IR to DR bead

5      formulations would take place after receipt of the results

6      from the pilot PK study?

7                    "Answer:  Yep.

8                    "Question:  Okay.  And the PK study results were

9      a necessary input to perform the in silico modeling; is that

10     correct?

11                   "Answer:  Yes.

12                   "Question:  Okay.  So are you saying that

13     because the window of -- of absorption is so narrow --

14                   "Answer:  That's right.

15                   "Question:  -- you couldn't use the IR all by

16     itself or any of the DRs all by themselves?

17                   "Answer:  I -- I am saying because the

18     absorption window is so narrow, all the DRs going to

19     lose -- lose bioavailability significantly.

20                   "Question:  They're going to lose what?

21                   "Answer:  Bio -- bioavailability significantly,

22     but you use IR, you lose -- you lose the duration.

23                   "Question:  Okay.  Did you have any ideas of

24     what that combination should look like as of the time you

25     wrote this e-mail, in early October of 2002?

Chang - designations

1          "Answer:  Just -- at the time maybe the concept

2     is very vague.  Maybe it is IR combination and not DR beads.

3     Most likely it is DR one bead.

4          "Question:  Most likely it's?

5          "Answer:  DR 1 beads.

6          "Question:  DR 1?

7          "Answer:  Mm-hmm.

8          "Question:  Did you have in mind as of

9     October 10th, 2002, any particular role of IR to DR 1 beads?

10         "Answer:  No, I don't.

11         "Question:  Now, Doctor, Raoufinia's e-mail of

12    October 16th, he says that -- it's on the last page of the

13    document under the heading goals, that any of his goals is

14    to model IR/DR bead formulations that will yield a Cmax that

15    is less than 750 nanograms per milliliter and a Cmin that is

16    greater than 300 nanograms per milliliter.

17         "Do you see that?

18         "Answer:  Yes.

19         "Question:  Did CollaGenex specify that range of

20    Cmin to Cmax?

21         "Answer:  CollaGenex have previous experience

22    with the Periostat, so they have a better knowledge and

23    understanding of the -- the PK performance of the

24    doxycycline.  So this is initial target goal for -- so they

25    set for us.

898

Chang - designations

 1                "Question:  By CollaGenex?

 2                "Answer:  By CollaGenex.

 3                "Question:  Okay.  So CollaGenex initially set

 4     this range of Cmin to Cmax that's reported here on the last

 5     page of Exhibit --

 6                "Answer:  That's right.

 7                "Question:  -- 3; correct?

 8                "Answer:  Yes.  Correct.

 9                "Question:  Okay.  So was one of the goals of

10     the modeling to identify an IR/DR formulation that

11     approximated the steady state blood levels of doxy obtained

12     from the twice daily administration of Periostat?

13                "Answer:  You can say that.

14                "Question:  Pardon?

15                "Answer:  You can say that.

16                "Question:  Yes?

17                "Answer:  Answer.  Yes:

18                "Question:  Okay.  Did CollaGenex ever tell you

19     what the desired plasma profile was for the product that you

20     were developing on their behalf?

21                "Answer:  Yeah.  Just -- I say this just before,

22     CollaGenex have prior experience with the doxycycline, so

23     they have better understanding of the plasma level of the

24     doxycycline.  So when we sign a contract, they -- they

25     already inform us, they give us the very vague target.

Chang - designations

1          "Question:  And what was the initial target they

2      gave you?

3          "Answer:  They just say .1 microgram per ml to

4      one -- one microgram per ml.

5          "Question:  Or -- that's another way of saying

6      that is 100 nanograms to 1,000-nanograms per ml?

7          "Answer:  That's right.

8          "Question:  Okay.  Did they tell you that they

9      want to mimic the bid dosing of Periostat?

10          "Answer:  That nobody needs to tell us because

11      that's golden guide.  It is a guide.  Is -- everybody knows

12      this is -- now you have products, dosing twice a day, so you

13      dose twice a day.  Now you want to convert to once a day,

14      you supposed to have once a day profile similar to that

15      profile that you -- you have never confidence to go into the

16      clinical study.

17          "Question:  So one of the goals from the outset

18      was to create a once-a-day product that would mimic the

19      dosing of the twice-a-day product?

20          "Answer:  That's --

21          "Question:  And they also gave you this broad

22      range of 100 nanograms to 1,000 nanograms per milliliter as

23      the Cmin to Cmax?

24          "Answer:  That's correct.

25          "Question:  Okay.  If I understand you

1    correctly, what you are saying is the .1 to 1 was the broad

2    band?

3              "Answer:  Mm-hmm.

4              "Question:  And then the .3 to .75 was the

5    narrow preferred band that CollaGenex identified?

6              "Answer:  I just say it is not necessary come

7    from the CollaGenex.

8              "Question:  So was it your understanding in the

9    summer of 2002 that CollaGenex had specified that its

10   preferred range for Cmin to Cmax was in the neighborhood of

11   .4 to .7 micrograms per ml for 24 hours, and an AUC that was

12   consistent with the bid formulation?

13             "Answer:  Yes, from this e-mail, yes.

14             "Question:  Let's mark as Exhibit 12 a one-page

15   document bearing production number SUP 12680.

16             Is this a copy of an e-mail from Michele,

17   Coulaloglou, Coulaloglou, or something like that --

18             "Answer:  That's right.

19             "Question:  -- to you and others, dated

20   October 23rd, 2002?

21             "Answer:  Yes.

22             "Question:  Okay.  And she was providing an

23   update on the doxy project after meeting with you that

24   morning?

25             "Answer:  Yes.

1          "Question:  Okay.  And on the IR pellet formula,

2     she says that the sugar spheres used are 30/35 mesh, 500 to

3     600, is that microns?

4          "Answer:  Yes.

5          "Question:  Comma, like used in Adderall XR.

6          "Do you see that?

7          "Answer:  Yes.

8          "Question:  Is it correct that the IR doxy

9     pellets were sugar spheres on which the doxy was coated?

10          "Answer:  That's right.

11          "Question:  Okay.  And as reported here, were

12     the sugar spheres used for the IR doxy pellets the same as

13     those used for the IR pellets in the Adderall XR product?

14          "Answer:  Yeah, the core -- the core substance

15     is the same as the Adderall XR.

16          "Question:  Now, under DR pellet formula in

17     Exhibit 12, it says that:  'The formula for the enteric

18     coating will be IMB 444 or DR 1, which uses Eudragit or

19     Eudragit, L30D55; is that correct?

20          "Answer:  Correct.

21          "Question:  And as of 2002, Eudragit L30D55 was

22     an enteric pharmaceutical coating that had long been

23     available from Rohm; correct?

24          "Answer:  That's correct.

25          "Question:  Was Eudragit L30D55 used in

1    Adderall?

2              "Answer:  That's correct.  We used the -- the

3    L30D55 for Adderall XR.

4              "Question:  For Adderall XR.

5              "Answer:  That's right.

6              "Question:  To coat the delayed release beads?

7              "Answer:  That's correct.

8              "Question:  Later in this e-mail, there is a

9    heading which says 'bead ratio and capsule strength.'  Do

10   you see that?

11             "Answer:  Yes.

12             "Question:  And it says quote, 'these will be

13   adjusted to provide the target plasma profile, et cetera, et

14   cetera.

15             "What was the target plasma profile as of

16   October 23rd, the date of this e-mail?

17             "Answer:  Still is .1 microgram per mil to

18   1 microgram per mil.

19             "Question:  With a preferred narrower range of

20   .3 to .75?

21             "Answer:  That's right.  That's right.

22             "Question:  Let me ask you to look at

23   Dr. Raoufinia's Exhibit 12.

24             "Answer:  Yes.

25             "Question:  Did you receive a copy of this

1    e-mail with the attachment from Dr. Raoufinia on or about

2    November 6th, 2002?

3              "Answer:  Yes.

4              "Question:  Okay.  And did you read the in

5    silico modeling report that Dr. Raoufinia attached to the

6    e-mail?

7              "Answer:  Yes.

8              "Question:  Okay.  Let me ask you to look at

9    Raoufinia Exhibit 15.  And I will just tell you that that's

10   a copy of the in silico report that was sent to CollaGenex.

11             "Answer:  Yes.

12             "Question:  Okay.  Did you receive a copy of

13   this document on or about November 15th, 2002?

14             "Answer:  Yes.

15             "Question:  And it says on the first page that

16   this report was forwarded to CollaGenex on Thursday the 14th

17   of November.  Do you see that?

18             "Answer:  Yes.

19             "Question:  And were you aware that the report

20   was being forwarded to CollaGenex?

21             "Answer:  That's correct.

22             "Question:  Now, why were 45 milligrams doxy

23   formulations examined as part of this in silico modeling

24   study?

25             "Answer:  We try to show, we can vary IR and DR,

Chang - designations

1    the ratio, and on top of that, we can vary a strength to --

2    to change the profile.

3              "Question:  Right.

4              "Answer:  That's it.

5              "Question:  The agreement that was entered into,

6    the basic agreement that we looked at earlier, called for

7    the development of a 40 milligram formulation; correct?

8              "Answer:  That's correct.

9              "Question:  Okay.  And so why were you

10   presenting at least modeling results on a 45 milligram

11   formulation?

12             "Answer:  It give the client more opportunity to

13   select.

14             "Question:  Okay.  And apart from the six ratios

15   that are reported in this modeling report, were there any

16   other ratios obtained in the modeling effort that came close

17   to approximating the .3 to .75 target range, to your

18   knowledge?

19             "Answer:  To my knowledge, all this is formula

20   for presented here, is very close to the target.  It can be

21   selected as the -- the candidate to continue for

22   development.

23             "Question:  Okay.  And is it correct that in

24   this report there is no data on a 75/25 formulation?

25             "Answer:  I already said to you that the ratio

Chang - designations

1    between IR and DR is selected by the Arash, to put into

2    the report.

3              By Arash Raoufinia to put into the report.

4    Actually, he did much more than this.

5              "Question:  Okay.  Now, for the 40 milligram

6    dosage form that is examined in this report, the ratios used

7    are 95 to 5, IR to DR, 90 to 10 and 80 to 20; correct?

8              "Answer:  Yes.

9              "Question:  There is nothing lower than 80 to 20

10   for the 40 milligram version; correct?

11             "Answer:  In this report, yes.

12             "Question:  And for the 45 milligram dosage

13   form, the only ratios used were 90/10, 85/15, and 70/30.

14   Correct?

15             "Answer:  That's right.

16             "Question:  Okay.  Let me mark as Exhibit No. 13

17   a two-page document bearing production numbers SUP 12723

18   through 23.

19             Now, in the second sentence of your e-mail in

20   Exhibit 13, you wrote that, hopefully by some time next week

21   you can get the input and approval from CollaGenex about the

22   ratio of IR and DR beads so that the project can be

23   continued.

24             "Do you see that?

25             "Answer:  Yes.

906

Chang - designations

1          "Question:  Why did you want CollaGenex to tell

2    you what ratio of IR to DR beads to use?

3          "Answer:  Maybe you not familiar with the -- the

4    contract R&D business.

5          "Maybe you don't understand the contract --

6    contract R&D business.

7          "Question:  Okay.

8          "Answer:  The client is our God, so every time

9    you need to ask them to approve of something.  You -- every

10   decision you make, right, you try to influence, but

11   sometimes they have their own idea.  So every time you just

12   back and forth and negotiate something workable.

13         "Question:  Dr. Chang, in connection with that

14   initial pilot PK study that we spoke about earlier, one IR

15   bead formulation was tested as well as three DR bead

16   formulations.  Correct?

17         "Answer:  That's correct.

18         "Question:  And the DR bead formulations were

19   known as DR 1, 2 and 3; correct?

20         "Answer:  That's right.

21         "Question:  Let me ask you to look at Raoufinia

22   Exhibit 17.  Do you recall before the break we looked at

23   some document you wrote where you said there would be a need

24   for a new business agreement to pursue the -- the project?

25         "Answer:  That's right.

Chang - designations

1          "Question:  And is Exhibit 17 a copy of the new

2     business agreement which was entered into in December of

3     2002 to permit further development of the product?

4          "Answer:  That's correct.

5          "Question:  Okay.  And the caption of -- of this

6     program expansion, Exhibit 17, is R&D demonstration

7     encapsulation and GMP supply manufacturer for doxycycline,

8     pulsatile, P-U-L-S-A-T-I-L-E, release capsules, (PR) in a

9     human pilot biostudy for CollaGenex pharmaceuticals.

10          "Do you see that?

11          "Answer:  Yes.

12          "Question:  And the pulsatile release capsules,

13     that was a terminology that was used at Shire to describe

14     the Adderall XR product; correct?

15          "Answer:  That -- that's correct.

16          "Question:  Is it correct, sir, as reported in

17     this agreement on the bottom of page 1, that based on the in

18     silico modeling results that we went over earlier today,

19     CollaGenex requested that Shire make a 40 milligram doxy

20     capsule formulation that contained IR and DR beads in the

21     ratio of 75 to 25?

22          "Answer:  That's correct.

23          "Question:  Do you know why CollaGenex chose

24     this 40 milligram 75/25 formulation rather than one of the

25     formulations set forth in the in silico modeling report that

908

Chang - designations

1    we looked at earlier?

2              "Answer:  This thing, right.  This -- this, so

3    many option there.  One option is their strength.  You can

4    increase 45 milligram to 45 milligram to gain some advantage

5    about the -- the plasma level.  You can increase -- you can

6    increase the Cmax, increase the Cmin, and by doing that,

7    40 -- 40 to 45 milligrams change.

8              And also you can have a non-option, to change IR

9    and DR ratio, to -- to manipulate it, the Cmax and the Cmin.

10   So this all related.  So you need to do some trade-off to

11   select the right strength -- not the right strength, the

12   strength you like.  And also the IR, the strength, the

13   strength you like, or the IR/DR ratio you like.

14             "Question:  Okay.  So these are parameters that

15   you can simply choose between to get the plasma profile you

16   want?

17             "Answer:  That's correct.

18             "Question:  And do you know why CollaGenex chose

19   the 40 milligram 75/25 formulation?

20             "Answer:  You keep asking -- keep asking 40

21   milligram, 45 milligram, and different ratio.  That's -- I

22   tell you it is not much difference, just the trade-off here

23   and there.  So, for example, right, you change the 40 to 45.

24   Doesn't mean you, you go increase the Cmax more, but the

25   Cmax, you increase the Cmax, you have a chance to fail the

Chang - designations

1    top limit.

2                    "Question:  The 1?

3                    "Answer:  The 1, yeah.  For big, big pocket.

4    Then you have a chance, then you have a higher chance to

5    succeed in the Cmin.

6                    "Question:  To succeed in the Cmin?

7                    "Answer:  Cmin is greater than the .1, or .3,

8    the target limit.  That's the advantage.

9                    "For the IR and DR ratio, same thing.  You can

10   rationalize this.  For IR portion, you can increase it.

11   Then you have higher chances to fail the Cmax limit.  Very

12   easy to, to over the Cmax.

13                   "Question:  Right.

14                   "Answer:  But you, you decrease it, the Cmin,

15   Cmin, you have a chance to fail.  So it all just all

16   trade-off.  So you give to anybody who know the business,

17   they can combination of all this to pick out one they think

18   is suitable for the product.

19                   "Question:  Okay.  And do you know why

20   CollaGenex decided that all of the various trade-offs, as

21   you have described it, 40 milligrams formulated at 75/25

22   seemed to be the best one?

23                   "Answer:  That that -- I know they-- for Shire

24   is the contract R&D.  We only can provide all option to

25   them.  Then based -- based on the data we provide, that I

Chang - designations

1    have a right to choose the -- the formula, ask us to

2    continue.

3            "Question:  Okay.  Did CollaGenex express any

4    concerns about going to a 45 milligram dosage form as

5    opposed to a 40 milligram dosage form?

6            "Answer:  That I don't -- I don't remember they

7    expressed their concern.  But the -- internally at Shire, at

8    least, we -- we know that 45 is not desirable, because the

9    assembled and absorbed doxycycline can destroy the GI

10   normal, GI normal flora.

11           "Question:  Okay.  I'm sorry.  I didn't catch

12   all of that.  Would you mind repeating it?

13           "Answer:  The 45 milligram up the dose.  The --

14   and also we know, that the doxycycline, lower GI, absorption

15   is very poor.  So have chances that some drug residue in the

16   lower GI.

17           "Question:  Residue?

18           "Answer:  Residue cannot get absorbed through

19   the systemic may have the effect on the -- the bacteria

20   normal flora in the gut.

21           "Question:  The normal flora in the gut?

22           "Answer:  In the gut.

23           "Question:  Okay.  Do you have any recollection

24   of coming up with the 75/25, 45 milligram formulation before

25   this contract was signed, Exhibit 17?

Chang - designations

1          "Answer:  All the -- the decision made, right,

2     all based on all simulation data.  Without that data, no --

3     no one can make up the ratio.

4          "Question:  Do you recall thinking of the 75/25,

5     40 milligram formulation before CollaGenex selected that

6     formulation as reflected in Exhibit 17?

7          "Answer:  No, I don't remember.

8          "Question:  Do you know who the person was at

9     CollaGenex who made the request that a 40 milligram 75/25

10    doxy formulation is the one that they wanted to pursue?

11         "Answer:  I don't remember.  But based on this,

12    this is this contract.

13         "Question:  Based on this contract, you mean

14    Exhibit 17?

15         "Answer:  Yes, that's right.

16         "Question:  Let's mark for identification as

17    Exhibit 14 a document that we received last night.  It has

18    production numbers SUP 54017 through 25.

19         "Okay.  And what is this document?

20         "Answer:  Look like it is a report for

21    simulation.

22         "Question:  Let me show you Raoufinia

23    Exhibit 18.

24         "Answer:  Yes.

25         "Question:  Which contains a substantial portion

912

Chang - designations

1    of what appears in Chang Exhibit 14.  Let me hand that to

2    you.

3                   "Basically, what appears in Raoufinia Exhibit 18

4    --

5                   "Answer:  Um-hmm.

6                   "Question:  -- let me just pull that out to

7    assist you -- begins on the second page of Exhibit 14,

8    second paragraph.  Do you see that?

9                   "I just want to show you where the portion that

10   was written by Dr. Raoufinia appears in Exhibit 14.

11                  "Answer:  Um-hmm.

12                  "Question:  Okay?  So Dr. Raoufinia said that he

13   wrote Exhibit 18?

14                  "Answer:  Okay.

15                  "Question:  On the first page of this document,

16   Exhibit 14, the second to last sentence, it says, 'from the

17   modeling results and IR/DR ratio between 70/30 and 80/20,

18   inclusive, perhaps 75/25, is recommended for the proof of

19   concept PK study.'

20                  Do you know who came up with that

21   recommendation?

22                  "Answer:  This -- I -- I really cannot say

23   anything.  I -- I really am not involved in this -- this

24   report.

25                  "Question:  Was Mr. Shah, the formulator,

Chang - designations

1    involved in preparing this report?

2              "Answer:  No.

3              "Question:  And you weren't?

4              "Answer:  I'm not.

5              "Question:  Pardon?

6              "Answer:  I'm not.

7              "Question:  You were not involved?

8              "Answer:  No.

9              "Question:  With respect to the work that you

10   did on the doxycycline project, did you ever believe that

11   any aspect of that work was an invention?

12             "Answer:  Yes.

13             "Question:  Did you believe that .1 to

14   1 micrograms per milliliter as a Cmin to Cmax was patentable

15   as an invention in your mind?

16             "Answer:  The number by itself is meaningless.

17   But we have data.  We have formula, can achieve that -- that

18   -- that plasma profile.  That mean a lot.

19             "Question:  Right.  You didn't come up with that

20   range for doxycycline, namely, .1 to 1, and that was

21   something that was given to you as a target; right?

22             "Answer:  Yes.  Yes, that number come from

23   the -- Bob Ashley, because they have previous experience,

24   but that target is useless.  Because they cannot formulate

25   it, a dosage form, can achieve their target.

Chang - designations

1        "Question:  Okay.  They cannot formulate to

2  achieve this target.

3        "You didn't come up with the idea of

4  45 milligrams of doxycycline as the amount to be contained

5  in the formulation; correct?

6        "Answer:  Again, it -- this -- we provide option

7  to the CollaGenex.  Is it 40 or 45?  You can have more

8  option for the client to select, so I think they have a

9  better chance to continue the -- the -- the development

10  program.

11        "Not -- 40-milligram we know.

12        "Question:  We know what?

13        "Answer:  We know is ideal.  For -- for this

14  part is better in terms of the -- the dose strength.

15        "Question:  Right, but when they came to you

16  initially --

17        "Answer:  It's 40.

18        "Question:  -- and signed the first contract,

19  they wanted a 40-milligram dose?

20        "Answer:  That's right.

21        "Question.  Okay.  And they wanted to utilize

22  your bead technology; correct?

23        "Answer:  Yes.

24        "Question:  And they wanted a combined immediate

25  release, delayed release product; correct?

1      "Answer:  Not they wanted, is that we proposed.

2   We know better than the CollaGenex.  We proposed IR and DR

3   combination.

4      "Question:  Okay.  And did you believe you were

5   a joint inventor of the subject matter claimed in this

6   application at the time that you signed the declaration?

7      "Answer:  Yes.

8      "Question:  Okay.  Now, there are three

9   individuals named here, you, Dr. Raoufinia and Mr. Shah.

10      "Answer:  Correct.

11      "Question:  Okay.  Among the three of you, who

12   was the first person who first thought of the idea of a

13   once-daily formulation of doxycycline, giving steady state

14   blood levels of a minimum of .1 and a maximum of about

15   1.0 micrograms per milliliter?

16      "Answer:  Myself.

17      "Question:  That was you?  Did you think of that

18   range?

19      "Answer:  That I tell you, the original range is

20   from -- from the -- Bob Ashley.  When they give this -- this

21   range, was no meaning, just a -- just a target.  But we is

22   the one who developed a product to achieve that -- that --

23   that target.

24      "Question:  Right.

25      "Answer:  To put some meaning to it.

1          "Question:  I realize you -- you developed the

2     product, the formulation.

3          "But the idea of developing a once-daily

4     formulation of doxy, giving steady state blood levels of

5     between .1 and 1, came from CollaGenex; correct?

6          "Answer:  How many times I need to say.  Yes,

7     this is from -- from there.  But the -- but I need to point

8     out this, they couldn't develop product to achieve this

9     goal.  Doesn't mean this -- this number is meaningless.

10    I -- we are the -- the development team, develop product to

11    achieve this goal, so to put some meaning to the -- the

12    value.

13         "Question.  Was there any aspect of the

14    invention that was first thought of by either Mr. Shah or

15    Mr. Raoufinia, before you?

16         "Answer:  No, I don't believe.

17         "Question:  So you thought of everything first?

18         "Answer:  Because I get the information first.

19    From -- from the -- the -- line management.

20         "Question:  From the?

21         "Answer:  Line management.  Upper management.

22         "Question:  You got what information first from

23    upper management?

24         "Answer:  The -- the contract, the -- all the

25    information from -- from the CollaGenex.

917

Chang - designations

1          "Question:  Uh-huh.  So in terms of thinking of

2    the invention, coming up with the idea of the invention,

3    what, in your opinion, did Mr. Shah contribute?

4          "Answer:  Shah -- Shah contribute in the

5    formulation and the process development.

6          "Question:  Okay.  What, if anything, did

7    Mr. Raoufinia contribute to coming up with the idea for the

8    invention?

9          "Answer:  Simulation work.  All the simulation

10   work, they asked us to -- to have a ratio, which -- first

11   the simulation, to simulate the three IR beads and three DR

12   beads -- three.  Three DR beads.  That later on have a

13   second simulation to identify the -- the ratio and then

14   the -- the different strength.

15         "Question:  Okay.  Among the three of you, who

16   was the person who first came up with the concept of such a

17   formulation having a 3 to 1 ratio of IR to DR portions?

18         "Answer:  The ratio I think is picked by the --

19   the CollaGenex, but based on our data, all simulation data

20   sent to -- to -- to CollaGenex, and after discussion,

21   they -- they picked the ratio.

22         "Question:  Okay.  So is it fair to say that

23   nobody at Shire, to your knowledge, came up with that ratio.

24   That was something CollaGenex picked?

25         "Answer:  It is still the same thing.  This --

1    this is contract -- this is a contract R&D for business.

2    Everything agreed to -- to -- the -- by the client.

3              "So this information we provide.  They will

4    agree to it, then we continue.

5              So, yes, some -- yes, some -- some sense they

6    agreed to it, 75:25.  We continue the program.

7              "Question:  Right, but who first came up with

8    the idea of 75:25?  Did it come from the CollaGenex guys or

9    did you propose it to them?

10             "Answer:  At least I didn't propose, so I don't

11   know who proposed.

12             "Question:  You personally --

13             "Answer:  I personal --

14             "Question:  Did not propose 75:25?

15             "Answer:  No.

16             "Question:  Do you know if Dr. Raoufinia

17   proposed 75:25 to CollaGenex?

18             "Answer:  Possible.  Because he is the one doing

19   the simulation work.

20             "Question:  But do you know if he did?

21             "Answer:  I cannot be 100-percent sure.

22             "Question:  Okay.  Do you know if Mr. Shah

23   proposed 75:25 to CollaGenex?

24             "Answer:  No.

25             "Question:  He did not?

Chang - designations

1      "Answer:  No.

2          "Question:  And according a figure 4, the steady

3      state blood levels for doxy obtained from the once daily

4      administration of 40 milligrams of immediate release doxy

5      also fall between .1 and 1.0 micrograms per milliliter;

6      correct?

7          "Answer:  You keep -- your question, yes.  The

8      problem is you use 40-milligram IR dose, immediate release

9      dose, you have chances to over one microgram per ml very

10     easily.  That -- that's the thing.

11         "Question:  Okay.  But according to the data in

12     your patent, the once daily administration of 40 milligrams

13     of immediate release doxy fall between .1 and 1.0 micrograms

14     per milliliter as the steady state blood levels; right?

15         "Answer:  Yeah, I tell you is true, according to

16     this figure, yes, meet the criteria, but don't forget,

17     individual subject, individual subject dosing, you are using

18     the 40 milligrams IR once a day, once daily, the Cmax

19     frequently over one microgram per ml.

20         "Question:  Okay.  Now, let's focus on this

21     other range that is recited in the claims, namely, .3 to .8.

22     Okay?

23         "And let's go back to figure 4.  Is it correct

24     that the steady state blood levels for the 80:20 formulation

25     do not fall within .3.8 micrograms per ml?

Chang - designations

1            "Answer:  Yeah.

2            "Question:  Is that correct?

3            "Answer:  Yeah.  Correct -- missed the Cmin.

4            "Question:  Missed the Cmin.

5            "Is it also correct that the steady state blood

6     levels for the 70:30 formulation in figure 4 do not fall

7     within .3 to .8 micrograms per ml?

8            "Answer:  Correct.

9            "Question:  Is it also true that the steady

10    state blood levels for the 40 milligram once daily immediate

11    release formulation in figure 4 do not fall within the .3 to

12    .8 micrograms per ml range?

13           "Answer:  Correct.

14           "Question:  And is it true that all of the

15    steady state blood levels for the Periostat twice daily in

16    figure 4 do fall within the range of .3 to .8 micrograms per

17    ml?

18           "Answer:  That's correct.

19           "Question:  Now, let's look at figure 5.  In

20    figure 5 in the white squared graph, we have steady state

21    blood levels for the once daily 40-milligram dose of doxy

22    containing the 75:25 ratio; correct?

23           "Answer:  That's correct.

24           "Question:  Is it correct, sir, that according

25    to figure 5, the 75:25 dosage form results in steady state

921

Chang - designations

1    blood levels that do not fall within the range of .3 to

2    .8 micrograms per ll -- ml?

3              "Answer:  Correct.

4              "Question:  Are you aware of any data in your

5    patent, sir, which shows that from a once daily dosage of

6    40 milligrams of doxy, the blood levels achieved at steady

7    state all fall between a minimum of .3 and a maximum of

8    .8 micrograms per ml?

9              "Answer:  No.

10             "Question:  Why don't we mark as Exhibit 16 a

11   multi-page document bearing production numbers SUP 14593

12   through 603.

13             "Okay.  And were you the person who put together

14   this presentation?

15             "Answer:  Yes.

16             "Question:  Okay.  Who attended the presentation

17   on behalf of CollaGenex?

18             "Answer:  Bob Ashley.

19             "Question:  So in this slide, you stated that

20   one of the goals of the program was to develop a once-a-day

21   Periostat XR using the Microtrol technology.

22             "Correct?

23             "Answer:  That's correct.  The Microtrol

24   technology in Shire would mean beads in capsule.

25             "Question:  Right.  I understand that.

922

Chang - designations

1              "Then on the next page, you titled the slide

2      'Approaches to the Periostat XR Formulation Development.'

3              "Correct?

4              "Answer:  Yes.

5              "Question:  And then you listed three bullet

6      points beneath that; correct?

7              "Answer:  Yes.  Let me say it again.  This

8      pattern, this here is trying to show the client we are

9      capable, Shire is capable to develop product, and those will

10     have a patent with the -- the product.  It is not really

11     associated to -- to doxycycline.  Try to -- try to use this

12     technology --

13             "Question:  Well --

14             "Answer:  -- we're using here.

15             "Question:  Was the -- the Microtrol technology

16     was the bead approach; correct?

17             "Answer:  That's right.  Beads in capsules.

18             "Question:  Right.

19             "Answer:  These three patents is beads in a

20     capsule.

21             "Question:  Right.  And so what you were showing

22     is that you could use and had used the beads in capsule

23     approach to develop drugs in the past; correct?

24             "Answer:  That's right.

25             "Question:  Okay.  And what you were telling

Chang - designations

1    them here is you could use a beads in capsule approach to

2    the Periostat XR formulation development?

3                "Answer:  That's right.

4                "MR. SHULMAN:  Let's mark as Exhibit No. 20 a

5    document bearing production number SUP 27363.

6                "Question:  The first e-mail in the chain on

7    this exhibit is dated May 24th, 2005.  Do you see that?

8                "Answer:  Yes.

9                "Question:  And it's from Kathryn Mallari to

10   you; correct?

11               "Answer:  That's correct.

12               "Question:  And the subject of her e-mail is

13   Periostat SLI 444, formulation development technical report.

14   Correct?

15               "Answer:  That's correct.

16               "Question:  Okay.  And your response is dated

17   May 24th, 2000, at 4:36 in the afternoon.  Correct?

18               "Answer:  Correct.

19               "Question:  And you wrote, Kathy, SLI 444

20   project is a straightforward program.

21               "You did write that?

22               "Answer:  Yes.

23               "MR. SHULMAN:  Let's mark for identification as

24   Exhibit 21 a multi-page document bearing production numbers

25   SUP 27412 through 417.

Chang - designations

1              Now, do you see on page 1 of this document

2    about, oh, a third of the way down the page, there is an

3    e-mail from Kathryn Mallari, dated June 1, 2005, addressed

4    to a number of different people, including Chris Powala and

5    Klaus Theobald at CollaGenex; correct?

6              "Answer:  Yes.

7              "Question:  Okay.  And the subject of Ms.

8    Mallari's e-mail is Oracea CMC section/NDA question,

9    responses and prep activities; correct?

10             "Answer:  Correct.

11             "Question:  And the e-mail that she wrote there

12   was forwarded to you on June 1, 2005, at 1:50 in the

13   afternoon.  Correct?

14             "Answer:  Yes.

15             "Question:  Okay.  And in the e-mail that was

16   forwarded to you, Ms. Mallari wrote:  Tara and CollaGenex,

17   please see below.  The Shire Labs' response to Tara's

18   questions are indicated after each question.

19             "And then there is the heading, Tara's

20   questions.

21             "Do you see that?

22             "Answer:  Yes.

23             "Question:  And Tara is from CollaGenex?

24             "Answer:  I don't know.

25             "Question:  Anyway, the first questions are,

Chang - designations

1    one, how is the formulation selected?  On what basis?  What

2    are the factors that led to the selection of the formulation

3    selected?  Is there any supporting development studies/

4    report that we can include here?  We will need an approved

5    report for the application.

6            "And then there is the answer, which says, with

7    regard to formulation selection, this was based on

8    CollaGenex's preferences after the review of PK studies data

9    and in silico modeling of those results.

10           "And then it goes on with a couple more

11    sentences.

12           "Do you see that?

13           "Answer:  Yes.

14           "Question:  Was it your understanding that with

15    regard to formulation selection, the formulation was

16    selected based upon CollaGenex's preferences after the

17    review of PK studies data and in silico modeling of those

18    results?

19           "Answer:  Yeah.  CollaGenex is the client.  They

20    have the final say in the formulation.

21           "Question:  Dr. Chang, I just want to ask you a

22    question about some testimony that -- that you testified

23    about this afternoon.

24           "Mr. Shulman had asked you a question that said:

25    In the Adderall product, what was the relative ratio in the

1     final product between the IR beads and the DR beads.

2              "And your response was:  To answer your

3     question, for Adderall XR, the IR and DR ratio is 1:1, but

4     this is no comparison between the project because Adderall

5     is and at the time -- oh, and is amphetamine.  For this, the

6     Periostat is doxycycline.  The physical/chemical property is

7     totally different, even the biopharmaceutical is different,

8     so you cannot put together.

9              "Can you just explain for me what you meant?

10              "Answer:  Every project have different thing.

11    Project.  Project.

12              "A different thing.  For amphetamine at that

13    time we looking for rising profile, so the -- the -- the

14    second dose will -- many build up from the first -- first

15    peak, so you can see the one peak build up, the other will

16    be even higher.  They don't have -- they don't create a

17    plateau.  Plateau, the plasma profile.

18              "The plateau plasma profile is bad for the ADHD

19    patient.  It will build up the tolerance.

20              "So that -- that's the thing will build up.

21    That's the -- the marketing strategy, and those are the

22    science based -- based development plan.

23              "For doxycycline is totally different thing.

24    For doxycycline, we use the DR beads, try to minimize the --

25    get the -- the absorption difference between the upper G.I.

Raoufinia - designations

1    and lower G.I., so we -- we do need the DR beads, try to

2    dissolve in the up -- the up -- in the small intestine

3    quickly to pump out everything for -- pump out -- pump.

4              "Question:  Pump out?

5              "Answer:  Pump out everything from the DR beads

6    in the small intestine to minimize the bioavailability loss.

7    Bioavailability loss.  And gain the -- the duration.  So it

8    is totally different."

9              (End of videotaped deposition.)

10             THE COURT:  Is there another deposition?

11             MS. GILL:  Another deposition.

12             Your Honor, Mylan would like to call the second

13   named inventor on the Chang patents, Arash Raoufinia.

14             MS. WILLGOOS:  Again, your Honor, we have an

15   exhibit that's not included in Mylan's --

16             THE COURT:  All right.  Please pass it up.

17             MS. WILLGOOS:  And plaintiffs would like to move

18   for the admission of DTX-1074.

19             THE COURT:  Any objection?

20             MS. GILL:  No objection.

21             THE COURT:  All right.  It's admitted.

22             (DTX-1074 was admitted into evidence.)

23             (Videotaped deposition of Arash Raoufinia played

24   as follows.)

25             "Question:  Would you state your full name,

928

Raoufinia - designations

1    please.

2              "Answer:  Arash Raoufinia.

3              "Question:  And the degree is in what field,

4    sir?

5              "Answer:  Doctor of Pharmacy.

6              "Question:  Okay.  And it also says in the

7    e-mail that the goal for Cmax was less than 750 nanograms

8    per milliliter, plus or minus one standard deviation below

9    one microgram per milliliter.

10             "Correct?

11             "Answer:  Yes.  That's -- that's what is stated.

12             "Question:  Okay.  So the Cmax and Cmin range

13   that you see here is a range that was given to you by

14   somebody else, not a range that you came up with yourself;

15   is that correct?

16             "Answer:  Definitely not by myself.

17             "Question:  Was it the goal in this doxycycline

18   project to obtain a -- a plasma profile at steady state that

19   approximated the plasma profile at steady state that one

20   gets from taking Periostat twice a day?

21             "Answer:  Based on what I set as parameters, I

22   think the -- the parameters are already set in the contract,

23   and we have seen that in there.

24             "Question:  Cmin and Cmax?

25             "Answer:  Seems like we have already set those

Raoufinia - designations

1    parameters prior, in the -- in the prior exhibits.

2              "MR. SHULMAN:  Let's mark for identification as

3    Exhibit 12 SUP 31435 through 42.

4              "Is this a copy of an e-mail that you sent to

5    Mr. Flanner and Dr. Chang on November 6th of 2002, attaching

6    a copy of the in silicon doxy report?

7              "Answer:  Yes.

8              "Question:  Okay.  And were you the one who

9    prepared the report that's attached to this e-mail?

10             "Answer:  Yes.

11             "Question:  Now, let's mark as Exhibit No. 15 a

12   document bearing production number SUP 36792 through 36800.

13             Okay.  And its subject is a Perio -- Periostat

14   XR preliminary in silico modeling report.

15             "Do you see that?

16             "Answer:  Yes.

17             "Question:  Okay.  And it goes on to say that:

18   The following preliminary report was forwarded to CollaGenex

19   on November 14th of 2002.  Do you see that?

20             "Answer:  Yes.

21             "Question:  Okay.  Now, let's go to the first

22   substantive page.

23             "And there on the first paragraph, you wrote

24   that:  CollaGenex requested Shire to conduct in silico

25   modeling to evaluate feasibility of once-a-day dosing of

Raoufinia - designations

1    doxycycline monohydrate for an adjunct treatment of signs

2    and symptoms associated with periodontitis in adults.

3                  "Do you see that?

4                  "Answer:  Yes.

5                  "Question:  You did write that; right?

6                  "Answer:  Yes.

7                  "Question:  And we also saw earlier that the

8    modeling efforts themselves began, I believe it was

9    October 28th of 2002.  Do you recall that?  We can go back

10   and look at the date, but it --

11                 "Answer:  Right.  Yes.  I recall as the official

12   time to start the work, yes.

13                 "Question:  And the second photograph also

14   states that:  After reviewing the results of the PK study,

15   CollaGenex requested Shire to conduct in silico modeling of

16   different ratios of IR to DR beads in a single formulation

17   to evaluate the possibility of once-a-day dosing of

18   doxycycline.  Do you see that?

19                 "Answer:  Yes.

20                 "Question:  And you did write that?

21                 "Answer:  Yes.

22                 "Question:  Okay.  And, incidentally, when you

23   were writing this report, did you try and be truthful and

24   accurate to the best of your ability?

25                 "Answer:  Yes.

Raoufinia - designations

1        "Question:  So let me ask you the question

2   again.  Is it correct that one of the purposes of

3   performing the in silico modeling of these various IR to DR

4   formulations was to predict the steady state in vivo plasma

5   concentration profiles for each?

6        "Answer:  Yes.

7        "Question:  Now, as of November 14th, 2002,

8   which is the date of this report, in Exhibit 15, had you

9   done any in silico modeling of doxy formulations other than

10  the six formulations that are described in this report?

11       "Answer:  Yeah.  This -- the model -- I usually

12  do many different combinations, and I usually do many of

13  them, and this report says that out of all the generated,

14  these are the ones that are presented that shows within the

15  profiles.

16       "Question:  Within the profiles?

17       "Answer:  Yes.

18       "Question:  Okay.  What did you mean when you

19  wrote that CollaGenex and Shire will discuss which of the

20  ratios in the report appears most promising from an IP

21  standpoint?

22       "Answer:  This is a very general term that I

23  used, to talk about different angles, so ...

24       "Question:  What does IP stand for?

25       "Answer:  IP stand for intellectual property.

Raoufinia - designations

1          "Question:  Okay.  What did you mean when you

2     wrote that CollaGenex and Shire will discuss which of the

3     ratios appears most promising from an intellectual property

4     standpoint?

5          "Answer:  I didn't mean anything in terms of

6     other than the fact that these are the -- the items that

7     needs to be discussed prior to making a decision on the

8     formulation.

9          "Question:  Yes.  Is it correct that in this

10    report, Exhibit No. 15, there is no profile data concerning

11    a 40 milligram doxy formulation where the ratio of IR to DR

12    beads is 75/25?

13         "Answer:  At what dose level?

14         "Question:  At any dose level.

15         "Answer:  Any dose level.  This -- this report

16    only shows 80/20 for the 40 milligram, and shows a 70/30 for

17    the 45 milligram, yeah.  So specifically 75/25 is not

18    mentioned in this report.

19         "Question:  Did you make the selection of the IR

20    to DR bead ratio that should be used for further study?

21         "Answer:  No, I did not.

22         "Question:  Did you come up with the idea of a

23    75 to 25 ratio of IR beads to DR beads?

24         "Answer:  I don't recall.

25         "Question:  You don't recall having done so?

933

Raoufinia - designations

1               "Answer:  I don't recall having done so, yes.

2               "Question:  Okay.  And then it goes on to say:

3    Based on the modeling results, CollaGenex has requested that

4    Shire prepare a pilot scale GMP supplies consisting of a 40

5    milligram doxycycline allocated as 75 percent in IR form and

6    25 percent in DR form in a single PR dosage unit and for

7    evaluation in a human PK study.

8               "Do you see that?

9               "Answer:  Yes.

10              "Question:  Does that refresh your recollection

11    that CollaGenex requested the 75/25 bead ratio?

12              "Answer:  I wasn't really involved after the

13    modeling, as I mentioned, with the decisions and the

14    manufacturing steps.

15              "Question:  Did you have any involvement in

16    making a 75/25 composition as described here in Exhibit 17?

17              "Answer:  I don't believe so.  I don't recall.

18              "Question:  Apart from this occasional

19    participation in the -- in the manufacturing of the 75/25

20    formulation, did you have any further involvement in the

21    75/25 formulation?

22              "Answer:  I don't recall having any involvement.

23    Again, my -- my involvement finished mostly after the

24    modeling part.

25              "Question:  Okay.  And did you believe that you

1       were a joint inventor of the subject matter claimed in the

2       application at the time that you signed this declaration?

3                   "Answer:  Yes.

4                   "Question:  Were you the one who first thought

5       of the idea of a once daily formulation of doxy that had

6       40 milligrams in it?

7                   "Answer:  Based on modeling, it seems -- seemed

8       that the 40 milligram -- the 45 are possible options.

9                   "Question:  Right.  But someone told you to

10      model 40 milligrams and 45.  It wasn't your idea; is that

11      correct?

12                  "Answer:  I believe we discussed this at the

13      beginning that this was the set of specifications provided

14      to us.

15                  "Question:  By CollaGenex?

16                  "Answer:  I believe it was CollaGenex, yeah.

17                  "Question:  Okay.  But once daily was the

18      objective of the overall project that CollaGenex had

19      contacted Shire for; right?

20                  "Answer:  Correct.

21                  "Question:  Okay.  Among the three inventors,

22      who was the person who first thought of such a formulation

23      having a 3 to 1 ratio of IR to DR beads?

24                  "Answer:  I don't know who was the first person.

25                  "Question:  Do you know when that idea was first

Raoufinia - designations

1   formulated?

2           "Answer:  No.

3           "Question:  Among the three of you, who was the

4   first person who -- who thought of -- who first thought of

5   such a 3 to 1 formulation, where the immediate and delayed

6   release portions are in the form of pellets?

7           "Answer:  I don't know who was the first person.

8           "Question:  Do you know if any of the three of

9   you were the first person to think of that idea?

10          "Answer:  I don't know.

11          "Question:  Among the three of you, who was the

12  first person who first thought of such a 3 to 1 formulation,

13  where the delayed release pellets are coated with an enteric

14  polymer?

15          "Answer:  I don't know.

16          "Question:  Was it you?

17          "Answer:  No.

18          "Question:  Among the three of you, were you the

19  person who first thought of such a 3 to 1 pellet formulation

20  that also included an excipient?

21          "Answer:  I don't know.

22          "Question:  It wasn't you?

23          "Answer:  No.

24          "Question:  Okay.  Among the three of you, were

25  you the first person who thought of such a 3 to 1 pellet

936

Raoufinia - designations

1    formulation where the pellets are contained in a capsule?

2              "Answer:  I don't know.

3              "Question:  It wasn't you?

4              "Answer:  No.

5              "Question:  And now if you go to claim 4, it

6    modifies claim 1 so that the minimum steady state level is

7    .3, and the maximum steady state level is .8 micrograms per

8    milliliter; correct?

9              "Answer:  Correct.

10             "Question:  Were you the person who first

11   thought of a once daily 40 milligram doxy formulation having

12   a 3 to 1 ratio of IR to DR pellets that gives steady state

13   blood levels of between .3 and .8 micrograms per milliliter?

14             "Answer:  I wasn't the first one.

15             "Question:  You were not?

16             "Answer:  (Shaking head no.)

17             "Question:  Okay.  And according to figure 4,

18   the steady state blood levels for doxy obtained from the

19   once daily administration of 40 milligrams of immediate

20   release doxy also fall between .1 and 1.0; correct?

21             "Answer:  Yes, it does.

22             "Question:  Now, let's look at figure 5.  That

23   figure shows steady state blood levels for the once daily 40

24   milligram dose of doxy that contains a 75 to 25 ratio of IR

25   and DR beads; correct?

937

Raoufinia - designations

1          "Answer:  Correct.

2          "Question:  Is it correct that according to

3    figure 5, the 75/25 dosage form results in some steady state

4    blood levels that do not fall within the range of .3 to

5    .8 micrograms per milliliter?

6          "Answer:  They are all below .8 or 800, but some

7    of the points are below 300.

8          "Question:  Right.  Is it correct that according

9    to figure 5, the 75/25 formulation -- strike that.

10         Is it correct that in figure 5 for the 75/25

11   formulation, the minimum steady state blood level is about

12   .16 micrograms per milliliter, which is less than .3?

13         "Answer:  Yes.

14         "Question:  Are you aware of any data in your

15   patent which shows that from a once daily dosage of

16   40 milligrams of doxy, all of the blood levels achieved at

17   steady state fall between a minimum of .3 and a maximum of

18   .8 micrograms per milliliter?

19         "Answer:  So you are referring to the patent, so

20   I would like to look through the data.

21         "Question:  Sure.

22         "Answer:  There is no other data in the patent.

23         "Question:  So is the answer to my question yes?

24         "Answer:  Yes.

25         "Question:  You are not aware of any data in the

938

Raoufinia - designations

1    patent which shows that from a once daily dosage of

2    40 milligrams of doxy, all of the blood levels achieved at

3    steady state fall between a minimum of .3 and a maximum of

4    .8 micrograms per milliliter; correct?

5                "Answer:  That's correct.

6                "Question:  Okay.  At the time you were

7    preparing to undertake the in silico modeling studies, did

8    you believe that it was preferential to have at least

9    80 percent of the formulation in the form of an IR portion,

10   and the rest in the form of a DR portion?

11               "Answer:  No.

12               "Question:  Okay.

13               "Answer:  My -- my understanding was based on

14   model predictions, so ...

15               "Question:  At the time you were preparing to

16   undertake the in silico modeling studies, did you believe

17   that it was preferential to have more than 50 percent of the

18   formulation in the form of an IR portion?

19               "Answer:  That was not given prior to the

20   modeling.

21               (Depositions designations end.)

22               MS. GILL:  Your Honor, we would like to call the

23   third and final inventor of the Chang patent, Niraj Shah.

24               THE COURT:  Also by deposition?

25               MS. GILL:  Also by deposition.

 1              (Deposition of Niraj Shah played.)

 2              "Question:  Would you state your full name,

 3    please?

 4              "Answer:  Niraj Shah.

 5              "Question:  You can put your hand down.

 6              "You can keep it up, too, if you'd like.

 7              "What's your residence address?

 8              "Answer:  2097 Misty Meadow Road, Finksburg,

 9    Maryland  21048.

10              "Question:  Okay.  And you joined Supernus or

11    Shire Laboratories back in late September of 2001?

12              "Answer:  Somewhere, correct.

13              "Question:  And you were there until roughly

14    September of 2005?

15              "Answer:  I would say it's five or six.  I could

16    not recall.

17              "Question:  Okay.  Do you know whether someone

18    at CollaGenex was the first person to conceive of the idea

19    of developing a once daily formulation of doxycycline?

20              "Answer:  I don't have any correct answer on

21    this.

22              "Question:  Did you have any responsibility for

23    determining what ratio of IR to DR beadlets should be

24    included in the doxy capsule product?

25              "Answer:  No.

940

Shah - designations

1              "Question:  Did you have any responsibility for

2     determining what amount of doxycycline should be included in

3     each doxy capsule?

4              "Answer:  No.

5              "Question:  Did you have any responsibility for

6     determining what range of steady state blood levels of

7     doxycycline should be achieved by the capsule product?

8              "Answer:  No.

9              "Question:  Now, when you joined Shire, were

10    there any existing technologies that you used to assist you

11    with making the IR beads and the DR bead?

12             "Answer:  No.

13             "Question:  Apart from you and Dr. Chang, did

14    anyone else participate in making the formulations for the

15    IR and DR beads for the doxycycline project?

16             "Answer:  Making was my responsibility.

17    Interpreting and developing was my supervisor's

18    responsibility.  Apart from them, there was another guy

19    named Arash Raoufinia was involved in that -- between when

20    we are in the development stage.

21             "Question:  Did there come a point in time when

22    you learned that the focus of the doxy project would be

23    directed to a capsule formulation containing IR and DR beads

24    in a ratio of 75 to 25?

25             "Answer:  I was not aware of, but I cannot make

Bhatt - designations

1   any gauge or estimate, so basically I have no idea.

2           "Question:  Okay.  But you don't recall coming

3   up with the idea that we ought to pursue 75/25?

4           "Answer:  I don't recall.

5           "Question:  What was the basis for your belief

6   that you were an inventor of the subject matter claimed in

7   this application?

8           "Answer:  This is again, it's a group effort to

9   work together on a project.  Initially myself and Dr. Chang,

10  we worked together to come out with the various formulation.

11          "Question:  Um-hmm.

12          "Answer:  And then Dr. Chang, with

13  Dr. Raoufinia, applied those to the in silico modeling, and

14  all the compilation of data made come to a conclusion that

15  we have an invention, yes.

16          (Deposition designations end.)

17          MS. GILL:  Your Honor, Mylan would like to call

18  Padmanabh Bhatt by deposition.  Mr. Bhatt was designated by

19  Supernus as a 30(b)(6) witness.

20          THE COURT:  Okay.

21          (Deposition of Padmanabh Bhatt played.)

22          "Question:  Would you state your full name,

23  please?

24          "Answer:  Padmanabh Bhatt.

25          "Question:  And by whom are you employed?

Bhatt - designations

1              "Answer:  Supernus Pharmaceuticals Inc.

2              "Question:  And for how long have you been

3      employed by Supernus?

4              "Answer:  Since its formation.  December 2005.

5              "Question:  Okay.  And were you employed by the

6      predecessor company, Shire Labs?

7              "Answer:  That's correct.

8              "Question:  When did you join Shire Labs?

9              "Answer:  January 2003.

10             "Question:  Okay.  Have you ever heard of

11     something called Microtrol technology?

12             "Answer:  Yes.

13             "Question:  Does that refer to?

14             "Answer:  Microtrol is a trademark term that was

15     used and probably continues to be used by businesspeople to

16     broadly describe the different concepts we have developed

17     for beads in a capsule.

18             "Question:  And what is the bead technology to

19     which it refers?

20             "Answer:  It doesn't refer to a technology, it

21     refers to the general concept of having beads that will

22     provide a certain type of profile that is custom developed,

23     that's invented for different products for differing needs,

24     and putting those beads in a capsule.  So it's a very

25     generic term that does not really focus on one idea.

Bhatt - designations

1          "Question:  Now, let's mark as Exhibit 9 another

2     document bearing production numbers SUP 18 through 19.

3          And is this -- do you recognize this document?

4          "Answer:  Yes.

5          "Question:  And is this the second amendment to

6     the development and license agreement that is Exhibit 7?

7          "Answer:  Correct.

8          "Question:  Have you ever heard of a product

9     called Periostat?

10         "Answer:  Yes.

11         "Question:  And that's a twice-a-day formulation

12    of 20 milligrams instant release doxycycline?

13         "Answer:  That's correct.

14         "Question:  Was it your understanding that the

15    goal of the development project set by CollaGenex was to

16    develop a once-a-day formulation that mimicked the blood

17    profiles achieved from twice-a-day Periostat?

18         "Answer:  My understanding is that Shire Labs

19    was chartered to develop a doxycycline formulation that

20    could be dosed once a day that would produce blood levels

21    between .1 and 1 microgram per ML.

22         "Question:  Do you know where CollaGenex got the

23    .1 to 1 blood level range?

24         "Answer:  You would have -- that would be up to

25    CollaGenex to answer.

944

Bhatt - designations

1             "Question:  What is your understanding of where

2   necessity obtained that range?

3             "Answer:  SUP -- Shire Labs/Supernus' strategy

4   was to accept the requirement, target requirement that the

5   partner provided.  And so we -- we accepted CollaGenex's

6   direction in that regard.

7             "Question:  Prior to the efforts that began at

8   Shire in 2001 to work on this once-a-day formulation of

9   doxy, had any third party worked on a once-a-day formulation

10  of doxy, to your knowledge?

11            "Answer:  I do know what others have testified

12  to, but I have seen at least one document that refers to a

13  company called Faulding.

14            "Question:  Do you know what, if any, problem

15  Faulding encountered in attempting to develop this product?

16            "Answer:  I have seen data that shows that the

17  bioavailability from 40 milligram once-a-day product was

18  very low.

19            "MR. SHULMAN:  Okay.  Let's mark as Exhibit 12 a

20  copy of Ashley's published U.S. publication, 2004/0115261.

21            "Question:  Have you seen this document before,

22  sir?

23            "Answer:  I don't recall seeing it.

24            "Question:  Once you took over responsibility

25  for the patent affairs of the company, did you read the

Bhatt - designations

1   Ashley application?

2           "Answer:  No, I did not.

3           "Question:  Would you look at paragraph 17,

4   please, of the application.

5           "Answer:  Yes.

6           "Question:  Where they're talking about the

7   blood levels of the tetracycline compound achieved from the

8   use of the compound of the invention.

9           "Do you see that?  Do you see that?

10          "Answer:  Paragraph 17 says, amount of

11  tetracycline compound, yes.

12          "Question:  Okay.  And the blood levels achieved

13  from the compound of Mr. Ashley's invention is said to be

14  between .1 and 1 micrograms per milliliter.  Do you see

15  that?

16          "Answer:  Yes, I do.

17          "Question:  And preferably between .3 and

18  .8 micrograms per milliliter; correct?

19          "Answer:  Correct.

20          "Question:  And those are the same ranges that

21  you all were instructed to work on at Shire; correct?

22          "Answer:  Yes.

23          "Question:  Okay.  Now the -- the Oracea

24  project -- product as well as the Chang patent claims called

25  for 40 milligrams of doxycycline in the dosage form.  Are

Bhatt - designations

1    you aware of that?

2              "Answer:  Yes.

3              "Question:  Okay.  Whose idea was it to include

4    40 milligrams in the dosage form?

5              "Answer:  We carried our prototype development

6    with various product concepts.  CollaGenex would do a

7    clinical study, we would receive the data back, and we would

8    make recommendation to CollaGenex as to what we thought was

9    the right approach to go forward with.

10             "CollaGenex would agree or disagree, and if they

11   agreed, we would keep moving forward.

12             "MR. SHULMAN:  Okay.  Let me show you what we'll

13   mark as Exhibit 13, I think.  Thanks:

14             "Question:  Which is a May 27, 2001 agreement

15   between Shire and CollaGenex.

16             "Answer:  Yes.

17             "Question:  Bearing production numbers SUP 36372

18   through 383.

19             "You recognize this as a development agreement

20   --

21             "Answer:  Yes.

22             "Question:  -- between Shire and CollaGenex?

23             "Answer:  That's correct.

24             "Question:  And it's dated May 22nd, 2001?

25             "Answer:  Correct.

947

Bhatt - designations

1          "Question:  And in the background on the very

2     first page, first paragraph, it says that:  CollaGenex has

3     requested that Shire conduct formulation development

4     activities to evaluate the application of Shire's Microtrol

5     technology with doxycycline hyclate as a line extension to

6     Periostat for the indication of periodontitis.

7          "Do you see that?

8          "Answer:  Mm-hmm.  Yes.

9          "Question:  To your knowledge, was that

10    statement true?

11         "Answer:  Yes.

12         "Question.  And it goes on to say that:

13    'CollaGenex desires development of a controlled release oral

14    solid dosage form that can deliver up to 40 milligrams of

15    doxycycline, over a six to eight-hour period of time, in a

16    dosage unit of reasonable size and appearance'?

17         "Answer:  Correct.

18         "Question:  Is that what CollaGenex wanted Shire

19    to do, according to your understanding?

20         "Answer:  The document says Shire was supposed

21    to attempt to create a once-a-day formula -- create a

22    formulation that can deliver 40 milligrams doxycycline over

23    a six to eight-hour period.

24         "Question:  Was Shire interested in developing a

25    doxycycline once a day 40-milligram product before

Bhatt - designations

1    CollaGenex approached it?

2                "Answer:  Shire did not have an internal program

3    to develop doxycycline --

4                "Question:  Okay.

5                "Answer -- once a day.

6                "Question:  And did Shire have any information

7    about how much doxycycline should be contained in a

8    once-a-day dose before CollaGenex informed it of the

9    40 milligrams?

10               "Answer:  Well, Shire Laboratories would have

11   seen the information that was available, either from

12   CollaGenex or in the public domain, on the existing

13   Periostat product.

14               "Question:  Could you look at paragraph 49,

15   please.  And just read that to yourself.

16               "Answer:  I've read it.

17               "Question:  Okay.  Do you see that it says:  The

18   tetracycline composition of the invention can be

19   administered in the form of a liquid as a suspension or

20   solution, or alternatively in solid form, such as a tablet,

21   pellet, particle, capsule, or soft gel.

22               "Do you see that?

23               "Answer:  I see it.

24               "Question:  The formulation that was developed

25   at Shire and formed the subject matter of the Chang patent

Bhatt - designations

1    is a capsule; correct?

2              "Answer:  That's correct.

3              "Question:  Containing pellets; correct?

4              "Answer:  That's correct.

5              "Question:  And pellets are sometimes referred

6    to as beadlets?

7              "Answer:  Yes.

8              "Question:  Okay.  And the formulation that

9    Shire developed that formed the subject matter of the Chang

10   patent had a blood serum concentration level of .1 to 1;

11   correct?

12             "Answer:  That was the target, yes.

13             "Question:  And that's what ultimately was

14   claimed in the Chang patent; correct?

15             "Answer:  Correct.

16             "Question:  And you also claimed in the Chang

17   patent a preferred blood level range of .3 to .8; correct?

18             "Answer:  That's correct.

19             "Question:  Okay.  And you also claimed in the

20   Chang patent a 40-milligram dosage form; correct?

21             "Feel free to look at the patent.

22             "Answer:  Yeah, I can look at the patent.

23             Yes.  Claim 1 of the Chang patent claims:  An

24   immediate release portion comprising a drug wherein the drug

25   consists of about 30 milligrams doxycycline, and a delayed

Bhatt - designations

1    release portion comprising a drug where in the drug consists

2    of about ten-milligram of doxycycline.

3              "So if you add those two up, it adds up to 40.

4              "Question:  Okay.  Now, would you look, please,

5    back at paragraph 49 of the Ashley application.

6              "Answer:  Yes.

7              "Question:  And it says, in the second sentence:

8    For example, the form can be polymeric capsules filled with

9    solid particles which can in turn be made to release the

10   tetracycline compound according to a known pattern or

11   profile.  Such particles can also be made to have more than

12   one release profile, so that over an extended time, the

13   combined release patterns provide a pre-selected profile.

14             "In the doxycycline product that you developed

15   at Shire and which formed the basis for the invention of the

16   Chang patent, is it correct that you had two different

17   particles in the capsule?

18             "Answer:  That's correct.

19             "Question:  And one of the particles in the

20   product that you developed at Shire was an instant release

21   particle?

22             "Answer:  An immediate release particle, yes.

23             "Question:  Or immediate release, yeah.

24             "And the other one was a delayed release

25   particle?

Bhatt - designations

1    "Answer:  That's correct.

2         "Question:  Okay.  And is it correct that the

3    instant release particle had a release profile that was

4    different than the release profile obtained from the delayed

5    release particle?

6         "Answer:  The immediate release particle and the

7    delays -- delayed release particle have different release

8    profiles.

9         "Question:  Is it correct that in the work that

10   you did at Shire which led to the Chang patent, you combined

11   the delayed release particles with the instant release

12   particles to obtain a combined release profile that fit to a

13   pre-selected target you were looking for?

14        "Answer:  We created a profile that met the

15   performance criteria.

16        "Question:  And that's the .1 to 1?

17        "Answer:  That's correct.

18        "Question:  Okay.  And you did so by combining

19   the release profile obtained from the delayed release

20   portion with the release profile obtained from the immediate

21   release portion; correct?

22        "Answer:  We combined the two beads, the

23   immediate release bead and the delayed release bead, to

24   create a -- a performance that met the -- the -- the

25   performance criteria that were established for the product.

Bhatt - designations

1          "Question:  If you go to the description of

2      figure 4 in column 3, it tells you that these graphs are for

3      doxycycline; correct?

4          "Answer:  It does.

5          "Question:  Okay.  So now let's go back to

6      figure 4.

7          "Is it correct that the administration of

8      20 milligrams instant release doxycycline twice a day, as

9      shown in figure 4, yields blood serum concentrations that

10     fall between .1 and 1.0?

11         "Answer:  That's correct.

12         "Question:  Now let's look at the white squared

13     graph in figure 4, which has the highest peak.  Do you see

14     that one?

15         "Answer:  I do.

16         "Question:  Okay.  And that's for 40 milligrams

17     instant release doxycycline taken once a day; correct?

18         "Answer:  That's correct.

19         "Question:  And the steady state blood levels

20     concentration for that form of administration also fall

21     between .1 and 1.0; correct?

22         "Answer:  That's correct.

23         "Question:  Now, if we could return to the Chang

24     patent, please.

25         "Answer:  Yes, sir.

Bhatt - designations

1          "Question:  So comparing the 40-milligram IR

2     once-a-day formulation in figure 4 to the two IR/DR

3     combinations in figure 4, is it correct that all three will,

4     quote:  'Give steady state blood levels of doxycycline of a

5     minimum of .1 micrograms per milliliter and a maximum of

6     1.0 micrograms per milliliter'?

7          "Answer:  The profiles fall between .1 and 1,

8     but you have to remember that these are mean average

9     profiles, and the individual subjects may not fall, for

10    example, if you take the 40-milligram IR and give it once a

11    day, there -- there will -- there -- there will be more

12    individuals sub -- subjects that may have excursions above

13    the one microgram per ml level with an average still showing

14    below one microgram per ml.  So you -- you know, that does

15    not meet, really, the -- the intent from a marketing

16    perspective for the product --

17         "Question:  Okay.  And the -- I'm sorry.  Go

18    ahead.

19         "Answer:  CollaGenex is trying to minimize the

20    exposure of subjects to microbial or antibiotic levels of

21    doxycycline.  And by their definition, that cutoff point was

22    one microgram per ml.  So even though the mean profile for

23    40 milligram IR given once a day falls within that one

24    microgram per ml cutoff point, the individuals may excurse

25    (sic) above that, and that is not acceptable.

Bhatt - designations

1        "Question:  And the -- the same is also true

2    with respect to individuals taking the DR or IR/DR

3    formulations; correct?

4        "Answer:  If -- if you are looking at the

5    simulated profile at face value, you can see that the Cmax

6    or the IR/DR combo is lower than the Cmax for the 40

7    milligram IR given once a day.  And so the chances of

8    individual subjects going above one microgram per ml from

9    the IR/DR combo, the chances are less than for individuals

10   who are exposed to the 40 milligram IR once a day.

11       "Question:  But it depends on what the standard

12   deviation is for each of these curves; correct?

13       "Answer:  Yes.

14       "Question:  Okay.  Did Shire ever run standard

15   deviations with respect to the 40 milligram IR once-a-day

16   formulations that's referred to here in figure 4?

17       "Answer:  I do not recall.

18       "Question:  Okay.  Can you tell from the data in

19   figure 4 what the standard deviation is for any of these

20   curves?

21       "Answer:  No.

22       "Question:  Okay."

23       (End of videotaped deposition.)

24       MS. GILL:  Your Honor, we would like to move

25   into admission DTX-2109.

Bhatt - designations

1          THE COURT:  Any objection?

2          MS. WILLGOOS:  No objection, your Honor.  We

3    would like to move into evidence DTX-1074.

4          MS. GILL:  No objection.

5          THE COURT:  They're both admitted.

6          (DTX-2109 and DTX-1074 were received into

7    evidence.)

8          MR. STEUER:  Mylan rests.

9          THE COURT:  All right.  Is there a motion?

10         MR. FLATTMANN:  Your Honor, yes.  We move for

11   judgment pursuant to Rule 502(c) of -- I'm sorry, your

12   Honor.  That Mylan has failed to meet its clear and

13   convincing burden of proving the asserted claims to the

14   three sets of patents invalid.

15         THE COURT:  I'm going to take it under

16   advisement, or is there a judgment, anything you wish to say

17   at this point?

18         MR. STEUER:  We many renew our previous motion.

19         THE COURT:  Anything you wish to say?

20         MR. FLATTMANN:  We oppose for the same reasons I

21   stated a couple days ago, your Honor.

22         Your Honor, in terms of our rebuttal case, given

23   the current state of evidence, we no longer intend to call

24   life Dr. Oates or Dr. Murry, but we do have as part of our

25   rebuttal case some limited deposition testimony that Ms.

Harper - designations

1    Willgoos will introduce and a few housekeeping matters with

2    relation to exhibits.

3              THE COURT:  All right.  And approximately how

4    long would that deposition testimony run?

5              MS. WILLGOOS:  About 20 minutes, your Honor.

6              THE COURT:  About 20 minutes?  All right.  Well,

7    we're going to take our afternoon recess and then we'll come

8    back and allow you to do that.

9              For the record, I'm taking all the motions under

10   advisement, reserving rulings on them until after trial.

11             We'll take a recess.

12             (Brief recess taken.)

13             THE COURT:  You may proceed.

14             MS. WILGOOS:  Thank you, your Honor.  Plaintiffs

15   would like to call by deposition designation, Jason Harper,

16   one of Mylan's corporate witnesses.  And pursuant to his

17   testimony, we would like to move into evidence, DTX-2243.

18             MR. STEUER:  No objection.

19             THE COURT:  It's admitted.

20             (DTX-2243 received into evidence.)

21             MS. WILGOOS:  May I approach the bench with the

22   exhibit?

23             THE COURT:  You may.

24             Let's turn down the lights.

25             (Deposition played of Jason Harper.)

957

Harper - designations

1              "Question:  Good morning, Mr. Harper.

2              "Answer:  Good morning.

3              "Question:  Okay.  Let's mark this document

4    bearing Bates numbers MYL-D 118531 through 540 as Harper

5    Exhibit 4.

6              "Mr. Harper, have you seen these documents

7    before?

8              "Answer:  They are forecast documents for

9    Mylan's generic version of Oracea.

10             "Question:  Let's go back to the forecast in

11   Exhibit 4 on page ending 540.  I believe we started

12   discussing earlier row 24, generic price index percent of

13   brand.

14             Okay.  So by -- by four months after Mylan's

15   launch of its generic version of Oracea, generics are taking

16   85 percent of doses of Oracea in the market and branded

17   Oracea has only 15 percent of doses; right?

18             "Answer:  The assumption in C -- Q3 CY 12 is

19   that 85 percent of the doses would be sold by the generics.

20             "Question:  So let's just go to quarter ending

21   December 2012.  You got 90 percent generic substitution in

22   that quarter; right?

23             "Answer:  The assumption is 90 percent generic

24   in Q4 CY 12.

25             "Question:  And then the assumption in every

Ashley - designations

1   quarter from Q2 CY 13, through the end of this spreadsheet,

2   Q1 CY 16, is that 95 percent of doses of Oracea will be

3   generic doses and branded sales will make up only five

4   percent of Oracea doses; right?

5              "Answer:  The assumption from that point forward

6   is 95 percent of the doses are generic and five percent are

7   branded Oracea.

8              (Deposition designations end.)

9              MS. WILGOOS:  We'd like to call our next

10  witness, your Honor.  We'll be hearing from Mr. Ashley one

11  last time.  Pursuant to that, we'd like to admit the

12  DTX-1019.

13             MR. STEUER:  No objection.

14             THE COURT:  It's admitted.

15             (DTX-1019 received into evidence.)

16             MS. WILGOOS:  May I pass up the exhibits?

17             THE COURT:  You may.

18             (Deposition of Robert Ashley played.)

19             "Question:  Good morning, Mr. Ashley.  Could you

20  please state your name for the record?

21             "Answer:  Robert Ashley.

22             "Question:  Okay.  Let me mark as Ashley Exhibit

23  No. 6 a document produced by plaintiffs in this action

24  bearing Bates numbers GAL 224903 through 224928.

25             "Have you got what's been marked as Ashley

1    Exhibit 6 in front of you, sir?

2           "Answer:  I do.

3           "Question:  So April 1st, '00, which I presume

4    is 2000, that's the date these individuals signed what's

5    been marked as Ashley Exhibit 6?

6           "Answer:  That's correct.

7           "Question:  And you characterize this as the

8    final protocol; is that right; sir?

9           "Answer:  That's correct.

10          "Question:  Now, let's mark for identification

11   as Exhibit No. 2, Ashley Exhibit 2, a provisional patent

12   application bearing production numbers MYL-DJ 2223 through

13   46.

14          "Okay.  Now, when this application was converted

15   to a non-provisional, you had to sign an oath and

16   declaration; do you recall that?

17          "Answer:  I don't recall signing --

18          "Well, I represent to you that's true, sir?

19          "Answer:  I may have signed it.  I don't recall.

20          "Question:  And the oath and declaration, among

21   other things, says that you read and understood the

22   application, including the specification and the claims.  Do

23   you recall that?

24          "Answer:  I don't recall having done that, but

25   if I did, I did.

960

Ashley - designations

1          "Question:  The question was, you stated in your

2      declaration that you read and understood this paragraph that

3      begins on page 11 at line 4; correct?

4          "Answer:  What exactly does the declaration say?

5          "Question:  I have read and understood the

6      application, including the specification and claims.

7          "Answer:  I don't recall having read this

8      particular paragraph.

9          "Question:  Well, you signed the declaration

10     under penalty of perjury; correct?

11         "Answer:  I have no idea whether -- I -- that's

12     a legal phrase I don't understand.

13         "Question:  Okay.  Well I represent to you that

14     you signed it under penalty of making false statements under

15     oath.  So ...

16         "Answer:  Well, I have no idea whether the

17     statement ...

18         "Question:  So is it correct, sir, that you

19     swore on your oath that you read and understood the

20     paragraph that appears at lines 4 through 9 on page 11 of

21     Exhibit 2?

22         "Answer:  Well, I clearly signed that I'd read

23     the patent, yes.  I don't recall reading this particular

24     statement.  I don't necessarily understand what's meant by a

25     delayed release agent in this context or generally.  There

1    are, of course, all sorts of examples of delayed release

2    agents, including, but not limited to, the ones that are

3    here.  So I probably read this paragraph -- or I read this

4    paragraph, I had no reason to doubt its veracity, so I

5    signed a statement to say that I'm sure it was true.

6              "Question:  At the time you filed the

7    application, did you have in mind any particular ratios or

8    combinations of instant release, delayed release, and/or

9    sustained release parallels that you thought would be useful

10   to achieve a preselected release profile from a capsule?

11             "Answer:  No.

12             "Question:  When you filed your application,

13   did you understand that you could select such a ratio,

14   although you didn't know what ratio to select, to achieve a

15   preselected release profile for a capsule formulation?

16             "Answer:  I didn't know whether we could do

17   that.

18             "Question:  Okay.  To your knowledge, sir, prior

19   to 2001, was it known that one could achieve a preselected

20   release profile for a capsule form of a drug composition by

21   including in the capsule a ratio of instant release and

22   delayed release particles containing the drug?

23             "Answer:  I don't know specifically, no.

24             "Question:  Were you aware of anyone who had

25   done that?

Ashley - designations

1          "Answer:  I was certainly aware of controlled

2     release products.  How they specifically achieved their

3     objectives, I didn't know.  I'd never been involved in the

4     development of anything like that.

5          "Question:  And is it your understanding that

6     the information set forth in your application is

7     insufficient to enable a formulator to make a once daily

8     capsule tetracycline composition that will give steady state

9     blood levels of between .1 and 1.0 micrograms per

10    milliliter?

11         "Answer:  Clearly, development work was

12    required.  I did not know what specific formulations would

13    work, and I don't know whether an ordinarily skilled

14    formulator would have been able to take this information.

15    I don't know.

16         "Question:  Prior to contacts with Shire, had

17    CollaGenex attempted, either by itself or in conjunction

18    with a third party, to develop a once daily dosage form of

19    doxy?

20         "Answer:  Yes, it had.  Or it had attempted --

21    yes, it had.

22         "Question:  On its own or with --

23         "Answer:  No.

24         "Question:  -- somebody?

25         "Answer:  In conjunction with Faulding

963

Ashley - designations

1    Pharmaceuticals.

2                "Question:  Okay.  And do you recall that an

3    objective of the program was to, as he reports here, develop

4    a once-per-day dosage form that can meet bioequivalence

5    criteria versus the current 20 milligrams twice-a-day dosage

6    form?

7                "Answer:  I don't recall the call.  That's what

8    Woody was reporting.

9                "Question:  Okay.  But do you recall -- even

10   though you don't recall the call, do you recall that the

11   objective of the program early on with Shire was to develop

12   a once-per-day dosage form that can meet the bioequivalence

13   criteria in comparison to the 20 milligrams twice-a-day

14   dosage form?

15               "Answer:  That certainly looks how Woody

16   interpreted our objectives.  I must admit, I don't recall

17   having said that, but that's how Woody interpreted it.

18               "Question:  And he also said that one of the

19   objectives was given that the half-life of doxycycline is

20   inherently 18 hours, the release profile would potentially

21   only need to be four to eight hours.  Do you see that?

22               "Answer:  That, again, is what Woody has said in

23   this document, yes.

24               "Question:  Let's mark as Exhibit No. 4 a

25   document bearing production numbers SUP 36372 through 83.

Ashley - designations

1        "Did CollaGenex ask Shire to formulate IR and DR

2   beadlets for use in a capsule dosage form?

3        "Answer:  I don't think so specifically.  I

4   mean, what happened was that over a period of time, a

5   number of discussions took place where Shire proposed -- I

6   mean, these idea -- we were -- CollaGenex was not a drug

7   formulation company.  CollaGenex didn't define any

8   formulation.  Shire would have defined any formulation

9   that -- what we did was define the criteria we wanted the

10  thing to end up with, which was this flat PK profile.

11  CollaGenex didn't define anything.

12       "Question:  Whose idea was it at CollaGenex to

13  formulate a once daily controlled release oral solid dosage

14  form that can deliver 40 milligrams of doxy as set forth in

15  the first paragraph here?

16       "Answer:  I'm not sure it was anybody at

17  CollaGenex's idea specifically.  Our idea was to flatten out

18  the PK profile of doxycycline somehow.  We had no idea how

19  to go about that.  Shire proposed one way of going about

20  that -- and we had no idea whether it would work until we

21  did it -- was to develop a controlled release oral solid

22  dosage form.  And there are other ways, of course.

23       "Question:  Well, you had already been working

24  on -- with Faulding on formulations, going back to the 90s,

25  where you were trying to alter the PK profile; correct?

1          "Answer:  And that had failed.

2          "Question:  Do you know what rate and extent of

3     release were specified by CollaGenex?

4          "Answer:  And I don't recall.

5          "Question:  Okay.  But were those parameters

6     specified by CollaGenex?

7          "Answer:  I don't recall.  I very much doubt it.

8     I suspect that they would be specified by Shire.  We

9     specified what the outcome was that we wanted.  I don't

10    think we would have known necessarily what the rate and

11    extent of release should have been to achieve that outcome,

12    but I certainly don't recall defining those things.  Again,

13    CollaGenex is not a formulations company.  CollaGenex is

14    a -- was a drug development company, the clinical bit of it.

15         "Question:  Okay.  Now, in the conclusion of

16    this report, it -- which is the last page, it states that

17    the results obtained from the various IR and DR ratios at 40

18    and 45 milligram doses of doxy reveal that a once-a-day

19    dosing may achieve the desired plasma profile.  Do you see

20    that?

21         "Answer:  I see that statement.

22         "Question:  Okay.  What was the desired profile?

23         "Answer:  I don't recall.  Our clear objective

24    was to remain well below the 1 microgram per mil top and to

25    keep the area under the curve -- the total administered

 1    available dose, if you like -- within a range which we

 2    believed would be effective.  And I don't know whether --

 3    and I don't recall how well we defined that, the bottom end,

 4    or whether we laid that out as a specific objective, but the

 5    top end was clearly an objective.

 6               "Question:  You mean the less than 1 microgram

 7    per ML?

 8               "Answer:  Right.

 9               "Question:  Okay.  And you say the area under

10    the curve was another criteria; correct?

11               "Answer:  Right, as a measure of the total

12    exposure of the patient, for want of a better word.

13               "Question:  Okay.  Over some period of time?

14               "Answer:  Over a period of 24 hours at steady

15    state.

16               "Question:  Okay.  And the experience that you

17    had with respect to the effective amount of the drug over

18    24 hours as measured by AUC was based on Periostat; correct?

19               "Answer:  Correct.

20               "Question:  Okay.  I think I understand.  So in

21    terms of the desired profiles, you had two objectives.  One

22    was to remain below 1.0 micrograms per milliliter, and,

23    number two, try to approximate the AUC that you knew would

24    work for Periostat if you could?

25               "Answer:  Yeah, I'll go with what I said, was

Ashley - designations

1    that, you know, an ideal outcome would have been that we had

2    no idea whether we could achieve an -- whether those things

3    were mutually exclusive.

4              "Question:  Okay.

5              "Answer:  That was, of course, why we engaged

6    Shire that had expertise in both formulation development and

7    in the testing of those things.  Our experience with

8    Faulding suggested that those things were mutually

9    exclusive.

10             "Question:  Well, the record will reflect it.

11   If now you want to say something, go ahead.

12             "Answer:  Well, what I recall us doing with

13   Faulding was something that I thought was really cleaver at

14   the time, which was to try to alter the microenvironment in

15   which the doxycycline was released by using organic acids,

16   and I recall citric acid was one of them.  It didn't work.

17             "Question:  Okay.  Do you recall any discussions

18   about what ratio of IR to DR beads should be included in a

19   pilot formulation?

20             "Answer:  I recall Shire making recommendations

21   to that effect --

22             "Question:  What do you recall?

23             "Answer:  -- following the PK data.

24             "I don't recall the numbers particularly.  But

25   there were clearly -- from their data -- from the data that

1    they'd obtained, there were clearly formulations which had a

2    likelihood of success to achieve the objective, which we've

3    talked about earlier, of maintaining the maximum, the Cmax,

4    below this putative level and maintaining the AUC within a

5    range which we thought would be effective.

6            "Question:  I'd like to mark a document, and I'm

7    just going to do it consecutively, as Ashley Exhibit 9.

8            "Do you recognize this document?

9            "Answer:  I certainly recognize the consent

10   tent.  I'm not sure that I could say that I specifically

11   recognize the document.  But, yes, I do recognize the

12   conversations we had with Faulding.

13           "Question:  And so is this a document that

14   Faulding prepared and sent to CollaGenex?

15           "Answer:  It certainly looks like it -- yes, it

16   is.

17           "Question:  I'd like to mark as Ashley

18   Exhibit 10 a document bearing Bates numbers SUP 0002421

19   through 0002445.

20           "And just for the record, because I forgot to

21   state it, Ashley Exhibit 9 is Bates numbers SUP 0002414

22   through 2420.

23           "Just let me know when you have had a chance to

24   take a quick look at Exhibit 10.

25           "Answer:  Okay.

Ashley - designations

1          "Question:  And is this a document sent by

2     Faulding to CollaGenex with the subject matter of pilot

3     blood study?

4          "Answer:  Yes.

5          "Question:  Okay.  And do you understand that

6     this is a summary of the pilot blood study that was

7     conducted by Faulding or on Faulding's behalf?

8          "Answer:  It certainly seems to be.

9          "Question:  Okay.  And I think you testified

10    earlier that you considered the -- CollaGenex considered the

11    Faulding formulations as failures; is that correct?

12         "Answer:  Yes.  I mean, it's fairly evident when

13    you look at the graphs that maybe it delayed -- as mentioned

14    in the cover letter, maybe uptake was delayed a little bit,

15    but, you know, the overall absorption was -- I don't know --

16    30 percent or something.  The area under the curve was way

17    too low.

18         "Question:  Okay.  So let's just take a step

19    back for a second.  Treatment A, B, C, and D, as set forth

20    on page 2 of this document, do you understand that these

21    were formulations that were tested in people, Faulding

22    formulations that were tested in people?

23         "Answer:  Yes.  I guess that that's what these

24    data -- the end data from individual subjects and then

25    compiled data from all the subjects.

Ashley - designations

1          "Question:  Okay.  Did CollaGenex consider each

2     of Treatments A, B and C as failures?

3          "Answer:  Yes.  There was nothing that even came

4     close to the objective, and there were no stability

5     problems.

6          "Question:  What -- why did you consider these

7     formulations failures?

8          "Answer:  Because they didn't achieve what we

9     believed would be an effective dose at a reasonably -- a

10    reasonable administered dose."

11         (End of the videotaped deposition.)

12         MS. WILLGOOS:  Just one last housekeeping

13    matter, your Honor.  We have some exhibits that were

14    testified, were part of the testimony of Drs. Chambers and

15    Gilchrest that we inadvertently did not move into evidence.

16    We'd like to do so at this time, and documents for counsel

17    and the Court, if you would like them.

18         THE COURT:  Sure.  Why don't you list them for

19    us.

20         MS. WILLGOOS:  Sure.  PTX-199, PTX-200, PTX-201,

21    PTX-202, PTX-208, PTX-209, PTX-470, PTX-492, and DTX-1640.

22         THE COURT:  Any objection to any of those?

23         MR. STEUER:  I don't anticipate an objection.

24         THE COURT:  Take a look.

25         (Pause.)

Ashley - designations

1              MR. STEUER:  No objection.

2              THE COURT:  All right.  They are all admitted.

3              (PTX-199, 200, 201, 202, 208, 209, 470, 492 and

4    DTX-1640 were admitted into evidence.)

5              MS. WILLGOOS:  Plaintiff rests, your Honor.

6              THE COURT:  All right.  Is there anything

7    further from Mylan?

8              MR. STEUER:  No surrebuttal.

9              THE COURT:  All right.  So where are we?  You

10   all have plenty of time left.  My perception is you don't

11   need it, but you do have the opportunity to do closings, and

12   the request this morning was we put that off until tomorrow,

13   which is fine.  But I would like your estimates as to how

14   much of your remaining time you anticipate using tomorrow.

15             MR. FLATTMANN:  I would anticipate spending

16   about one hour at most on the closing, your Honor.

17             All right.  And Mylan?

18             MR. STEUER:  Sounds about right.

19             THE COURT:  All right.  Will, let's meet

20   tomorrow at 9:30, then.  And you do have more than an hour

21   each, but I think an hour is a very good target for both of

22   you.  Okay.

23             Anything else at this point?

24             MR. FLATTMANN:  I believe that's all, your

25   Honor.

Ashley - designations

1          THE COURT:  No?

2          MR. STEUER:  No, your Honor.

3          THE COURT:  All right.  Have a good night and

4    we'll see you tomorrow at 9:30.

5              (Court recessed at 4:09 p.m.)

6

7

8        I hereby certify the foregoing is a true and accurate
     transcript from my stenographic notes in the proceeding.

9

10                    /s Brian P. Gaffigan
                     Official Court Reporter
11                    U.S. District Court

12

13

14

15

16

17

18

19

20

21

22

23

24

25