```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3                              - - -
     RESEARCH FOUNDATION OF STATE
 4   UNIVERSITY OF NEW YORK, et al.,  :   CIVIL ACTION
                                      :
 5                    Plaintiffs,     :
                                      :
 6   v.                               :
                                      :
 7   MYLAN PHARMACEUTICALS, INC.,     :
                                      :   NO. 09-184-LPS
 8                    Defendant.      :
     ---------------------------------
 9   MYLAN PHARMACEUTICALS, INC.,
                                      :   CIVIL ACTION
10              Plaintiff,            :
                                      :
11            v.                      :
                                      :
12   GALDERMA LABORATORIES,INC.,      :
     GALDERMA LABORATORIES, L.P., and :
13   SUPERNUS PHARMACEUTICALS, INC.,  :   NO. 10-892-LPS
                                      :
14              Defendants.
                              - - -
15
                         Wilmington, Delaware
16                        Friday, July 8, 2011
                         BENCH TRIAL - VOLUME D
17

18                              - - -

19   BEFORE:      HONORABLE LEONARD P. STARK, U.S.D.C.J.

20   APPEARANCES:                     - - -

21           MORRIS NICHOLS ARSHT & TUNNELL, LLP
             BY:  JACK B. BLUMENFELD, ESQ.
22
                     and
23

24

25                              Brian P. Gaffigan
                                 Official Court Reporter
```

```
 1    APPEARANCES (Continued):

 2
              PAUL HASTING JANOFSKY & WALKER, LLP
 3            BY:  GERALD J. FLATTMANN, ESQ.,
                   CHRISTINE WILLGOOS, ESQ.,
 4                 JOSEPH M. O'MALLEY, JR., ESQ., and
                   MELANIE R. RUPERT, ESQ.
 5                 (New York, New York)

 6                     Counsel for Research Foundation of
                       State University of New York, Galderma
 7                     Laboratories, Inc., New York University,
                       Galderma Laboratories, L.P., and
 8                     Supernus Pharmaceuticals, Inc.

 9
              POTTER, ANDERSON & CORROON, LLP
10            BY:  RICHARD L. HORWITZ, ESQ.

11                 and

12            WILSON SONSINI GOODRICH & ROSATI, PC
              BY:  DAVID S. STEUER, ESQ.,
13                 MATTHEW R. REED, ESQ., and
                   KIRIN K. GILL, ESQ.
14                 (Palo Alto, California)

15                 and

16            WILSON SONSINI GOODRICH & ROSATI, PC
              BY:  TUNG-ON KONG, ESQ.
17                 (San Francisco, California)

18                 and

19            WILSON SONSINI GOODRICH & ROSATI, PC
              BY:  LORI P. WESTIN, ESQ.,
20                 (San Diego, California)

21                     Counsel on behalf of
                       Mylan Pharmaceuticals, Inc.
22

23

24

25
```

1                                - oOo -

2                        P R O C E E D I N G S

3                 (REPORTER'S NOTE:  The following trial

4      proceedings was held in open court, beginning at 9:31 a.m.)

5      good morning, everyone

6                 (The attorneys respond, "Good morning, your

7      Honor.")

8                 THE COURT:  We are hear for closing argument.

9                 Mr. Flattmann.

10                MR. FLATTMANN:  Yes, your Honor.  With the

11     Court's permission, I'd like to hand up some slides that

12     would assist me in my closing.

13                THE COURT:  That would be fine.  I have gotten

14     used to that practice.

15                MR. FLATTMANN:  Yes, your Honor.

16                May I proceed, your Honor?

17                THE COURT:  You may.

18                MR. FLATTMANN:  Your Honor, on Tuesday morning,

19     I previewed the evidence that we would adduce on direct and

20     cross-examination, and I promised we would meet our burden

21     on infringement, and I predicted that Mylan would fail to

22     meet its heavy clear and convincing burden of proving

23     invalidity of its three sets of patents.  I submit we have

24     fulfilled that promise and that Mylan had indeed failed far

25     short of meeting its heavy burden of proving invalidity.

1          I'd like to go back to each of those promises

2    and predictions and walk us through the evidence that we

3    have adduced and trial and match our opening statement

4    essentially to our proofs at trial.

5          Your Honor, it's clear that Mylan infringes all

6    three sets of the patents.  Galderma has proven infringement

7    by a preponderance of the evidence here.

8          First, the Chang patent.  Mylan has already

9    conceded infringing most claims of the Chang patent, and

10   this Court entered an stipulation and order to that effect

11   back in March.  Only asserted claims 4 and 18 of the Chang

12   patent are still at issue.  As you can see, both of those

13   claims require steady state blood levels of doxycycline of

14   between .3 and .8 micrograms per mil.  But the evidence was

15   clear that Mylan infringed claims 4 and 18, even before a

16   single expert testified in this case.

17         The pivotal pharmacokinetic study that Mylan

18   relies on directly in its label already shows that patients

19   taking Mylan's drug will have steady state plasma

20   concentrations of doxycycline between .3 and .8 micrograms

21   per mil.

22         As you may recall from Galderma's opening

23   statement, Mylan has already admitted infringement of these

24   claims on other occasions.  At the preliminary injunction

25   hearing, Mylan's counsel acknowledged that its generic

1    product will result in a doxycycline concentration in

2    patients of .6 micrograms per mil which is square in the

3    middle of the range, and Mylan's own statement of contested

4    facts in the pretrial order says that the mean trough

5    concentration is .3 micrograms per mil.

6              THE COURT:  Are either of those actually

7    evidence on the slide there?

8              MR. FLATTMANN:  Well, the statement of contested

9    facts is evidence that the Court can consider because it's

10   an admission by Mylan incorporated into the pretrial order,

11   but I will also show the Court that these statements appear

12   in the testimony at trial.

13             THE COURT:  Maybe they prove that their proposed

14   fact is not actually a fact.

15             MR. FLATTMANN:  Well, I was going to suggest

16   that that is what they attempted to prove, but their experts

17   admitted it nonetheless.

18             In particular, as we see from this slide, Mylan's

19   expert Dr. Chambers admitted that the Cmax concentration was

20   .6 micrograms per mil.  He did so here in open court; and he

21   admitted that the trough concentration of Mylan's generic

22   product was .3 micrograms per mil.  That is just what Mylan

23   said in its uncontested facts, and he verified it and

24   confirmed that.  That proves infringement.

25             Dr. Friend's testimony was consistent with that

1     as well, your Honor, yesterday.

2              Indeed, I think as your Honor just recognized,

3     by the end of yesterday, after the testimony of Dr. Chambers

4     and Dr. Friend, Mylan was essentially reduced to challenging

5     its own statement of contested facts in the pretrial order.

6     It even went so far as to redirect Dr. Friend on the

7     exhibits that support its own statement of contested facts

8     in the pretrial order in an attempt to prove that they don't

9     support those asserted facts.  That's remarkable.

10             Now, on top of these multiple concessions, we

11    put in affirmative proofs.  Dr. Rudnic affirmatively

12    established that patients taking Mylan's generic product

13    would meet the claimed steady state plasma concentrations

14    recited in the claim of between .3 and .8 micrograms per

15    mil, But Mylan now says that all of the blood levels must

16    fall between .3 and .8 at all times.  Now, that wasn't the

17    Court's claim construction, and it isn't the law.

18             Mylan and its experts admit that the steady

19    state trough is .3 and the Cmax is .6.  Therefore, Mylan's

20    product will admittedly fall in the range and patients will

21    have blood levels within this range.  However you parse the

22    data, that is infringement.  So as such, your Honor, we

23    submit that Galderma has proven Mylan's infringement of

24    claims 4 and 18 of the Chang patent by a preponderance of

25    the evidence and infringement of the other asserted claims

 1    has been stipulated to.

 2              I'll turn to the infringement of the Ashley

 3    patents, but first I'd like to make a bigger picture

 4    observation.  I put Mylan's 50-milligram doxycycline label

 5    for its approved 50-milligram product up on the screen.

 6              Mylan's story concerning the Ashley patents is

 7    internally inconsistent, and it doesn't make sense.

 8              MR. STEUER:  Your Honor, this isn't an exhibit.

 9              MR. FLATTMANN:  I didn't say it was.

10              THE COURT:  If that is an objection, it's

11    overruled.  It's a demonstrative.

12              MR. FLATTMANN:  Right.  There is abundant

13    testimony of record concerning the 50-milligram product, and

14    we are simply illustrating that.  But their story doesn't make

15    sense, your Honor.  Mylan's expert, Dr. Gilchrest agrees with

16    us that Oracea has sub-antimicrobial activity, but she says it

17    isn't new.  Mylan's other expert, Dr. Chambers says it doesn't

18    even exist.

19              Now, we'll talk about the various admissions

20    that contradict Dr. Gilchrest's opinions, but her basic

21    theme is that 30- and 40-year old prior art taught that

22    sub-antimicrobial dose of doxycycline could treat rosacea.

23    She believes, however, that this same art taught both

24    40 milligrams of doxycycline, namely Oracea, and 50 milligrams

25    of doxycycline, and that both would work as well, just as well

1    against Oracea, with no difference in side effects due to

2    antimicrobial activity.

3            Now, Dr. Chambers apparently didn't read the

4    same references.  He believes that 40 milligrams of Oracea

5    and 50 milligrams of doxycycline are essentially equal,

6    and that both of those products would, in fact, act as

7    antibiotics in inhibiting flora growth and et cetera.

8            But Mylan already makes a generic 50-milligram

9    doxycycline product, your Honor.  If that product is no less

10   effective and no less safe than Oracea, as Dr. Gilchrest says,

11   and is no more effective in avoidance of antimicrobial activity,

12   as Dr. Chambers says, why do they need to copy Galderma's

13   product?  Why do they want to spend millions of dollars on

14   lawyers in this litigation when they would have us believe

15   they're already selling it in the form of the 50-milligram

16   product?  And how do they explain the tremendous commercial

17   success that they all admit that Galderma has achieved?

18           Doctors don't get fooled by pharmaceutical

19   company advertising.  You can look at what Dr. Gilchrest

20   eloquently said about this a couple days ago.

21           She agreed that most doctors try to prescribe

22   the best drug for their patients and, in her view, "all

23   physicians endeavor to make informed decisions based on

24   information and not on advertising materials but based on

25   objective evidence."

1          That is why Oracea has been successful, and that

2     is why Mylan wants to copy.

3          Now, your Honor, on the strength of her own

4     independent analysis of the data, Mylan's expert Dr. Gilchrest

5     only first started prescribing 40 milligrams of doxycycline

6     for rosacea after Galderma's product Oracea was approved and

7     launched, after the product that is indisputably covered by

8     the same patents Dr. Gilchrest now says are invalid was first

9     invented, developed and sold.

10          Let's take a look at the claims and look at the

11     evidence in a little more depth.  Specifically, with regard

12     to infringement, both Ashley patents have subantibacterial

13     claim limitations which Mylan meets.  Mylan's label says so.

14          The Court's construction of this claim limitation

15     appears on the right-hand column here.  This was the same

16     construction argued by Mylan and adopted by the Court.  If

17     you compare the Court's construction of the limitation with

18     Mylan's label in the left-hand column, we see that Mylan's

19     proposed ANDA product meets the subantibacterial claim

20     limitation.  By example, the Court said, subantibacterial

21     amount means it does not significantly inhibit the growth of

22     microorganisms and the label says it should not be used for

23     reducing the numbers or eliminating microorganisms associated

24     with any bacterial disease.

25          As you may recall, Mylan's positions on this

1    are directly contradicted by the label.  The contrast is

2    remarkable.  As Dr. Webster testified, Mylan's label reads

3    right on the subantibacterial amount in many ways.  It does

4    so where it says that there was no detectible long term

5    effects on bacterial flora in a number of different body

6    cavities and tissues, it says so when it says that bacteria

7    is not significantly reduced or eliminated, and it says so

8    in about three or four other ways.

9            Now, it's not just Dr. Webster who testified that

10   Mylan infringes the subantibacterial amount limitations.

11   Dr. Gilchrest did, too.  She repeatedly admitted that 40

12   milligrams a day of doxycycline or 20 milligrams twice a day

13   of doxycycline does not alter bacterial flora.  With reference

14   to Periostat, 20 milligrams twice a day, she said it would not

15   be appropriate to use in an anti-infection, and that it was

16   subantibacterial.  She called it a subantibacterial dose on

17   several occasions.

18           So through their own experts, and through the

19   affirmative proofs that we put in with Dr. Webster, Galderma

20   has met its burden of proving by a preponderance of evidence

21   that Mylan's ANDA product infringes.

22           Now, Dr. Chambers, I submit his continually

23   shifting testimony on this issue or, as he termed it once on

24   redirect, his wobble, doesn't change the basic underlying

25   facts.  He completely reversed his position and he

1    jettisoned all of his early arguments regarding predictions

2    from in vitro data.  He even ran from his own MIC chart.

3    But he runs from there right into the in vivo studies, the

4    same in vivo studies that Mylan relies on for its label

5    claims of no significant reduction of bacteria.

6         He relies on a new theory that purportedly

7    shows in vivo data of antibiotic resistance in the Haffajee

8    article.  His testimony on the Haffajee article, which Mylan

9    did not present to the FDA and did not include on its label

10   and did not rely on for its labeling claims, was at best

11   inconsistent, your Honor.

12        He admitted on cross that Haffajee failed to

13   show any significant inhibition of growth.  To use his own

14   words again, he wobbled when he was confronted with the

15   Haffajee statement that the source of the observed bacterial

16   resistance could not be determined.  That that question

17   could not be answered.

18        Now, Dr. Chambers criticizes the studies

19   actually considered by the FDA and actually presented by

20   Mylan to the FDA because they didn't have positive controls,

21   supposedly.  But he admitted, when pressed, that Haffajee

22   didn't have a real positive control either.  It didn't compare

23   the 20 milligrams of doxycycline to any other tetracycline

24   compound, much less a higher dose of doxycycline.  In fact,

25   your Honor, the only time that Dr. Chambers showed any

1    bacterial resistance at all was when it was a hypothetical

2    example entirely unsupported by any actual data.

3            Your Honor, as I said, Dr. Chambers runs from

4    the in vitro data that he had previously embraced and right

5    into the in vivo studies that Mylan relies on for its label

6    claims of no significant reduction of bacteria.  The

7    contrast between his testimony on these studies on direct

8    and cross was remarkable.

9            On direct, he criticized all of the studies

10   by cherry-picking data around the margins.  On cross, he

11   embraced all of them.  He said they were all sound and true.

12   He admitted they all supported the Mylan label claim.  He

13   admitted Mylan adopted all of them.  That was clear from his

14   testimony.

15           We saw that for each of the Skidmore, Walker

16   2005, Walker 2000 and Thomas studies.

17           And as you can see from the testimony here in

18   PDX-822, he admitted the same thing about Walker 2005 on

19   cross-examination.  It supported the label.

20           Now, he couldn't run from Mylan's label either,

21   although he tried.  He tried to say that the label didn't

22   match the claims, but on cross he admitted that the label

23   says that Mylan's product will not reduce the numbers or

24   eliminate microorganisms associated with any bacterial

25   disease.  He agreed with that statement.  He agreed that

1   that matched the Court's claim construction of subantimicrobial

2   amount.  Namely, that it meant no significant inhibition of

3   growth of microorganisms.

4            Now, he tried to say that FDA didn't actually

5   agree even though they approved the label, but on cross, he

6   admitted that FDA actually removed the word "antibiotic"

7   from the Oracea label.

8            He ultimately had to admit that he was also

9   engaging in speculation as to FDA's intentions or motives in

10   not approving a label claim that the amount of doxycycline

11   is "well below" a significant inhibitory amount.  He didn't

12   know what that meant or what either CollaGenex or FDA

13   intended by that or what the motives were regarding those

14   words.

15           Now, Mylan suggested that to meet our burden on

16   infringement, we need to demonstrate its product will not

17   significantly inhibit the growth of any of the millions of

18   bacteria in body tissues.  That, again, was not the Court's

19   claim construction.  Those words do not appear in the claim

20   or in the patent, and that is not the standard for proving

21   infringement.

22           The Mylan label says directly that its product

23   will not reduce bacteria.  It will not significantly inhibit

24   growth in several different ways, in fact.  Mylan's Vice

25   President of Regulatory Affairs, Mr. Talton admitted in his

1    testimony that that is true, and that Mylan has developed

2    no clinical data to the contrary.

3         Mylan has not shown that its product will

4    significantly inhibit the growth of bacteria, of any

5    bacteria for that matter.  It must be held to its label.  It

6    must be held to what it told the FDA and what it is going to

7    tell patients and doctors, and that establishes infringement.

8         So, once again, your Honor, Galderma has proven

9    by a preponderance of the evidence that Mylan's product

10   infringes the Ashley patents.

11        I'll turn to the Amin patents now.

12        Mylan and its experts simply failed to rebut

13   our infringement proofs concerning the Amin patents.  First

14   of all, Mylan does not even contest and both Galderma and

15   Mylan's experts have testified that production of nitric

16   oxide and iNOS leads to a number of downstream effects,

17   including vasodilation, erythema, increased microvascular

18   permeability, leucocyte invasion, and edema.

19        Now, both Galderma and Mylan's experts further

20   testified and agreed that these effects lead to the signs

21   and symptoms of rosacea, including papules and pustules.

22   And this is from Robbins' testimony.

23        Moreover, Mylan also doesn't contest, and

24   again both Galderma and Mylan's experts have testified, that

25   doxycycline decreases the production of nitric oxide from

1    iNOS.  This is again Dr. Robbins' testimony and part of the

2    statement of uncontested facts in this case.

3              In fact, Mylan's expert, Dr. Robbins has

4    testified that work from his own laboratory has shown that

5    doxycycline decreases the production of nitric oxide.

6              Also, Mylan's 40-milligram doxycycline generic

7    product plainly infringes because, as its own expert

8    Dr. Robbins has testified, the use of Mylan's ANDA in

9    accordance with the label is effective in inhibiting the

10   papules and pustules of rosacea, which, as we know, are the

11   result of increased production of nitric oxide, based on the

12   testimony of both sides' experts.

13             So Mylan simply could not dispute these basic

14   facts.  As a result, they can't rebut our proofs.  If you

15   use the product in accordance with the label, it will

16   infringe.

17             So, your Honor, as such, we submit that Galderma

18   has proven infringement of all three sets of patents at

19   issue here.  Mylan has already agreed it infringes most of

20   the claims of the Chang patent.  Galderma has set forth

21   sufficient evidence that Mylan infringes the other patents

22   and claims as well.

23             I'll turn to validity, your Honor.

24             Now, Mylan has fared no better on its invalidity

25   defenses.  That is because as to all three sets of patents,

1    Mylan's proofs fell short of its heavy burden showing

2    invalidity by clear and convincing evidence.  The fact that

3    Mylan has now retooled and reconfigured and rejiggered the

4    piles of art in the last two weeks hasn't helped.  Neither

5    did Mylan's last minute effort during trial to add and drop

6    still more references.

7          I'll start with the Ashley patents.  The patents

8    are valid, and Mylan hasn't proved otherwise.  It hasn't met

9    it clear and convincing burden.

10          Dr. Gilchrest, on cross, testified consistently

11    with her deposition.  She had to admit none of her cited

12    art came close to disclosing the treatment of rosacea with

13    a subantimicrobial amount of tetracyclines, much less

14    40 milligrams of doxycycline.

15          She dropped three of her nine references to

16    avoid their explicit disclosure of antibiotic activity, and

17    she admitted that none of the remaining references disclosed

18    antibacterial amounts.

19          She admitted that none of the new references

20    she added to her argument disclosed subantibiotic amounts

21    either, and that they also didn't disclose non-reduction of

22    microflora.

23          Now, in view of these glaring deficiencies

24    in their proofs, on direct, she tried to supplement the

25    disclosures of articles like Murphy and Cotterill by

1    combining them with teachings from art that is nowhere

2    listed in Mylan's statutorily required Section 282 notice.

3    I think we exposed that attempt on cross and confirmed that

4    the six references on which she actually and legitimately

5    relies fall short of the claims, and so does the additional

6    prior art that she recently added.

7         Now, Dr. Gilchrest says that Ashley is obvious

8    in view of this art but she could provide no explanation for

9    why no one developed this invention for decades after this

10   art was published.  Very tellingly, she testified that she

11   never heard of anyone using doxycycline in an amount of less

12   than 50 milligrams to treat rosacea, and she, herself didn't

13   do that until Oracea was launched.

14        Now, let's take a look at some of her references.

15   She admits that she is also relying on six of them now.  She

16   admits that none of them anticipate Ashley because none

17   discloses a subantibacterial amount, and none disclose

18   failure -- a lack of significant inhibition.  None disclose

19   anything about microflora.

20        Your Honor, these are glaring deficiencies in

21   their proofs.  These are critical limitations of the claim.

22   They're not in the art.  The art doesn't anticipate, by

23   their own expert's admission.

24        Now, Dr. Gilchrest also admitted that none of

25   the six references discloses the treatment of rosacea with

1   any amount of doxycycline.  That's fairly definitive.  And

2   none disclose any antibiotic in an amount of less than

3   100 milligrams a day.  The art was pointing in exactly the

4   opposite direction.

5          Mylan continues to rely at trial on the

6   Pflugfelder patent, although it has now been relegated to

7   its role as an obviousness reference as opposed to an

8   anticipation reference.  Your Honor recalls that the PTO

9   believed this to be the closest prior art but found that it

10  was deficient and could not invalidate the claims that Mylan

11  has pushed on.

12         At trial, Dr. Webster and Dr. Gilchrest both

13  testified that Ashley issued over the Pflugfelder patent and

14  Dr. Gilchrest in particular admitted that she dropped

15  Pflugfelder as an anticipatory reference because it doesn't

16  even disclose the disease we're talking about here.  As she

17  admitted, it doesn't explicitly teach a method for treating

18  the papules and pustules of rosacea.

19         Now, as I have mentioned, Mylan recently added

20  these five additional and even more distant references to

21  support its invalidity defense.  Now, although these

22  references were cited a long time ago in one of Mylan's

23  interrogatory responses, they have only recently resurfaced.

24  Adding more art to the pile at the last minute didn't help

25  Mylan meets its burden, though, because as Dr. Gilchrest

1    admitted, none of these new references anticipates or

2    renders obvious the claims, and she said none of them

3    disclose the use of subantibacterial amounts to treat

4    rosacea.  It's clear on their face, they're even more

5    distant than what came before.

6            Drs. Webster and Gilchrest both testified that

7    none of these references say anything at all about the use

8    of subantibacterial amounts of tetracyclines to treat acne

9    or rosacea.

10           The fact that Mylan felt the need to drag in

11   these references as prior art at the last minute speaks

12   volumes.  The fact that it tried to bring in still more

13   prior art that wasn't even on its 282 statement tells us

14   that Mylan fully appreciates the deficiencies in its

15   invalidity case.  It's right through trial.

16           Now, your Honor, since the time of its paragraph

17   4 notice, only one reference has survived the reshuffling

18   and the rejiggering that Mylan has engaged in:  the

19   Pflugfelder reference.  Mylan has only continued to stack

20   more art and more and more art into the pile, some that is

21   not even on the 282 notice.  I showed the Court an example

22   of this during the cross-examination of Dr. Gilchrest.

23           But it's quite telling in the new art that

24   they have cited and the non-282 art is even more distant,

25   as Dr. Gilchrest admitted on cross.  All of that art went

1    to antibiotic amounts, antibiotic activity, or just was

2    silent on the topic.

3              Now, you will recall that Dr. Gilchrest used

4    this chart and charts like it in an attempt to prove

5    invalidity.  These charts I think we revealed on cross

6    showed an attempt to supplement the disclosures of the

7    Murphy and other references at trial with so-called

8    state-of-the-art references.

9              In particular, this one refers to the element, in

10   a subantibacterial amount that reduces lesion count; and it

11   says Murphy administered 125 milligrams of oxytetracycline for

12   six to twelve months, a dose that will not affect bacterial

13   flora and in sebaceous glands in the skin.

14             The only problem with this chart is that Murphy

15   doesn't say anything about that.  Murphy doesn't say

16   anything about bacterial flora or bacterial flora in

17   sebaceous glands.  That is from a different reference, a

18   non-282 reference.

19             When pressed, Dr. Gilchrest admitted that Murphy

20   and Cotterill contained no mention of subantibac -- microbial

21   amounts or reduction in skin microflora in sebaceous glands.

22   So she basically invalidated her own charts in Mylan's

23   attempt to fill the void in its evidence with non-Section

24   282 references under this Court's order during the case

25   concerning the non-Section 282 references.  It can't even

1    attempt to succeed in that effort.

2          Dr. Feldman.  After having watched over an hour

3    of deposition testimony, all we know about Dr. Feldman now

4    is what we knew before trial.  That his alleged uses of

5    Periostat were uncorroborated private uses, if they happened

6    at all.  They don't qualify as prior art.

7          Dr. Feldman's alleged use was not corroborated

8    or public in 1999 or 2000, and it certainly wasn't

9    corroborated by any witness at this trial.  All we have

10   is the overwhelming evidence from Dr. Feldman, himself or

11   the lack of evidence showing that those alleged uses were

12   unpublished, undisclosed, unappreciated, uncorroborated,

13   and undeveloped.

14         Your Honor, there is good reason for the

15   corroboration requirement under the law.  It's so people

16   can't come in years later with no supporting evidence and

17   say they invented it and take patents away from the real

18   inventors.

19         Here, Dr. Feldman doesn't say he invented anything.

20   Why is that?  The evidence from Dr. Feldman's testimony shows

21   he didn't publicly disclose any use of Periostat.  He did not

22   disclose the idea to other dermatologists, nor did he write

23   anything about the use or publish it, nor did he ever attempt

24   to sell the idea or speak to CollaGenex or anyone else about

25   it or attempt to patent it.

1          There was simply, and is simply, no evidence

2     that Dr. Feldman ever even prescribed the Periostat to a

3     single patient to treat rosacea.  No one has ever seen this

4     alleged prescription.  We don't know if the use ever happened,

5     and neither does Dr. Feldman, according to his testimony.

6          At trial, both of Mylan's experts, Drs. Gilchrest

7     and Stafford had to admit that.  They had to admit that they

8     didn't know if the patient filled her prescription, if it

9     existed at all, or if the patient took the drug, much less got

10    better.

11         THE COURT:  On these factual disputes, whether a

12    patient took it, whether it is prescribed, who has the

13    burden of proof, and what is the burden of proof?

14         MR. FLATTMANN:  Well, the burden of proof is clear

15    and convincing evidence, your Honor, and falls squarely on

16    Mylan.

17         THE COURT:  Even on these factual predicates for

18    their clear and convincing argument, for their invalidity

19    argument?

20         MR. FLATTMANN:  Absolutely, your Honor.  They

21    have the burden of establishing there is any prior art at

22    all.  They haven't come forward with any evidence that there

23    was any filling of the prescription or taking of the drug by

24    the patient, so they haven't met their clear and convincing

25    burden of proving invalidity because they can't even meet

1          their burden of proof of showing it was prior art.

2                    I really think that is a very important point.

3          No one in this entire case can say with any certainty at all

4          that the patient took the drug, not even Dr. Feldman.   There

5          is no proof, just speculation.   I'll get into that.

6                    First, Dr. Gilchrest.   She can't corroborate the

7          story.   She doesn't have any firsthand knowledge.   All she

8          has to go on is what Dr. Feldman says.   Dr. Feldman says he

9          doesn't know if the patient filled the prescription, so, of

10         course, nor does Dr. Gilchrest.   She admitted that on a

11         couple of occasions.

12                   Dr. Gilchrest also admitted that we can't

13         simply speculate or assume that the patient took the drug

14         because patient noncompliance has been a problem for

15         thousands of years.

16                   To make a separate point, your Honor, she

17         admitted that she had not even taken account of the fact

18         that as shown in Plaintiff's Trial Exhibit 470, Ashley's

19         invention was conceived before Dr. Feldman's uncorroborated

20         alleged use.   That article references a telephone conference

21         about the clinical trials for Periostat on February 17th,

22         2000 with the FDA.   That's the very latest date on which

23         this invention could have been conceived by Dr. Ashley, and

24         that predates this alleged uncorroborated prior use.

25                   Moreover, Dr. Gilchrest admitted that she is not

1    aware of anyone who prescribed a dose of less than 50

2    milligrams of doxycycline, which is an antibiotic dose for

3    the treatment of rosacea prior to April 2001.

4            Now, given her expertise and her prominence in

5    the field for many decades, if anyone would have known, she

6    would have.  You can bet, your Honor, that Mylan's attorneys

7    scoured the world looking for this evidence.  It doesn't

8    exist.

9            Neither she, nor Dr. Webster ever heard of this

10   supposed conference that Dr. Feldman referred to.  Mylan has

11   failed to prove anything about the conference.  We don't

12   have any evidence about it, no notes, no dates, no papers,

13   no agenda.

14           Again, if all this happened, they would have

15   heard about it.  They would have known of it.  It would have

16   been published.  It would have been publicly known.  It

17   wasn't.

18           Dr. Stafford, who was Mylan's expert on the IMS

19   data, admitted during trial that it's not possible to directly

20   link the patient who was allegedly prescribed Periostat with

21   the patient who later filled the prescription.  That's because

22   IMS data simply does not address the important questions here.

23   It doesn't say who the patients are, and it doesn't say what

24   the drug was prescribed for.  There was no dispute on that.

25           In the end, Dr. Stafford's testimony was

1    speculation.  It was likely that the patient was the one

2    that Feldman prescribed for.  It was likely that she filled

3    the prescription.  Mylan adds a few more likelies to the

4    equation:  that she took it, that it worked, et cetera, but

5    it has no evidence on any of these points, and likelies from

6    experts and speculation from Mylan are not a substitute for

7    proof of clear and convincing evidence, your Honor.

8              In summary, all Mylan could do is speculate

9    about Feldman's alleged prior uses.  In the end, this

10   Feldman experiment amounts to nothing but a failure of

11   proof.

12             I will now turn to the Chang patent, your Honor.

13             In the opening statements, we previewed the

14   collection of art that Mylan was asserting against the Chang

15   patent.  First, your Honor will recall that Mylan had a large

16   stack of 18 references.  Right before trial, the pile shifted

17   and reconfigured.  Even after Dr. Rudnic's testimony, Mylan's

18   pile changed again.  In the end, we were left with four

19   references.  So it's been constantly morphing throughout the

20   course of even the trial.

21             As we heard yesterday from Dr. Friend, Mylan's

22   invalidity arguments now rest on these four references:

23   the Ashley controlled-release references, it's the '854

24   application; the Ashley patents-in-suit here, I'll call

25   them the rosacea references and the '932 application; an

1    amphetamine patent, which is the '819 patent; and a

2    minocycline patent, which is the Sheth '304 patent.  So

3    I'll call these the four Friend references collectively.

4         Your Honor, none of those references came close

5    to disclosing all the elements of the asserted claims or

6    making them obvious.

7         Galderma presented an expert on the validity of

8    the Chang patent who I will submit his credentials were

9    pertinent and beyond dispute.  Dr. Rudnic has been involved

10   in the formulation development of over 80 commercial

11   products, and they have combined sales of over $1 billion.

12   He is the inventor of the patent that the Patent Office

13   regards as the closest prior art to Chang.  He is the

14   inventor and codeveloper of the Shire Microtrol technology

15   that Mylan asserted was the technological foundation for

16   the Chang formulation.  Dr. Rudnic explained how and why

17   Mylan's prior art is irrelevant to the invention of Dr.

18   Chang.

19        What did Mylan do in response?  In response,

20   Mylan presented two experts who denigrated the work of

21   Dr. Chang as pedestrian formulation development, even

22   though neither of them had, in their long careers, ever

23   accomplished Dr. Chang's so-called pedestrian act of

24   developing so much as a single drug formulation that ever

25   made it to the market.

1            So perhaps it was fitting for Mylan to present

2    two experts that were so bereft of successful formulation

3    development experience.  Both were asked to opine on two

4    references, the Ashley references, that are somewhat

5    analogously totally bereft of any formulations.

6            I think we foreshadowed in our opening and

7    have now proven that Mylan would have the Court invalidate

8    a formulation patent, Chang patent, on anticipation grounds,

9    no less, based on stitching together random excerpts of

10   two references that, even taken together, don't disclose a

11   single example of any formulation.  That is contrary to the

12   black letter law that anticipation requires that a single

13   prior art reference disclosed the limitations of the claim

14   as they're arranged in the invention, your Honor.

15           Can we put up DDX-615, please?

16           Your Honor will recall that Mylan used an

17   anticipation claim chart in Dr. Friend's testimony, DDX-615.

18   This is ultimately no more than random pieces from a few

19   documents that have been cut out and pasted together to

20   render a meaning that bears no relation to the purpose or

21   meaning of either original reference.

22           Now, even if such cutting and pasting were

23   proper for a validity attack, Mylan still can't meet its

24   heavy burden, clear and convincing evidence, of proving

25   invalidity with the Ashley references.  There is a glaring

1    hole in its proofs, your Honor.  Namely, to borrow from Dr.

2    Rudnic's analogy, which I think was instructive, if the

3    Chang patent were instead a patent for a Big Mac, Mylan has

4    taken from the recipe book a disclosure of a bun from one

5    page, and all beef patties from another, an unrelated recipe

6    page, a disclosure of lettuce and cheese from some other

7    page, but at the end of the day, as both Mylan's counsel

8    and its experts admitted, Mylan still missing the so-called

9    secret sauce.

10             It's now undisputed that the key Chang claim

11   limitation of 30 milligrams of IR and 10 milligrams of DR

12   beads is completely absent from the Ashley references, as

13   it's absent, according to Mylan's own expert, from Mylan's

14   admittedly more distant '304 and '819 references.

15             And Dr. Friend's apparent surprise at the fact

16   that one Adderall patent using Microtrol technology has been

17   determined by the Patent Office to be patently distinct over

18   another of the same breed, both patents being closer in

19   their disclosures to one another than either is to Chang,

20   took the air out of Dr. Friend's unwarranted denigration of

21   Dr. Chang's truly inventive work as merely off-the-shelf

22   technology.

23             No doubt appreciating the shortcomings in its

24   validity attack, Mylan resorted to a somewhat unprecedented

25   tactic here.  It tried to shore up the hole in the prior

1    art, not with another prior art reference, your Honor, but

2    with contemporaneous inspired modeling by Dr. Rubas.  But

3    it's clear that Dr. Rubas's modeling, whatever it was

4    intended to convey, is not prior art, and it cannot credibly

5    be taken as objective evidence of the knowledge of a person

6    of skill in the art here.

7          Indeed, Dr. Rubas hedged both of his opinions by

8    saying that they were things that a person of skill could

9    have known -- could have known.  But "could have" is not the

10    test.  The statute requires that it would have been obvious,

11    and it requires both public disclosure and motivation.

12          Knowledge of one of ordinary skill in the art

13    still requires credible proof, and that proof is usually

14    supplied by contemporaneous literature cites, not by murky

15    modeling techniques used by a litigation expert who was

16    given Dr. Chang's invention and then was asked by Mylan to

17    show why, working backwards, that which he already knew was

18    not surprising.

19          That's not a proper validity attack.  Even the

20    best of inventions look elegantly simple and unsurprising when

21    viewed in a false light, your Honor.  From the ultimately

22    improper advantage of hindsight, Dr. Rubas' modeling simply

23    can't shore up a hole in Mylan's proofs here.

24          Now, the other art that Mylan relies on is

25    directed to different active ingredients like amphetamines,

1    different pharmacokinetic parameters like increasing blood

2    levels as opposed to maximum concentration, or different

3    effects like antibacterial effects.  Mylan argues that

4    different individual elements were in the art, to be picked

5    and chosen from here and there, but it never shows that anyone

6    combined them, and it never shows that this combination would

7    have been obvious at the time of the invention instead of

8    in hindsight.

9           All Mylan is doing is cherry-picking various

10   pieces of the claimed invention from dozens of sources and

11   cobbling them together as if the Chang patent formulation

12   were already known and in hand.  We can see that with the

13   Microtrol technology argument.

14          In its opening statement, Mylan's counsel argued

15   that the Chang patent inventors merely used off-the-shelf

16   technology to arrive at the Oracea formulation.  But even

17   Mylan's expert, Dr. Friend agreed that so-called off-the-shelf

18   technology is appropriate for formulating all drugs.  He

19   agreed with that.

20          There were no guarantees that Shire could have

21   developed it either.  We saw, in Dr. Ashley's deposition

22   testimony yesterday, that before CollaGenex even approached

23   Shire to try to make a once-a-day formulation of doxycycline,

24   Faulding failed three times to do this.  Just because

25   something can be taken off the shelf doesn't mean it will

1    work.  We saw that with Faulding's failures.

2         Mylan's story about the invention of the Chang

3    claims makes no sense.  On one hand, it urges that Chang was

4    just using Shire's Microtrol technology.  On the other hand,

5    it says, no, Ashley actually invented all of this.  They

6    can't have it both ways, and their arguments undercut each

7    other.  The evidence shows that neither was the case.

8         First, Robert Ashley testified that he didn't

9    even know how to develop the Chang patent formulations.

10   The inventors are presumed to be correct.  Mylan has the

11   burden of proving, by clear and convincing evidence, that

12   the invention was derived or that it's wrong, but all Mylan

13   showed was that CollaGenex had a goal and didn't know how

14   to accomplish it.  That's not inventorship.

15        As this Court previously found, ironically, in

16   Purdue Pharma v Faulding, the very company that failed to

17   formulate a once-a-day doxycycline:  The test for conception

18   is whether the inventor had an idea that was definite and

19   permanent enough that one skilled in the art could

20   understand the invention.  An idea is definite and permanent

21   when the inventor has a specific settled idea, a particular

22   solution to the problem at hand, not just a general goal or

23   research plan he hopes to pursue here.

24        A side-by-side comparison demonstrates who

25   the real inventors of the formulations claimed in the Chang

1    patent is.

2            According to Robert Ashley, the objective of

3    his Ashley CR application was to define a pharmacokinetic

4    profile which avoided the spikes of concentration and had no

5    diminutions of concentration, but that he had no meaningful

6    idea of what composition might achieve that objective.  He

7    didn't know how he was going to get there.

8            But as Dr. Chang testified, CollaGenex and

9    Mr. Ashley couldn't develop a product to achieve this goal.

10   The profile itself that was sought by Ashley was meaningless,

11   to use Dr. Chang's words.  It was Chang and his team that

12   developed a product to achieve the goal to, as Dr. Chang put

13   it, to put some meaning to the value.

14           Now, inventors, as I said, are presumed to be

15   correct.  Mylan has the burden of proving that inventorship

16   is wrong by clear and convincing evidence.

17           What did it show?  That CollaGenex had a

18   goal and didn't know how to accomplish it.  That Shire

19   accomplished it, and all CollaGenex did was "okay" Shire's

20   work.  Again, a research goal is not conception of the

21   invention.

22           Mylan has put forth no evidence to contradict

23   Mr. Ashley's own statements that he didn't invent this.

24   None of it matters anyway.  Absent deceptive intent, the

25   Court can fix inventorship if it feels as though it's proper

1   under 35 U.S.C., Section 256.  Mylan hasn't attempted to

2   show any deceptive intent.

3           Now, returning to the four Friend references,

4   all of which we learned were brought to Dr. Friend's

5   attention by Mylan's counsel.  Dr. Friend testified

6   yesterday that he believed that the Ashley references

7   were the closest prior art.  But even as the closest prior

8   art, Dr. Friend agreed that the Ashley controlled-release

9   patents did not even disclose any formulation that was

10  tested or modeled or any formulation of immediate-release

11  and delayed-release beads at all.

12          Even as the closest prior art, Dr. Friend agrees

13  that a comparison of the hypothetical plasma profile of the

14  Ashley CR references, on the left here, figure 1, and the

15  Chang formulation, illustrated here on the right, figure 5,

16  were different.  That is Mylan's closest prior art.

17          In fact, Dr. Friend agreed that the Ashley patent

18  applications do not teach the Chang patents.  He admitted that

19  if you were trying to follow the disclosures of Ashley with

20  respect to the only release profile disclosed, you would not

21  be successful if you tried a 30-milligram IR to 10-milligram

22  DR combination.  That's definitive, your Honor.

23          In his direct examination, Dr. Friend also relied

24  on two combinations of art in support of his obviousness

25  opinion.  One combination included the minocycline, or Sheth

1   '304 patent, and Dr. Friend confirmed that minocycline and

2   doxycycline have different physical and chemical properties,

3   and he confirmed that the point of the '304 patent was to keep

4   the blood plasma levels in a concentration range where they

5   would act as an antibiotic.

6           Dr. Friend testified that he is not aware of

7   any disclosure in the '304 patent of anything other than

8   antibiotic doses of minocycline.  That is at transcript, 846

9   to 847.

10          In view of all these differences, even

11  Dr. Friend testified that the '304 patent is not as close

12  to the Chang inventions of the Ashley patent applications

13  which the Chang patent issued over anyway.

14          Now, also according to Dr. Friend, there is no

15  particular reason why a person of ordinary skill in the

16  art would look to the Burnside '819 amphetamine patent

17  when attempting to formulate a once-a-day doxycycline.

18  Dr. Friend testified that the use of amphetamines is very

19  far indeed from the Chang patent.

20          Notably, Dr. Friend testified yesterday that he

21  could have chosen dozens of other examples, but Dr. Friend

22  didn't chose any.  Mylan's counsel gave it to him.

23          Dr. Rudnic, a named inventor on this Burnside

24  '819 amphetamine patent, agreed.  He testified that he

25  didn't think the patent had anything to do with the Chang

1    patent.  He is the named inventor.

2              Now, we also learned yesterday from Dr. Friend

3    that a person of skill in the art, applying the teachings

4    of the Burnside '819 amphetamine patent, would violate the

5    important requirement that patient plasma concentrations

6    don't exceed 1.0 micrograms per mil threshold.  So they

7    wouldn't meet the claim, according to Dr. Friend.

8              In the end, Dr. Friend doesn't dispute that

9    none of the references he relies on expressly disclose a

10   once-daily dose of doxycycline, a formulation with a

11   30-milligram IR portion and a 10-milligram DR portion,

12   formulations that result in steady state blood levels of .1

13   to 1.0 micrograms per mil or formulations that result in

14   steady state blood levels of between .3 and .8 micrograms

15   per mil.

16             So both sides' experts are in agreement at the

17   end of the day concerning certain critical facts about the

18   alleged prior art references.  They simply don't meet the

19   important limitations of the Chang patent.  So there can't

20   be any anticipation or any way to combine these references

21   to arrive at the Chang invention.  They can't overcome that

22   failure of proof, your Honor.

23             Mylan's pharmacokinetics expert, Dr. Rubas

24   testified that he didn't even consider whether a person of

25   ordinary skill in the art in 2003 would have been motivated

1   to formulate an IR/DR once-daily product.  Curiously, when

2   asked the question on cross, Dr. Rubas testified that he

3   didn't even understand why that was relevant.  Well, it is.

4   This is because Dr. Rubas admits essentially that his

5   analysis was based on hindsight, which is prohibited by

6   the Federal Circuit precedent and the KSR decision.

7           Dr. Friend, himself testified that he relied on

8   Dr. Rubas's analysis, which, again, we know was tainted with

9   hindsight.  So Dr. Rubas's improper hindsight analysis

10  taints Dr. Friend's opinions as well.

11          In sum, your Honor, Mylan's invalidity proofs on

12  Chang fall far short.

13          I'll go to the Amin patent, your Honor.  I'll

14  turn to our third pile of art.  Mylan cited over eight

15  references against Amin but it couldn't identify any of them

16  as invalidating art.

17          These are the eight references that Mylan relied

18  on.  Six of the references are from Golub and Greenwald, two

19  of the inventors of the Amin patents, and the seventh one is

20  from the drug sponsor.

21          By Mylan's expert, Dr. Robbins' admissions,

22  though, none of these eight references expressly or

23  inherently disclose nitric oxide or inducible nitric oxide

24  synthase, and not one of them, according to Dr. Robbins,

25  discloses, expressly or inherently, the use of doxycycline

1    to inhibit nitric oxide or inducible nitric oxide synthase in

2    mammals.

3              I can show you where that appears in his

4    testimony, over and over, for each of these eight references.

5              Here at Robbins trial transcript, 735 to 736.

6    Again, on page 736.  Again, on page 730.  Again, with regard

7    to Schroeder on page 731, 737, 733, 732, and 731.  For each

8    of the eight references, he made these critical admissions.

9              So we kept our promise in the opening that we

10   would show that they, by their own admission, admit that

11   there is no express or inherent disclosure of nitric oxide

12   or iNOS in any of the references they rely on.

13             Now, during trial, Mylan argued that the Amin

14   patents are inherently anticipated.  But Mylan, first of

15   all, can't overcome the Robbins admissions that there is

16   no inherent disclosure; and it can't meet its heavy burden

17   of clear and convincing evidence that the prior art is

18   necessarily practiced anyway.

19             Mylan's own expert, Dr. Robbins can't say

20   whether doxycycline decreases NO or iNOS in two medical

21   conditions, periodontitis and rheumatoid arthritis, which

22   were the two medical conditions disclosed in the prior art

23   references that he relied on.  He admitted with regard to

24   both of those conditions that he couldn't answer as to

25   whether doxycycline decreased iNOS expression or NO

1    production.  That's at page 730 and 734 of the transcript.

2            He further reiterated his position -- I think

3    this is perhaps the most important piece of evidence -- his

4    position that the Amin patents were the first to disclose that

5    tetracyclines inhibit iNOS expression and NO production.  The

6    first means novel.

7            As you can see, your Honor, none of their prior

8    art references even mention NO or iNOS.  Mylan's own expert

9    has admitted novelty.  How can Mylan prevail on its

10   invalidity defense.

11           Your Honor, we have demonstrated that the

12   objective indicia of nonobviousness also strongly point in the

13   same direction here, to validity.  In fact, because these

14   common sense objective indicia of nonobviousness were so clear

15   on the their face and were established through Mylan's own

16   experts, Galderma didn't need to rely on separate rebuttal

17   testimony to prove secondary considerations.  The admissions

18   from Mylan's experts, buttressed by the testimony of

19   Galderma's own experts, suffice.

20           First, long felt need.

21           The evidence demonstrates that there was a

22   need for a treatment for rosacea that did not cause side

23   effects, gastrointestinal upset, phototoxicity, and other

24   side effects which were viewed by dermatologists as, I think

25   Dr. Webster said, a big pain in the neck in the 80s and 90s.

1           The evidence showed a need for the treatment of

2    rosacea that did not cause antibiotic resistance.

3    Dr. Gilchrest testified to that and also testified that it

4    helped to address a very serious public health concern.

5           The evidence showed a need for a once-daily

6    dosage form to increase patient compliance.  As Dr. Gilchrest

7    testified, she prescribes once-daily dosage forms because it's

8    easier for the patient and improves patient compliance.

9           Similarly, Dr. Friend testified that reducing

10   the number of doses required over a period of time improves

11   both patient compliance and therapeutic outcome.

12          Even today, Oracea remains the only orally

13   available approved treatment for rosacea.

14          Failure of others.

15          Dr. Rudnic told us the whole story as to why the

16   first tries by Faulding, a very fine formulation company,

17   failed to make a once-a-day formulation of this drug.

18          Robert Ashley confirmed that failure in his

19   testimony which we heard yesterday.

20          Unexpected results.

21          The results obtained by these inventions were

22   entirely unexpected.  It was unexpected that subantibiotic

23   amounts would work to treat rosacea.  Dr. Webster testified

24   to that.

25          Rosacea was thought by many to be bacterial in

1    origin.  Others didn't know what caused it.  It was treated

2    in any event, regardless of what one thought the etiology of

3    the disease was, it was treated by antibiotic dosages.

4            As Dr. Webster testified, the conventional

5    wisdom was to hit these bugs with high doses of antibiotics.

6    It was completely counterintuitive that small amounts of the

7    drug work, that subantibiotic amounts would work.

8            It was unexpected that once-daily dosing would

9    work for subantibiotic amounts of doxycycline.  As Dr. Rudnic

10   testified, he would not have expected that it would have

11   succeeded given the absorption window, and he would not have

12   expected that any particular IR/DR combination of the claims

13   would have succeeded.

14           It was not expected that these levels would work

15   in any sort of once-a-day formulation.  It was not expected

16   that the drug could exhibit substantially no side effects,

17   as shown in everyday practice with the drug, confirmed by

18   the testimony of Dr. Webster.

19           It was not expected that the drug would exhibit

20   no phototoxicity.  As Dr. Webster testified, this has made

21   it a lot easier to treat patients year round, particularly

22   in the summer.

23           It was not expected that the drug would not

24   cause the same gastric upset in patients and the other side

25   effects that had been observed in the past.

1           So there is abundant testimony from experts

2      on both sides on the common sense factors to support

3      nonobviousness of the patents here.

4           Notably, Mylan hasn't even contested commercial

5      success in this case.  They really can't.  It hasn't

6      contested it at trial.  Galderma's experts have testified

7      that Oracea is covered by each of the patents-in-suit here,

8      and Mylan did not dispute that at trial.

9           Mylan's own IMS data, which is DTX-2243,

10     regarding Oracea's annual sales by itself is sufficient to

11     demonstrates Oracea's commercial success.  That IMS data

12     showed that annual Oracea sales doubled between 2007 and

13     2008 and again between 2008 and 2009, and Mylan itself

14     projected that Oracea's sales growth would just keep on

15     increasing, and it has.  To date, sales since launch, just

16     a little over four years ago, totalled over a half billion

17     dollars.

18          Now, Mylan's own expert, Dr. Gilchrest admitted

19     that Oracea is a commercial success, and that it sells well,

20     in her words -- my words that she agreed with.

21          Dr. Webster attributed the commercial success to

22     the need that Oracea fills because of its patented features.

23          Mylan has failed to provide any evidence at

24     trial that Oracea sales are due to anything but the patented

25     benefits of Oracea.  Mylan's expert, Dr. Gilchrest

1    testified:  "... all physicians endeavor to make informed

2    decisions based on information and not on advertising

3    materials but based on objective evidence, and I do that

4    also."

5            She also testified that she had no information

6    that led her to believe that Galderma or CollaGenex have

7    been anything but truthful in their marketing of Oracea, in

8    their marketing about Oracea and its benefits.

9            Ultimately, why did Mylan's expert, Dr. Gilchrest

10   say that Mylan was pursuing a generic copy when I asked her

11   that question?

12           Because they believe it will be a successful

13   product.  They want to hitch their wagon to Galderma's

14   successful product, Oracea.

15           So there is abundant unrefuted evidence of

16   commercial success and nexus to the claimed invention for

17   these patents.

18           In conclusion, your Honor, Mylan's product

19   infringes each of the assert claims of the patents in suit.

20   Mylan's invalidity defenses fell short of meeting their

21   clear and convincing burden as to all three patents.  They

22   were forced to cobble together dozens of references in

23   Byzantine combinations just to make hindsight obviousness

24   arguments, but none disclosed the inventions.  Despite these

25   piles of art that they have relied on, no one developed a

1  drug like this for decades.  The alleged Feldman prior uses

2  were not public uses at all.  They were uncorroborated then,

3  they were uncorroborated today, and they weren't public.

4  Dr. Feldman wasn't here to shed any light on it, and no

5  other witnesses were called that could do so from firsthand

6  knowledge.  The common sense factors further confirm the

7  validity of all five patents.

8           Your Honor, in view of the evidence that we have

9  adduced at trial, we submit judgment should be entered in

10 favor of Galderma.  Thank you.

11          THE COURT:  You said several times in your

12 presentation that it's undisputed that Oracea practices or

13 is an embodiment of the five patents in suit.  Other than

14 what you showed us that your experts testified to that fact

15 and you claim it's not contested, what else do you have or

16 is that all that you have to base your conclusion, your

17 contention that that fact is undisputed at this time?

18          MR. FLATTMANN:  I rely on the testimony of our

19 three technical experts who testified that they compared

20 the Oracea label and Oracea to the asserted claims of the

21 patents in suit and concluded that Oracea was covered by

22 each of those asserted claims, and the fact that during the

23 course of the trial, none of Mylan's experts disputed that

24 conclusion.

25          THE COURT:  Okay.  Thank you very much.

```
 1              MR. FLATTMANN:  May I answer any other

 2   questions, your Honor.

 3              THE COURT:  If I have more, I'll get back to

 4   you.

 5              MR. FLATTMANN:  Certainly.

 6              THE COURT:  Thank you.

 7              MR. FLATTMANN:  Thank you.

 8              THE COURT:  I'll hear now from Mylan.

 9              MR. STEUER:  Your Honor, David Steuer for Mylan.

10              I'd like to start off by --

11              (Remote control handed to Mr. Steuer.)

12              MR. STEUER:  They're going to see if I can

13   handle the clicking here.

14              I want to thank the Court and its staff for its

15   courtesy.  I know the long days for the lawyers are long

16   days for the Court as well, and the Court has been very

17   gracious to me and our team and our staff.

18              Also, I think opposing counsel has been

19   aggressive but courteous.  I do want to thank them, I should

20   have at the pretrial, but they moved that for my benefit to

21   make a long planned commitment.

22              Your Honor, I think the parties have presented a

23   good record for the Court to assist the Court in deciding

24   this very important case.

25              The Hatch-Waxman Act is an important feature of
```

1   this country's policy with respect to pharmaceuticals.

2   President Reagan said, when he signed into the law the

3   statute in 1984, that, "The Hatch-Waxman Act will provide

4   regulatory relief, increase competition, economy in

5   government and best of all, the American people will save

6   money, and yet receive the best medicine that pharmaceutical

7   science can provide."

8           So there is nothing wrong about a generic hoping

9   to compete and lower the cost.  I think to the extent that

10  that is something that should be considered, it should be

11  considered by legislatures.

12          (Binders passed forward.)

13          The question for this Court is whether the five

14  patents are valid; and, if so, whether Mylan will infringe

15  them by selling its ANDA product.

16          I'm going to also review the evidence in the

17  way I previewed the evidence because I, too, believe in

18  pedestrian formulations so I'm not changing anything.

19          Let's start with the Ashley patents.  Let's talk

20  about invalidity.

21          Your Honor, you saw Dr. Feldman.  You had a

22  chance to see him speak.  You had a chance to consider his

23  demeanor and his testimony.  He was, we believe, entirely

24  credible, entirely forthright in his testimony, and he

25  testified to two separate instances of practicing the Ashley

1    patents before their priority date.

2           First, his own use.  Dr. Feldman testified

3    clearly and convincingly that he learned at a dermatology

4    conference late in the 1990s that he could use Periostat 40

5    milligrams doxycycline, the especially preferred embodiment

6    of the Ashley patents, to treat his own rosacea.  He

7    testified he used it for many months starting in late 1999.

8    He found that it reduced the papules and pustules on his

9    own face, on his chin.

10          He practiced the method of the Ashley patents.

11   This is a public use.  Galderma has produced nothing to

12   contradict Dr. Feldman.  Dr. Feldman said that after he used

13   the Periostat he was prescribed, he requested professional

14   courtesy samples, and that CollaGenex sent him samples.  If

15   that Galderma could have disproved that at trial, they

16   certainly would not have hesitated to do so.

17          Dr. Feldman testified about the second instance

18   of practicing the Ashley patents prior to their priority

19   date when he prescribed Periostat in February 2000 for a

20   patient that suffered from rosacea.  Dr. Feldman testified

21   that the reason he wrote the prescription for the patient is

22   that he, himself had a successful use of Periostat to treat

23   his own rosacea.

24          We have seen the patient record from the patient's

25   files, from Dr. Feldman's files, and we have also seen the IMS

1    data demonstrating that a patient of Dr. Feldman filled

2    a prescription for Periostat in March 2000.  Of course,

3    the appointment with the patient of Dr. Feldman was on

4    February 19th, 2000.

5              Dr. Stafford testified that the IMS data leads

6    him to conclude that the patient in Dr. Feldman's patient

7    record was likely -- and he can't know 100 percent but was

8    likely the same patient who filled the prescription in

9    March 2000.  That would make sense because Dr. Feldman

10   testified it was the only prescription he ever wrote.

11             The Court asked Mr. Flattmann a question during

12   his remarks about what the burden of proof is with respect

13   to evidentiary issues relating to an invalidity claim.  I

14   think the Supreme Court recently gave guidance on that issue

15   in the Microsoft v i4i case.  I think that was the exact

16   point of Justice Breyer's concurrence, so I think that

17   might be a good place.  Justice Breyer pointed out although

18   the overall burden is clear and convincing proof, that

19   with respect to specific evidentiary facts, the normal

20   preponderance of evidence standard may well control.

21             I think that might be a good place to start on

22   the answer.  We'll certainly brief that issue.

23             Now, Galderma claims there is no evidence the

24   patient ever filled the prescription, but Dr. Webster has

25   testified that it is to be expected that a patient will take

1    a prescribed drug.

2              When we asked him, "Question:  And the

3    assumption you make is that they will in fact take it.

4    Correct?"

5              He answered:  "Yes."

6              Indeed, one of the central assumptions of

7    Galderma's infringement theory is that patients prescribed

8    Mylan's ANDA product will take it, as Dr. Webster agreed.

9              Dr. Feldman's conclusion that his patient

10   had taken the Periostat is consistent with Dr. Webster's

11   testimony.

12             Now, Galderma appears to argue that because

13   Dr. Feldman did not count lesions or measure microflora, he

14   was not practicing the invention.  However, Dr. Webster's

15   comments were not consistent with Galderma's theory.

16             Dr. Webster was asked whether, in order for

17   Mylan to infringe, that Galderma would need to count lesions

18   or take skin swabs?  His opinion was that was not required.

19             I asked him:  "So your opinion today is that we

20   know that a patient that takes this preparation will have a

21   reduction in lesions and no reduction in skin microflora?"

22             Dr. Webster said:  "That is my opinion."

23             But even if Galderma were correct with respect

24   to whether lesions need to be counted to establish a use, it

25   turns out that Dr. Feldman testified explicitly to having a

1    reduction in pimples and pustules on his face.  In fact, I

2    think he wrote for his chin at the time, and he said the

3    skin looked better.

4            Both Dr. Feldman's own use and his prescribing

5    of Periostat to his patient are public uses.  A public use

6    does not require a journal article.  It doesn't require a

7    patent application.  Especially when it's a third party

8    who is not attempting, as Mr. Flattmann discussed, to take

9    credit for an invention.  Dr. Feldman doesn't claim he

10   invented the Ashley patents.

11           The only element of either of Dr. Feldman's

12   uses that was private was the name of the patient, which is

13   not related to any limitation of the Ashley patents.

14           The use was obvious and in line with a world

15   of prior art described by Dr. Gilchrest.  Here are some

16   examples:

17           In 1962, Murphy administered 125 milligrams of

18   oxytetracycline for 6 to 12 months to treat acne; and the

19   antibiotic dose for oxytetracycline was 1,000 milligrams.

20           Sneddon in 1966 of administered 100 milligrams

21   of a controlling dose of tetracycline to treat rosacea.

22   This was 45 years ago.

23           Marmion and Wereide in 1969 treated patients

24   with low doses of tetracyclines to treat rosacea.

25           Cotterill in 1971 administered 250 milligrams of

1   oxytetracycline for three months to treat patients for their

2   skin problems.  And,

3            Bartholomew administered 500 milligrams of

4   oxytetracycline to treat rosacea.

5            One point about Murphy that Dr. Gilchrest

6   pointed out is that the dose of oxytetracycline that Murphy

7   used to treat his patients was so low, it actually fell

8   below the bottom bounds of the Ashley patent.  That is why

9   it did not anticipate claim 23 of the Ashley patent.

10           There was a point made that these are all old.

11  Dr. Gilchrest explained to us, well, they're old because

12  there is no dispute about this.  It was just well known that

13  papular rosacea is an inflammatory malady and that lower

14  doses of tetracyclines are effective in giving systemic

15  relief.

16           Here are some of the key quotes from these older

17  documents:

18           Marmion.  There is a high degree of correlation

19  of the changes occurring -- I'm sorry.  I'm ahead of myself.

20           This is about Pflugfelder.  Pflugfelder was not

21  considered to be invalidating by the examiner.  Of course,

22  Mylan did not have a chance to discuss their views of

23  Pflugfelder with the examiner, which is why we're trying

24  this.  Dr. Gilchrest explained why the invention was made

25  obvious by Pflugfelder.

1      Now, the distinction that has been drawn is

2  that meibomian gland disease or ocular rosacea is a distinct

3  malady from facial rosacea.  However, that does not stand up

4  to the prior art that was not shown to the examiner.  The

5  examiner did not see Marmion or Bartholomew, so the examiner

6  was not aware of the high degree of correlation in the eye

7  with the skin decease and treatment that is effective for

8  the skin disorder, telling the art that it may therefore be

9  a value for treatment in the ocular condition.

10      Bartholomew said, systemic oxytetracycline is

11  thus a useful and safe treatment for ocular rosacea as well

12  as rosacea of the face.  So it was actually long known in

13  the art that if you treat one, you treat the other.

14      Dr. Webster, who was, of course, Galderma's

15  witness on the Ashley patents, did not disagree that rosacea

16  and ocular rosacea are often seen in the same patient and

17  are related.

18      Now, the only witness on the Ashley patents for

19  Galderma was Dr. Webster.  Dr. Webster is a distinguished and

20  accomplished physician/scientist, but he is not an independent

21  expert.  He has been a paid Galderma and CollaGenex consultant

22  for many years.  He admitted on cross that he actually advised

23  CollaGenex on developing the very product that is before the

24  Court.

25      He gave an answer that I don't think I have

1    heard before.  When I discussed prior writings with the

2    witness, he said that he had the publisher change his

3    writing because he had, of course, stated on direct that

4    this was an amazing invention -- that was the word he used,

5    "amazing" -- to believe that a low dose of doxycycline could

6    be effective.

7            I challenged him on that.  I said:  Well, you

8    actually wrote that 50 milligrams a day may be an acceptable

9    dose, which is a little higher than the invention but not

10   much and certainly not a dose you would treat an infection.

11   He denied that.  I showed him an exhibit, and he said that

12   the publisher probably put that in.  These things happen

13   between the manuscript and the galleys.

14           This was really not Dr. Webster's best moment

15   because he actually said that in three different publications

16   that are all in evidence.  In fact, he wasn't amazed at all

17   that a low dose of doxycycline could be effective because he

18   was already recommending low doses of doxycycline to the

19   profession and for treatment of patients.  It's not surprising

20   because, as Dr. Gilchrest explained, rosacea hasn't been

21   considered an infectious disease for decades.

22           The Ashley patents, what we have here are some

23   quotes from the art that shows the state of knowledge, what

24   was obvious to someone of skill in the art about the nature

25   of acne, about the nature of rosacea.  That they don't

1    change bacteria flora in the sebaceous gland, and that it's

2    an antiinflammatory process.  This is not news.  It was

3    known well before Ashley.  It was known decades before Ashley.

4                1975, which is 36 years ago, Plewig stated, "The

5    fact is that it is not necessary to kill C. acnes; good

6    therapeutic effects can be obtained with non-inhibitory

7    levels."  Non-inhibitory, non-antibiotic.

8                These studies have confirmed Plewig's

9    observation confirming the antiinflammatory activity and

10   lack of inhibition of bacterial growth in sebaceous glands

11   with low dose tetracycline compound treatment.

12               Let's talk about infringement.

13               In infringement, each and every claim has a

14   requirement that there be an amount of doxycycline that

15   does not significantly inhibit the growth of microorganisms.

16   This is a scientific issue.  It implicates all microorganisms.

17   The patent isn't limited to a particular microorganism or a

18   particular location within the human body, as Dr. Webster

19   admits.

20               In the prosecution history, Mr. Ashley told us

21   that, "A skilled artisan would have no difficulty understanding

22   the phrase, 'substantially no antibiotic activity.'  A few

23   of the more sensitive bacterial cells may be inhibited by a

24   subantibiotic dose of a tetracycline."

25               Now, doxycycline is one of the most potent of

1    antibiotics.  It shuts down the protein metabolisms of

2    microorganisms.  In other words, it inhibits their growth.

3    And doxycycline is broad spectrum, which means it inhibits

4    the growth of many microorganisms.  When administered

5    orally, doxycycline circulates into every part of our body

6    or, as Dr. Chambers told us, wherever blood goes, it takes

7    doxycycline with it.

8            Dr. Chambers told us that our bodies contain

9    more bacterial cells than human cells.  There are an

10   estimated 100 billion bacterial cells, to be exact.  In

11   fact, by a factor of 10, which was a creepy fact I learned

12   during the prosecution of this case.

13           We know that more than a few of the more

14   sensitive bacterial cells, which is the words of the

15   inventors, are inhibited by a 40-milligram daily dose of

16   oxycycline, significantly more.  We know that because

17   they have tested it.

18           Now, you heard from Dr. Chambers on this.  I

19   don't think anybody has questioned his credentials and

20   knowledge when it comes to doxycycline, what doxycycline

21   does to the 1 x 10 to the 14th microorganisms in our bodies.

22           Dr. Webster, who is a dermatologist by training,

23   does not actually present to the Court the same background

24   and expertise that Dr. Chambers does.  Dr. Chambers reviewed

25   five in vivo studies regarding 40 milligrams of a daily

1    companies of doxycycline, three of which Dr. Webster did not

2    address.  Let's look at these studies briefly.

3            This is the Haffajee study from 2008.  It was

4    funded by the NIH, and as stated by Dr. Chambers, figure 3

5    in the Haffajee study provides irrefutable evidence that

6    Mylan's ANDA product will significantly inhibit the growth

7    of microorganisms.  Though the Court's claim construction

8    doesn't require that significance be significance to a

9    statistical measure, this is, in fact, a statistically

10   significant inhibition of growth.

11           The spike does not occur unless there is an

12   inhibitory effect.  Dr. Chamber's opinion regarding

13   Haffajee's study is unrebutted.  Dr. Webster didn't testify

14   about it.

15           Mr. Flattmann said that there is language in the

16   study that points against that.  What that language pointed

17   to was they couldn't determine which particular strain were

18   the doxycycline resistance strains that grew.

19           Dr. Chambers said, in his sparring with

20   Mr. Flattmann, Mr. Flattmann was perverting the study.

21   Although I'm not going to be quite as colorful as maybe Dr.

22   Chambers can be at times, I do believe that that is true.

23   That if you read the study, the part that Mr. Flattmann

24   points to is just the part where they are saying they can't

25   break apart that group of resistant organisms to tell you

1   which ones exactly are the ones that took advantage of this

2   antibacterial effect of doxycycline.

3          We also talked about the Thomas study.  Here,

4   Dr. Chambers told us that Table 2A provides irrefutable

5   evidence that Mylan's ANDA product will significantly

6   inhibit the growth of microorganisms.  Again, this is a

7   spike that does not occur unless there is significant

8   inhibition.

9          Dr. Chambers' opinion regarding the Thomas study

10  is unrebutted.  Dr. Webster didn't address it.

11         This is the Walker 2000 study, and Dr. Chambers

12  testified that Tables 1 to 3 all show Mylan's ANDA product

13  will significantly inhibit the growth of microorganisms.  So

14  the graph of data from Table 1 from Walker 2000, data shows

15  significant inhibition of growth.  Dr. Chambers' opinion

16  regarding the Walker 2000 study again is unrebutted.

17         So what do Haffajee, Thomas, and Walker 2000

18  study have in common other than the fact that Dr. Webster

19  didn't talk about them?  All three studied the oral cavity,

20  and all three oral cavity studies proved Mylan's ANDA product

21  will significantly inhibit the growth of microorganisms.  Dr.

22  Webster did not identify a single study of the oral cavity

23  that shows anything to the contrary.

24         So what are the studies that Dr. Webster did

25  rely on?  He relied on the Skidmore study.  Well, we showed

1    you that Dr. Skidmore doesn't know too much about the

2    Skidmore study.  But whoever wrote it, that person didn't

3    provide data that allows a scientist to rule out the

4    possibility of a false negative.

5              Mr. Flattmann criticized Haffajee because it

6    didn't have a larger dose of doxycycline.  The positive

7    controls rules out a false negative.  It's not necessary to

8    rule out a positive.  Just like a placebo is necessary to

9    rule out a false positive.  Positive controls rule out the

10   false negative.

11             But in any event, Skidmore did not have a

12   positive control.  It would have been interesting to see

13   what it would have look like if you had a 50-milligram dose

14   of doxycycline, which Galderma contends is antibiotic,

15   against the 40-milligram dose.  Then we could see if there

16   really is an antibiotic threshold there.

17             Dr. Chambers explained that the data cannot be

18   interpreted.  Therefore, no significant inhibition of growth

19   occurred.  One of the subjects in the doxycycline group

20   suffered a case of vaginitis because of, as the author said,

21   the doxycycline.  That, too, is a significant inhibition of

22   growth which caused the vaginitis.  And Dr. Webster did not

23   opine otherwise.

24             With respect to the Walker 2005 study, once

25   again there was no positive control.  Once again, the data

1    cannot be interpreted to include the possibility of a false

2    negative.

3            Dr. Chambers also found data that was suggestive

4    of significant inhibition of growth, but he said he really

5    can't be definite on that because he couldn't get any of the

6    underlying data.

7            Your Honor, the Court heard a lot of discussion

8    about the label.  I believe that in this trial, the Court

9    has much more evidence about the label than it had earlier

10   when it ruled on it.  In particular, now the Court has the

11   label history, which is, I believe, quite revealing.

12           Now, Dr. Webster interprets the label to mean

13   that Mylan's ANDA product will not significantly inhibit the

14   growth of microorganisms, but his interpretation is actually

15   not the language of the label.

16           Where he says no effect -- that the label

17   says it has no effect, what it actually says is that the

18   microbiological studies demonstrated no detectable long term

19   effects.  We don't dispute those studies that are referenced

20   did demonstrate no detectable long term effects.  That is

21   different from no effects.

22           It says that this dose should not be used to

23   treat bacterial disease.  Well, of course, that is true.

24   There is no studies showing, for example, 40 milligrams of

25   doxycycline would knock out pneumonias or other infections.

1    That's why it says doxycycline should not be used for those

2    purposes.  It's a direction to the physician on how to use

3    this drug.  As all the doctors before the Court testified,

4    this is not a dose that you would use to cure disease.

5            I think Dr. Webster used the phrase such as, I

6    think you want to poke or punch the disease.  This is not a

7    punching dose.

8            What Dr. Webster does is he basically reads

9    words that aren't in the dose -- aren't in the label.  He

10   says that the package insert wording says clearly that for

11   the long term administration, there was no effect on the

12   bacterial flora of the oral cavity, skin, intestinal tract

13   and vagina.  That is actually not what it says.

14           Again, he says that what the label says is that

15   there was no effect.  That is just simply not what it says.

16   I think we saw some of that in Dr. -- in Mr. Flattmann's

17   discussion, which is what he described as being the label is

18   actually not what the label is.

19           Now, everyone agrees, even Dr. Webster, that a

20   therapeutic amount, in an amount that will significantly

21   inhibit growth are two very different amounts.  They cannot,

22   and should not, be confused.  So he said one dosage that

23   reaches antimicrobial effect, while inadequate to treat an

24   infection, could still alter the normal flora and have

25   changes induced therein.  We agree with that.  That is not

1    how we would treat infection, with such a lose dose.

2           We do think that perhaps the most telling

3    evidence regarding how the Court should interpret the label

4    comes from the FDA.  The FDA insisted that certain changes

5    be made to the label before approving it.  What the FDA

6    demanded is that the language that perhaps did directly read

7    on the patent be removed, be deleted.  The FDA expressly

8    refused to allow Galderma to claim that Oracea does not

9    inhibit microorganisms.  They took that out.

10          The FDA insisted on inserting the words

11   "detectable long-term" -- detectable long-term -- between

12   the words "no" and "effect."  Dr. Webster acts as if those

13   new words never appeared in the label, but apparently the

14   FDA thought they were important enough that they should be

15   in there.

16          Dr. Flattmann talked about how we don't know

17   what "well below" or what the FDA thought "well below"

18   means.  While I thought the argument would be stronger if

19   the FDA only struck the word "well" and allowed Galderma, or

20   actually CollaGenex, to continue to say that the amounts are

21   "below" the level required to inhibit microorganisms.  They

22   took out the entire concept.

23          So the FDA was certainly not convinced.  Although

24   they weren't a judge in a patent case, they certainly weren't

25   convinced that the limitation had been met by Galderma.

```
 1              THE COURT:  In passing, you referred to Mr.

 2    Flattmann as Dr. Flattmann.  He appreciates the promotion,

 3    I'm sure.

 4              MR. FLATTMANN:  I appreciate that.

 5              MR. STEUER:  I think he is a doctor of law, your

 6    Honor.

 7              THE COURT:  Let me ask you, what about the

 8    deletion of the word "antibiotics" by the FDA at the same

 9    time?

10              MR. STEUER:  Well, I think what is interesting

11    here, and I don't have a slide on it, but if you look at the

12    entire label on it, for the Court, Section 5.1, in fact,

13    Oracea is described as an antibiotic.  I don't know the

14    history behind that, i wasn't a participant in it, but the

15    label actually does repeatedly refers to the product as an

16    antibiotic.

17              THE COURT:  But there is nothing in the record

18    as to what FDA was actually thinking and why they insisted

19    on these changes; isn't that correct?

20              MR. STEUER:  Well, I wouldn't say there is

21    nothing in the record.  We have the FDA memorandum which gives

22    their opinion on these reports.  I read some language from the

23    FDA memorandum where they said -- and this is not too far

24    distant in time actually from the approval of this label --

25    where the FDA said we don't think you can extrapolate from the
```

1   evidence you give us to the conclusion that there is no effect

2   on microorganisms.

3                So to the extent we have a little window into

4   the FDA's thinking, I think the memorandum is helpful on

5   that.  We don't dispute the accuracy of the label.  We think

6   the label is fine.  We think it's accurate.

7                Now, once again, I think we have to fall back

8   on the burden of proof here.  It was incumbent upon Galderma

9   to show that there is no significant inhibition of

10  microorganisms in the body, in a human.

11               We are certainly aware from the Court's previous

12  ruling that the Court does not believe that in vitro

13  evidence will suffice to show that it isn't prudent, but

14  the in vivo evidence actually weighs strongly against the

15  argument for infringement, and the data is what the data is.

16               The claim limitation is a scientific inquiry and

17  the science is, yes, there will be significant inhibition.

18               Dr. Chambers, of course, also pointed out that,

19  as I just discussed, preempting my order of slides, that

20  their label does not speak to the specific issue of the

21  patent.

22               THE COURT:  Before you move on.

23               MR. STEUER:  Yes.

24               THE COURT:  Answer for me whether, in fact, it

25  is contested that Oracea embodies the patent in suit, in

1    particular, the Ashley patents in what you have just gone

2    over.

3                MR. STEUER:  No, we do not believe -- I believe

4    we have shown, based on Dr. Chambers' testimony, we do not

5    believe it practices the Ashley patents because we do not

6    believe that it does not significantly inhibit microorganisms

7    in the body.

8                THE COURT:  What about the suggestion that you

9    effectively conceded that by not explicitly challenging it

10   during the trial?

11               MR. STEUER:  Well, I do think that we challenged

12   it during the trial.  Perhaps I didn't -- I can't cite a

13   specific phrase, but all our evidence was looking at the

14   specific preferred embodiment which Dr. Chambers pointed

15   out.  The preferred embodiment is the 40 milligrams of

16   Periostat, 20 BID, which is the Haffajee study.  We pointed

17   out that was the preferred embodiment.  It caused the growth

18   of microorganisms.  The resistant doxycycline microorganisms

19   rose.

20               So I actually thought that we were trying to

21   make that point that the preferred embodiment does not in

22   fact meet the limitation of the patents.  I do think that I

23   would have to respectfully disagree with that assertion it

24   wasn't presented.

25               Well, the Amin patents are a different breed

1    because they don't mention rosacea.  They're about reducing

2    these chemicals, nitric oxide and nitric oxide synthase.

3    I'm not going to talk a lot about the Amin patents.  I think

4    the evidence and the arguments are pretty clear.

5              It's kind of an interesting patent because the

6    invalidity expert was dropped in the middle of trial.  As I

7    want to discuss, the noninfringement here and the invalidity

8    are, I think, are quite strong on it.

9              Noninfringement, their basis of infringement is

10   the syllogism.  They have no direct evidence of inhibition

11   of this chemical.

12             Dr. Grisham said he thinks there is overwhelming

13   evidence in the literature that this is a pathogenetic

14   mechanism, referring to rosacea, involved in the formation

15   of pustules and papules.

16             Well, nobody agrees with him.  Dr. Robbins said

17   there is no evidence that nitric oxide is involved in the

18   pathogenesis of rosacea.

19             Dr. Webster said we still don't know convincingly

20   what the cause of rosacea is.  And,

21             Mr. Ashley said I don't think that causality has

22   ever been proven, one way or the other.

23             What do the documents say?  What do the studies

24   say?

25             Well, the study was actually, at one point,

1    relied on by Mr. Grisham.  Dr. Grisham indirectly said:

2    Based on the results of the study, we conclude that the

3    inflammatory species nitric oxide has no role in the

4    inflammatory mechanism of acne rosacea.

5             What we want to show in the second slide is the

6    difference between what Oracea proposed and what was approved.

7    They proposed a label that stated that Oracea suppresses

8    various processes, including the processes in the Amin patent,

9    nitric oxide, iNOS, but the label says the mechanism of action

10   of Oracea in the treatment of inflammatory lesions of rosacea

11   is unknown.

12            Well, this actually does speak directly to the

13   patent.  Like in the Bayer case, I think that the patentee

14   should be bound by its label right here.

15            Dr. Grisham, in fact -- just to point out that

16   the label is dispositive on this, Dr. Grisham says that he

17   disagrees with the statement in the label.  So that is not

18   very helpful to Galderma on this.

19            But the question is, does Mylan product inhibit

20   iNOS or nitric oxide?  So we asked him were you aware of any

21   studies, Dr. Grisham?  And he said he wasn't.

22            But this is what the patent shows.  This is a

23   test tube.  It's from the patent, trying to show what

24   happens in the test tube when you try to inhibit iNOS and

25   reduce nitric oxide, or I might have that backwards.  But

1    when you are dealing with these chemicals in the test tube,

2    see, nothing happens until there is actually quite a heavy

3    blood concentration or a heavy concentration in the test

4    tube.

5            Now, I know that on the Ashley patent, there is

6    a lot of discussion about how, just because it inhibits in

7    the test tube, it is much tougher to inhibit in terms of

8    antibiotics in the body, which Dr. Chambers disagrees with.

9            Well, here, there is no inhibition at this dose

10   level in the test tube, and there is no evidence at all of

11   inhibition in the body, so there is really just a complete

12   absence of proof here.

13           Let's talk about the invalidity of the patent.

14           What we're relying on here is inherent

15   anticipation.  Of course, the law on this is that, "A prior

16   art reference may anticipate without disclosing a feature

17   of the claimed invention if that missing characteristic is

18   necessarily present, or inherent, in the single anticipating

19   reference."

20           This really describes the Amin patents to a

21   tee because what the Amin patents do, they recognize the

22   property.  It talks about the tetracyclines, that they have

23   this inhibitory quality.

24           Here are the two experts to speak on invalidity,

25   Dr. Robbins and Dr. Oates.

1           As Dr. Robbins said, the prior art inherently

2    anticipates the Amin patents.

3           Dr. Oates didn't show up.  I don't know why.  I

4    guess Galderma felt they didn't need him.

5           Dr. Robbins also spoke about enablement.  He

6    said that the patent does not enable the practice of the

7    art, particularly with respect to the low dose dosages.  And,

8           Dr. Oates didn't speak to that.

9           Dr. Robbins was cross-examined on it, if I

10   recall correctly.

11          Finally, your Honor, let me, if I may, turn to

12   the Chang patent.

13          Again, I do think it's worth noting which

14   witnesses that Galderma chose to bring to trial and who they

15   didn't bring.

16          Galderma did not bring a single one of the three

17   named inventors, which is I think unusual, and especially I

18   think unusual when there is an inventorship issue that is

19   proposed, because we do believe that there is a terrible

20   inventorship problem with this patent.

21          Let's talk about infringement.  To an extent,

22   this has played a larger role than it probably should in

23   the scheme of things.

24          Dr. Rudnic had an interesting infringement

25   opinion, which was free of both the Court's claim

1    construction and he decided not to read Dr. Ashley's or

2    Mr. Ashley's deposition because he thought it wouldn't be

3    interesting.

4           Now, Dr. Rudnic, like Dr. Webster, is not an

5    independent expert.  He was an executive of the company that

6    created this patent.  Dr. Rudnic is a colleague of the

7    inventors.  So he is really not coming to this as we would

8    hope an independent expert would.  He, like Dr. Webster, I

9    believe should be viewed more as a party expert.

10          I certainly don't discount Dr. Rudnic's ability

11    to create great drugs.  That is admirable.  I don't think

12    the ad hominums against Dr. Friend are particularly relevant

13    since it's clear from his professional resume that he has

14    been recognized as an outstanding formulation scientist, and

15    he has decided to try to work on addressing the problem of

16    AIDS in the developing world, so I don't think that means

17    that his opinion should be discounted.

18          Now, let me say on infringement, I think the

19    data speaks for itself.  I don't think I need to go over it,

20    except I want to respond real briefly to the point about

21    the proposed facts this is a mistake, and to the extent

22    the mistake is taken as an admission or a waiver, there is

23    always an inquiry as to whether a waiver is knowing and

24    intentional.

25          This statement is from a part of the pretrial

1  findings that don't even address the Chang patent, and it's

2  not consistent with the pretrial findings we made on the

3  Chang patent.  So I do think the best way to decide the

4  infringement on these two claims is to look to see within

5  the evidence that was presented allows the Court to conclude

6  that the data proves that Mylan's ANDA product will in fact

7  have steady state values that fall between the narrowed

8  values of these dependent claims.  I don't think I'm going

9  to go beyond that.

10          The Court has probably heard enough about .3 and

11  .8.

12          Well, let's talk about invalidity.

13          I want to first address two of Dr. Rudnic's

14  points, because one of the questions that we have to deal

15  with is, is this an obviousness invention?  Is this novel?

16          Now, first, Dr. Rudnic said that there was new

17  learning on the absorption window.  The new learning was a

18  study that was done.  It was actually a very neat study

19  where they had capsules explode at different places in the

20  body in the digestive system to see what the absorption

21  would be.

22          He said this is why no one else could do it,

23  because they had this undisclosed study; but it's a bit of

24  a puzzling argument to begin with, because the Court has

25  clearly seen that science has known for decades where

1    doxycycline is absorbed.  It's absorbed in the duodenum.

2    One of the things I learned in this trial is how to

3    pronounce "duodenum."

4             If we can go to the next slide now.

5             Really, all you need to discount the argument

6    that Dr. Rudnic says is to pull out a calender.  On December

7    17th, 2002, that's the date in which Shire and CollaGenex

8    went forward with the 75 percent/25 percent, and the report

9    from Scintipharma didn't even come out until 2003.  There

10   is no testimony that anybody at Shire used that report.  So

11   that is really just a posthoc suggestion by Dr. Rudnic.  It

12   just doesn't stand up to the most basic scrutiny.

13            Dr. Rudnic also talked about the Faulding

14   failure and said that this isn't easy because Faulding tried

15   to do this and they failed.  Faulding is an Australian

16   company.

17            But really that is not what Faulding shows, if

18   you look at it.  Faulding was attempting a very different

19   and, frankly, a very novel approach, which was to change

20   the absorption site of the doxycycline.  It only failed,

21   not because it didn't meet the Chang parameters, Dr. Rudnic

22   admitted it did, it wasn't bioequivalent.  It met the Chang

23   patent's blood concentration ranges but it wasn't bioequivalent

24   to Periostat, which meant, as Dr. Rudnic explained, it would

25   have cost more and been harder to have the product approved,

1    because it wasn't bioequivalent.

2            Why did CollaGenex try such a strange approach?

3    It's really for the same reason it contracted the work with

4    Shire to work on Oracea:  to come up with something it

5    could patent to avoid competition, to protect the Periostat

6    franchise.

7            An evergreen Periostat, as was candidly expressed

8    here, as Dr. Rudnic admitted, a simple 40-milligram instant

9    release doxycycline tablet or capsule is not going to be

10   patentable.

11           So I guess we ask ourselves how difficult was

12   this project to come up with this ratio, to come up with the

13   instant release, delayed release?

14           Mylan's experts, Dr. Rubas and Dr. Friend

15   testified about the relationship between the blood plasma

16   concentrations required by CollaGenex and the ratio of

17   instant release to delayed release that is in the patent.

18           Now, Galderma says that Dr. Rubas' work should

19   not be credited because he started with a total dose of

20   40 milligrams of doxycycline, and he knew what the desired

21   blood levels were so he was able to work backward.  But, of

22   course, so did Shire.  CollaGenex gave Shire all the same

23   parameters that Dr. Rubas received.  In fact, they were all

24   in the Ashley patent.

25           So Dr. Rubas formed his opinion that a person of

1       ordinary skill in the art could determine this based on

2       exactly the same information that led the Shire people to

3       create their ratio.

4               Now, Mr. O'Malley yesterday latched on to a

5       phrase I used in my opening statement why I referred to

6       the three to one ratio as the "secret sauce," and I think

7       Mr. Flattmann hit me with it again today.  So I want to

8       explain briefly why I used that phrase.  It's a story.

9               When I was in high school, I worked at

10      Jack-in-the-Box.  They sold hamburgers, and the hamburgers

11      had what they call secret sauce, and it was a marketing

12      term.  The "secret sauce" was just mayonnaise and ketchup.

13      It was Thousand Island dressing.

14              THE COURT:  Are you breaching your employment

15      agreement?

16              MR. STEUER:  I don't believe I ever signed

17      anything except my paychecks for $1.40 an hour.

18              So among us, amongst the cooks, "secret sauce"

19      was the joke, that you call something this simple and

20      obvious as "the bun" and you call it "secret sauce."

21              That is really the way I think we should view

22      this three to one ratio.  It's really no more original or

23      it's any more special than the sauce I slopped on to the

24      Jack-in-the-Box hamburgers I made a few years ago.

25              Dr. Rubas and Dr. Friend showed how simple the

1   process really was.  Dr. Rubas showed the vast literature

2   that was available to anyone who wanted to do the formulation.

3   Given the information that CollaGenex provided, Dr. Rubas

4   had no problem coming up with a graph that showed this

5   process.

6           Dr. Chang said, "So you give to anybody who know

7   the business, they can combination of all this to pick out

8   one they think is suitable for the product."  And,

9           In his e-mail, he referred to this as a

10  straightforward project.  That's in Defendant's Trial

11  Exhibit 1094.

12          We agree with him on that, of course.

13          I want to discuss another contention that

14  Dr. Rudnic said.  This is a contention that you couldn't

15  just do a 40-milligram pill or tablet because it wouldn't

16  have accomplished the goals of the invention because it

17  would be too much.  The blood levels would be too much.

18  That is what Dr. Rudnic testified.

19          That actually, of course, as we discussed, goes

20  against the language of the patent itself which says that

21  40 milligrams of doxycycline would work, but it's actually

22  confirmed by the PK experiments that were done by CollaGenex

23  on that 40-milligram dose.

24          They now say that they tested 18 subjects, it

25  was called a 103 study; and we'll detail it in our briefs,

1    your Honor; and they timed them at all the various time

2    points, half hour, hour, and so forth through 24 hours, and

3    one of the 18 subjects was barely over 1 microgram per

4    milliliter, and it was for only one reading, at the Cmax,

5    and it went right back down.

6              So, in fact, the data confirms what the

7    patent says, that 40 milligrams would have been just fine,

8    unpatentable but just fine in terms of accomplishing the

9    goal of the invention.

10             We should note that no one came up with any

11   evidence that the 1.0 level is anything other than a level

12   derived to avoid prior art.

13             We asked all the witnesses where did you get

14   this 1.0 antibiotic threshold?  And they said, well, it's

15   in the literature or somebody told you.  What is the

16   literature?  I don't know.  Who told you?  I don't remember.

17             So I think we would have seen proof of that if

18   it existed.  And I really think that's the more likely

19   conclusion that Mr. Ashley drew out of there.

20             Dr. Gilchrest told us there was no long felt need

21   for this product or any need at all for the combination.  I

22   believe the patent itself confirms it, and that is, in fact,

23   the essence of product evergreening.

24             Now, as Dr. Friend made clear, the incorporating

25   Ashley patent anticipates every element of the Chang patent

1    expressly or inherently.  As I see it, Galderma really

2    fights only on -- though I'm not sure Mr. Flattmann would

3    agree with this, I believe the fight is really joined on the

4    three to one ratio of instant release pellets to delayed

5    release pellets.

6            Dr. Rubas and Dr. Friend show how that ratio is

7    easily and simply calculated by one of skill in the art from

8    the information available in the Ashley '932 application,

9    and thus was inherent in the publication.

10           Finally, on invalidity, much is made the fact

11   that prior art previously advanced by Mylan was not part of

12   Dr. Friend's testimony.  Well, I will say when we learned

13   that we had 13 hours to fight 45 claims in five patents, it

14   led to wondrous concentration, as Dr. Johnson once said, and

15   we did peel it off.

16           I do believe that the evidence that we gave the

17   Court is more than sufficient to invalidate this patent, but

18   I don't think there was any concession that the prior art

19   that was not called today was no longer of any use, and, in

20   fact, when Dr. Friend was redirected, he said no, I think

21   this does all invalidate it.  So it's a matter of economy, I

22   think.

23           Let's talk about inventorship.  The law is clear

24   here a patent can be invalidated if it has incorrect

25   inventorship.

1       I know that Mr.  Flattmann said it's not a big

2  deal because inventorship can be corrected.  It can be

3  corrected, but it doesn't correct itself.  They would have

4  to make a motion; and to proceed on the patent, they would

5  have to get an assignment from the inventor.  None of that

6  is here at the court, and so the Court is really not in a

7  position to nunc pro tunc correct any inventorship error.

8       The facts are really quite clear.  The three to

9  one ratio or the 75 to 25 percent of IR beads to the DR

10  beads, which may well be the key element of the invention,

11  and, according to Shire, it was not Shire who thought of

12  the ratio.

13       This e-mail from a senior project manager said

14  it was CollaGenex who picked the ratio, which is what

15  Richard Chang said as well.  He said it was picked by

16  CollaGenex, and he said the client is our God.  Their God

17  picked this ratio.

18       We could just as well ask the inventors, and we

19  did, who invented Oracea.  Here is what they said:

20       (Deposition clip played.)

21       "Question:  Did you come up with the idea of a

22  75 to 25 ratio of IR beads to DR beads?

23       "Answer:  I don't recall.

24       "Question:  You don't recall having done so?

25       "Answer:  I don't recall having done so, yes.

1    "Question:  Okay.  But you don't recall coming

2    up with the idea that we ought to pursue 75:25?

3    "Answer:  I don't recall.

4    "Question:  Right.  But who first came up with

5    the idea of 75:25?  Did it come up from the CollaGenex guys

6    or did you propose it to them?

7    "Answer:  At least I didn't propose.  So I don't

8    know who -- who proposed.

9    "Question:  You personally --

10   "Answer:  I personally.

11   "Question:  -- did not propose 75/25?

12   "Answer:  No.

13   (Deposition clip ends.)

14   MR. STEUER:  So here you have the three

15   inventors denying the invention.  Is three to one important?

16   Well, it certainly seems to be because that's the basis for

17   them resisting the Ashley patent application.

18   I think this is a big problem for Galderma that

19   it really can't overcome.  If it argues that the exact

20   ratio is not particularly important or not particularly

21   significant and all that matters is that there was work done

22   on a range of values and that the specific value is not that

23   important, then they really lack the argument that Ashley

24   doesn't anticipate.

25   However, they have argued that, in fact, it is

1   unique and special.  That really goes to the Purdue Pharma

2   quote they put up there, because Purdue said that a specific

3   settled idea is what we figured to invent here.

4         Three to one is a specific entitled idea, and

5   Galderma has certainly taken the position that it is.  None

6   of the three gentlemen listed on the patent corrected it or

7   claimed it.

8         The Chang patent, your Honor, we believe is an

9   invalid patent.  It should be invalidated.  The only thing

10  it accomplished really is to provide market protection for

11  CollaGenex to extend, and what an extension it was.  Their

12  Periostat franchise, through a straightforward combination

13  of pellets, serves little purpose other than to protect that

14  franchise.

15        Your Honor, this is a case about patents, not

16  whether the law is misguided.  Under the law here, the

17  patents are not valid.  Applying the law, Mylan does not

18  infringe.

19        THE COURT:  Thank you.  You both have been very

20  efficient with your time.  I will give you a few minutes to

21  rebut one another, if you wish to do that.

22        MR. FLATTMANN:  Thank you very much, your Honor.

23        Your Honor, we heard about Feldman again, but

24  nothing that was said in my colleagues closing addressed the

25  key issue here.  The key issue is was Feldman prior art?

1    Was it publicly disclosed?  There was not a word about that.

2           Where is the public disclosure in the evidence

3    that was adduced at trial?  We have one document, Feldman's

4    patient record, and we know it was kept under lock and key

5    until last year in this litigation, when it first emerged.

6    Until then, none of this was public, and none of it was

7    prior art.

8           Where was this Westwood Conference in 1998 and

9    1999, if it really happened?  If all this really happened,

10   where is the evidence of it?  The law requires corroboration.

11   Where is it?

12          Our case doesn't hinge on Dr. Feldman's

13   credibility.  We certainly believe him when he says that he

14   did not publicize his personal use.  We believe him when he

15   says he doesn't know if the patient took the drug.

16          Counsel made a statement that public use doesn't

17   require a journal article or a publication.  Well, here, the

18   problem is that there is no evidence that the drug was ever

19   administered.  As Your Honor knows, the claim requires a

20   method comprising oral administration of this drug to an

21   actual patient.  So there is a failure of proof here that

22   there is any prior art or any public use, your Honor.

23          Dr. Webster's testimony was taken out of

24   context at least twice in Mylan's closing.  He said that, as

25   to whether patients take their medication, he called that a

1    deeply flawed assumption, on trial transcript 157 and 158,

2    and explained that much further.

3            With regard to the claimed ranges that are

4    mentioned in some of his papers, he explained on redirect

5    that those numbers were the available dosages, and he did

6    not believe that he should be treating the disease with

7    50 milligrams.  That's at transcript 168 to 169.

8            Could you please put up PDX-845.

9            We showed with Dr. Gilchrest on cross-examination

10   that the additional references that were referenced in

11   counsel's closing, the Plewig reference and Braun-Falco

12   references disclosed antibacterial numbers.  That is clear

13   from her testimony and transcript 538 through 539.

14           With regard to Plewig, she said that the Plewig

15   inventors concluded beyond a doubt that antibiotic activity

16   of antibiotics accounted for the therapeutic benefits.

17           With the other Plewig article, she agreed that

18   1,000 milligrams was used, and that was an antibiotic dose.

19           With regard to Braun-Falco, 1,000 and 1,500

20   milligrams was used, which was also an antibiotic dose.

21           So these references, even if they were

22   appropriately considered as part of the body of prior art by

23   the Court, and they should not be, they point in the other

24   direction.

25           Now, please put up PDX-818.

1          I was taken to task to some degree in closing

2    for my reading of the Haffajee article.  Dr. Chambers took

3    me to task on that as well, I believe.

4          But the language is plain.  It says:  The

5    question as to whether the same strains of a given species

6    were resistant pre- and post-therapy to the administered

7    agents or whether new resistant strains or strains resistant

8    to multiple antibiotics had emerged could not be answered.

9          Dr. Chambers resisted I think the plain meaning

10   of those words and insisted that the Haffajee inventors had

11   found resistance based on some sort of antibiotic activity.

12   That is not in there, and Haffajee is not on Mylan's label.

13         Now, much was made of Dr. Chambers' testimony on

14   direct that he believed that the Walker 2000 and Thomas

15   article did not support the Mylan label claim.

16         Well, he said the opposite in his testimony.  If

17   you go to his cross-examination testimony on the Skidmore,

18   Walker 2005, Walker 2000 and Thomas articles and transcript

19   cites 612 through 625.  He, again and again, agrees with the

20   fundamental conclusions of each of these articles that there

21   is no effect on microflora, that these are subantibiotic

22   amounts.  That all four of these studies, these in vivo

23   studies support the Mylan label.

24         He is cherry-picking around the edges in his

25   direct testimony, and that was revealed on cross when he

1     agreed with the broad statements of these articles are in

2     the label.

3             Now, please put up PDX-813.

4             There is a part of the label that you didn't

5     hear about in Mylan's closing, and that is a part of the

6     label that they can't run from, and that Dr. Chambers

7     couldn't run from.  It's the part where they say it should

8     not be reduced from reducing the numbers or eliminating

9     microorganism associated with any bacterial disease.

10            The reason they can't run from that or address

11    it is because that goes directly to the fact these amounts

12    do not significantly inhibit the growth of microorganisms.

13    That is a match-up.  In however many ways they want to

14    parse the other language and say, well, it's not a perfect

15    match-up, there are a couple of qualifying words, et

16    cetera, this is directly reading on that, on your claim

17    construction.  That is why you didn't hear about it during

18    the testimony of any of their experts or in the closing.

19            THE COURT:  They say that language is a

20    direction to doctors as to what they should and should not

21    do with the 40-milligram dose and that, therefore, doesn't

22    really say what you contend it says.

23            MR. FLATTMANN:  Well, it's a direction to

24    doctors that this drug is not to be used for reducing the

25    numbers.  That is exactly why they're inducing infringement

1    here, because they're providing this direction to the people

2    who are actually administering the drugs, the people who are

3    the direct infringers, so to speak.  That is clear from the

4    law that we cited at the time of the preliminary injunction

5    and we'll cite again in our post-trial briefs.

6              THE COURT:  A direction to a doctor "don't use

7    it for this purpose" is, to you, the same thing as "it will

8    not do the following?"

9              MR. FLATTMANN:  Well, it's a little different.

10   It says it should not be used to reduce.  It doesn't say

11   don't use it, it says it should not be used to reduce.  So

12   it's saying that this product isn't effective for that; and

13   when read in conjunction with the other admissions in the

14   label that there is no detectable long term of effect on

15   bacterial flora and the other admissions that we've gone

16   through, it would be clear that that is, as a whole,

17   evidence that shows infringement here.

18              They're directing a doctor that, as administered

19   here, administered in accordance with the label they're

20   promulgating, that they're agreeing to in order to sell this

21   drug, that you will not reduce the numbers or eliminate

22   microorganisms with this product.  That is not the intended

23   use.  That is not how they're telling doctors and patients

24   to use it.  That controls as a matter of law, and they

25   didn't address that.

1           Now, I think another thing that they did not

2   address or explain was that Dr. Gilchrest admitted that the

3   amount used in the Mylan product is subantimicrobial.

4           Could you please go to PDX-816.

5           She admitted that the preferred embodiment,

6   Periostat, does not alter bacterial flora.  She called

7   Periostat, the preferred embodiment, a subantibacterial

8   dose.

9           They didn't say a word about Dr. Gilchrest or put

10  her picture up on the board.  That also obviously goes to

11  whether Oracea is covered by the claims, the 20 milligrams

12  twice a day and 40 milligrams of the FDA is comparable.

13          Now, again, Dr. Gilchrest made this admission,

14  and it doesn't matter that it was made in the context of a

15  different opinion in the case.  They can't have it one way

16  for invalidity, or validity, and another way for infringement

17  here.

18          Now, again, I think it's very important to

19  point out, your Honor, that they're arguing that the

20  preferred embodiment is not included within the invention.

21  They're saying that Periostat -- not Dr. Gilchrest but

22  Mylan's counsel and Mylan are saying that Periostat is not

23  a subantibacterial amount.  Well, Periostat, as the named

24  preferred embodiment, is presumed to be included within the

25  scope of these claims.

1    Now, with regard to Amin, I just have a few

2    short points.  They suggested that there might have been

3    some reason why we didn't call a rebuttal expert,

4    Dr. Rhoads.  Well, we hardly need to call a rebuttal expert

5    if their expert says that none of his art anticipates.

6    They rely on inherency, supposedly, but their

7    expert said explicitly that none of the eight references

8    anticipated inherently or directly.  He said there was no

9    express or inherent disclosure in any of those references of

10   nitric oxide or iNOS.  Since they already dropped their

11   obviousness defense, there was hardly any reason to refute

12   or rebut what he had left to say.  He had already done in

13   his own references.

14   They say it's all inherent, but they also say

15   it's not enabled.  I suggest that that is impossible

16   contradiction in their arguments before the Court.

17   As to Chang, I was incredibly surprised to hear

18   that they now think that their proposed facts in the pretrial

19   order were a mistake.  Well, if they were a mistake, why did

20   Dr. Chambers agree to them when I asked him those questions on

21   cross-examination?  Why did Dr. Friend accept those numbers

22   when he was asked those questions?  The Chambers admission is

23   telling.  And the trough concentration of Mylan's drug doesn't

24   depend on what patient Mylan is arguing about at the time.

25   Now, in terms of Dr. Rudnic, there was a

1   suggestion that he didn't read the claim construction or

2   apply it.  I think that was clarified in his redirect at

3   transcript 256 and 257 where he explained just the opposite.

4             Now, I was also surprised to hear now, even in

5   the closing argument, they have proposed yet another new

6   theory concerning why the Chang patent is invalid involving

7   some sort of testing some document.  We didn't hear a word

8   about that at trial.  Who testified about that?

9             We also heard secret sauce is some sort of a

10  joke.  Well, they couldn't find it.  They couldn't find this

11  supposed joke anywhere in any of the formulation art of this

12  three to one IR to DR ratio.

13            As to inventorship, Your Honor, certainly if you

14  bought their theory on inventorship -- and I don't think

15  you should without the authority to add Ashley.  It's not

16  a problem.  Ashley has already assigned his inventions to

17  CollaGenex, and CollaGenex was bought by Galderma, and there

18  is nothing in the statute that would preclude you from doing

19  that if you felt it was appropriate, but there is absolutely

20  no need to do so.

21            The people who put the secret sauce into the

22  formulation were undeniably the Chang inventors.  Their

23  testimony on that issue and Dr. Chang's testimony on that

24  issue was very clear.  He testified that although these

25  numbers may have existed and may have been part of the wish

1   list that was given to him by CollaGenex that they were

2   meaningless until he made them a reality.  Dr. Chang created

3   the special sauce, and he created the formulation with his

4   co-inventors, and no one else did before them, and they're

5   unable to point to any evidence of that.

6               Thank you, your Honor.

7               THE COURT:  Thank you very much.

8               Mr. Steuer, you can have the last word, if you

9   wish.

10              MR. STEUER:  Thank you, your Honor.  I have not

11  much more than the last word.  And the last word is that

12  Robert Ashley did not claim that he was the inventor of the

13  three to one.  So I think it would be a remarkable act of

14  the Court, as invited by Galderma, to name Robert Ashley an

15  inventor when he didn't even testify that he was the person

16  at CollaGenex that came up with Oracea.

17              I believe on that, the record is clear.  It was

18  someone at CollaGenex.  It might have been Ashley, it might

19  not have been Ashley, but whoever that inventor is who came

20  up with this ratio that the plaintiff relies upon was not

21  any of the three gentlemen named on the patent.

22              THE COURT:  Thank you.  I thank both sides for

23  your efficient and effective advocacy, and your efficient

24  use of time.  We'll look forward to receiving your briefs

25  later this month, and we'll take these issues under

1    advisement.

2              Safe travels to all of you.

3              (The attorneys respond, "Thank you, your Honor.")

4              (Trial proceedings end at 11:45 p.m.)

5

6

7         I hereby certify the foregoing is a true and accurate
     transcript from my stenographic notes in the proceeding.

8

9                        /s Brian P. Gaffigan
                         Official Court Reporter
10                        U.S. District Court

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25